## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HCR MANORCARE, INC.,[1] | Case No. 18-_____ (___) |
| Debtor. | |

### DECLARATION OF JOHN R. CASTELLANO, CHIEF RESTRUCTURING OFFICER OF HCR MANORCARE, INC., IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

John R. Castellano, being duly sworn, states the following under penalty of perjury:

1.     I am a Managing Director of AP Services, LLC ("AlixPartners")[2] in its turnaround and restructuring services group in North America, which has a place of business at 300 N. LaSalle St., Suite 1900, Chicago, Illinois 60654.   At AlixPartners I specialize in designing and implementing business turnarounds and providing interim crisis management.  I have been with AlixPartners since 1998 and have extensive experience in strategic restructurings and hands-on implementation in various industries.   I have served in various interim management roles and in an advisory capacity for AlixPartners' clients working through financial and operational restructurings.

2.     In May 2017, HCR ManorCare, Inc., a Delaware corporation and the above-captioned debtor and debtor in possession (the "Debtor"), retained AlixPartners as its restructuring advisor to assist in connection with liquidity and restructuring matters.  I have overseen the AlixPartners team assigned to the Debtor and its non-debtor subsidiaries and

---

[1] The last four digits of the Debtor's federal tax identification number are 9231.  The Debtor's mailing address for the purposes of this chapter 11 case is 333 N. Summit St., Toledo, OH 43604.

[2] Unless otherwise stated, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the relevant First Day Motion (as defined below).

affiliates (collectively, the "Company") and was appointed Chief Restructuring Officer of the

Debtor effective August 31, 2017.  In that role, I am generally familiar with the Debtor's day-to-

day operations, business and financial affairs, and books and records.

3.      Except as otherwise indicated herein, all facts set forth in this declaration (this

"Declaration") are based upon my personal knowledge, my review of relevant documents, or my

opinion based upon my experience, knowledge, and information concerning the Debtor's

operations and financial and business affairs.  I am over the age of 18 and authorized to submit

this Declaration on behalf of the Debtor.  If called upon to testify, I would testify to the facts set

forth herein.

4.      The Company is a leading national healthcare provider that, through certain non-

debtor providers, operates a network of more than 450 locations nationwide across the following

business segments: (a) skilled nursing and inpatient rehabilitation facilities, memory care

facilities, and assisted living facilities (collectively, the "Long-Term Care Business"); (b)

hospice and home health care agencies (the "4H Business"); and (c) outpatient rehabilitation

clinics (the "Outpatient Rehab Business") and other ancillary healthcare and related businesses

(collectively, the "Other Businesses" and, together with the Outpatient Rehab Business, the

"Outpatient Rehab and Other Businesses").  The Company consists of the Debtor and more than

300 of its wholly owned or controlled subsidiaries through which the Company conducts

business operations.[3]  The Debtor is a holding company with no material assets other than its

direct and indirect ownership interests in operating and non-operating subsidiaries within the

Company.[4]

---

[3] A simplified corporate organizational chart of the Company is attached hereto as **Exhibit A**.

[4] As discussed in Part III below, the Debtor is the borrower under a $25 million prepetition subordinated secured loan from one of its non-debtor subsidiaries, HCR Home Health Care and Hospice, LLC.

5.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  On the Petition Date, the Debtor filed a prepackaged plan of reorganization (the "Plan"), which implements that certain Plan Sponsor Agreement, dated as of March 2, 2018 (the "Plan Sponsor Agreement") between the Debtor and Quality Care Properties, Inc., HCP Mezzanine Lender, LP, and the parties signatory thereto as lessors (collectively, "QCP"), and a disclosure statement relating to the Plan (the "Disclosure Statement").  The Debtor is also filing, concurrently herewith, a motion seeking to schedule (a) a combined hearing for the Bankruptcy Court to consider approval of the Disclosure Statement and the prepetition solicitation procedures, as well as confirmation of the Plan (the "Combined Hearing"), and (b) related objection and other deadlines.

6.      The Plan is the culmination of fifteen months of negotiations between the Company and QCP, the owner and lessor of approximately 98% of the real property used by the Company, through certain non-debtor providers, in the Long-Term Care Business.  The primary features of the Plan are as follows:

- QCP (or its designee(s)) will receive 100% of the stock of the Reorganized Debtor in full satisfaction of its claims against the Debtor arising under the Debtor's guaranty of the lease obligations owed to QCP by non-debtor HCR III Healthcare, LLC ("HCR III"), an intermediate holding company and indirect subsidiary of the Debtor, as described in detail below.

- No creditors other than QCP will be impaired.

- Equity holders will receive no distributions; however, holders of more than 80% of the equity of the Debtor (the "Majority Stockholders") have agreed to support the Plan pursuant to that certain Restructuring Support Agreement, dated as of March 2, 2018, by and among the Debtor, QCP and the Majority Stockholders (the "Restructuring Support Agreement").  The Restructuring Support Agreement is attached as an exhibit to the Disclosure Statement.

01:22949845.1

- The Effective Date of the Plan is contingent upon, among other things, the closing of the Plan Sponsor Agreement, which sets forth detailed terms and conditions for the transfer of the Company's business to QCP. The Plan Sponsor Agreement is attached as an exhibit to the Plan.

- HCR III, QCP and the lessors under the MLSA (as defined below) will, on the Effective Date, enter into that certain Amendment to Master Lease and Security Agreement, substantially in the form attached to the Plan (the "Master Lease Amendment"), and, on or prior to the seventh day after the Effective Date, HCR III and the lessors under the MLSA shall terminate, release and discharge the Guaranty (as defined below) pursuant to the Plan Sponsor Agreement.

The Debtor and QCP anticipate that it may take three to six months after confirmation of the Plan to obtain the regulatory approvals necessary for consummation of the transaction and, therefore, effectiveness of the Plan.

7.      The Long-Term Care Business is primarily conducted through non-debtor subsidiaries of HCR III, which leases the real property from QCP under that certain Master Lease and Security Agreement dated as of April 7, 2011 (together with all amendments and addenda thereto, the "MLSA"). The leased properties under the MLSA comprise 289 skilled nursing and inpatient rehabilitation facilities (each, a "SNF") and memory care or assisted living facilities (each, an "ALF").[5] Each SNF and ALF that is subject to the MLSA is referred to individually herein as a "Leased Facility" and, collectively, as the "Leased Facilities." HCR III, in turn, subleases the Leased Facilities to numerous direct and indirect subsidiaries and affiliates (each a "Sublease OpCo" and, collectively, the "Sublease OpCos") pursuant to corresponding subleases between HCR III and the applicable Sublease OpCo (each a "Sublease"). The Debtor guarantees the obligations of HCR III under the MLSA pursuant to that certain Guaranty of

---

[5] The Company operates an additional six SNFs that it leases from parties other than QCP.

Obligations, effective as of February 11, 2013 (as amended or modified from time to time, the "Guaranty").

8.     As described in detail below, operators of post-acute/skilled nursing facilities, including the Company's non-debtor providers—separately licensed and certified non-debtor operating entities that provide health care services to patients (the "Non-Debtor Providers")— have faced a challenging business environment in recent years.  As a result, since 2012, the revenues generated by the Long-Term Care Business have been insufficient to cover ordinary-course Leased Facility operating expenses and regular monthly rent obligations under the MLSA (which rent obligations were set in 2011).  Until April 2017, the Company had been using profits from the 4H Business and the Outpatient Rehab and Other Businesses to help meet the rent obligations of the Long-Term Care Business under the MLSA.  In April 2017, however, when non-debtor HCR Healthcare, LLC ("HCR Healthcare"), the borrower under the Prior Credit Facility (as defined below), defaulted on its obligations thereunder, the secured lenders under the Prior Credit Facility prohibited any further use of their collateral—including the cash and operating assets of the 4H Business and the Outpatient Rehab and Other Businesses—to pay rent or other obligations of the Long-Term Care Business.  The Company's current Credit Facility (as defined below) contains similar restrictions on the Company's ability to use proceeds of the 4H Business and the Outpatient Rehab and Other Businesses to satisfy obligations of the Long-Term Care Business, including, among other things, rent due under the MLSA.

9.     Although the Company and QCP entered into a series of amendments and forbearances to the MLSA, which provided temporary rent relief, the Long-Term Care Business continues to generate insufficient revenues to enable HCR III to meet its full rent obligations under the MLSA.  Beginning in November 2016, various representatives of the Company and

QCP and their respective advisors began engaging in extensive negotiations regarding a potential long-term resolution of the issues facing the Company, particularly with respect to the Long-Term Care Business. Those negotiations ultimately resulted in the consensual Plan, the Plan Sponsor Agreement, and the Restructuring Support Agreement by and among the Debtor, QCP and the Majority Stockholders, which provide for the orderly transition of ownership of the Company to QCP.

10.     The Debtor is requesting relief in certain "First Day" motions filed with the Bankruptcy Court (each, a "First Day Motion" and, collectively, the "First Day Motions"), contemporaneously with this Declaration, to enable the Debtor to minimize the adverse effects of the commencement of this chapter 11 case on the Company's businesses.[6]  As explained herein, the Debtor is a holding company that does not directly conduct any material operations. Consequently, the relief sought by the Debtor in the First Day Motions is limited in nature and intended to obtain Bankruptcy Court authorization for five critical initial objectives: (a) scheduling the Combined Hearing within forty (40) days following the Petition Date to consider (i) approval of the Disclosure Statement and the prepetition solicitation procedures and (ii) confirmation of the Plan and related notice procedures; (b) the Debtor to continue to maintain its existing Bank Account (as defined below); (c) the Debtor to use cash collateral of the Prepetition Secured Parties (as defined below), including one of its non-debtor affiliates, to fund the fees and costs of this case; (d) the continuation of the Debtor's ordinary-course business arrangements with its non-debtor affiliates; and (e) implementation of certain administrative procedures to minimize any disruption to the Company's businesses as a result of the commencement of this

---

[6] Certain of the First Day Motions do not seek immediate relief on an interim basis and, accordingly, will not be heard at the "first day" hearing.

chapter 11 case.  The relief requested in the First Day Motions is essential to ensure the success of the Debtor's reorganization efforts.

11.     I submit this Declaration in support of the First Day Motions.  I am familiar with the contents of each First Day Motion, including the exhibits annexed thereto, and I believe that the relief sought in each First Day Motion: (a) is necessary to preserve the value of the Debtor's estate; (b) is necessary to ensure that the Non-Debtor Providers' patients continue to receive the highest quality of care without interruption during the pendency of this case; (c) is integral to the successful reorganization of the Debtor; and (d) serves the best interests of the Debtor's estate, creditors, and other parties in interest.

12.     Part I of this Declaration explains the Company's business segments, prepetition indebtedness and centralized operations.  Part II describes the events and circumstances leading to the Plan and the commencement of this chapter 11 case.  Part III sets forth the relevant facts in support of each of the First Day Motions.

## PART I

### A.     Overview of the Company

13.     Headquartered in Toledo, Ohio, the Debtor is a holding company that conducts business operations through more than 300 wholly owned or controlled subsidiaries that comprise the Company, including the Non-Debtor Providers.  The Company has operated SNFs through the Non-Debtor Providers for many decades and traded on the New York Stock Exchange until 2007.  As noted above, the Company is a leading national healthcare provider that, through the Non-Debtor Providers, operates an extensive network of more than 450 locations across the United States.

01:22949845.1

14.     As of the Petition Date, the Company has approximately 50,000 employees (collectively, the "Employees") in full- and part-time positions, including nurses, therapists, medical directors and other health professionals, maintenance technicians, administrative support and other staff and corporate personnel.[7]   The Employees work at the Leased Facilities and certain facilities leased from third parties other than QCP.

15.     For the twelve months ended December 31, 2017, the Company had revenues of approximately $3.741 billion, 82% of which derived from the Long-Term Care Business, and reported a consolidated pre-tax loss from continuing operations of approximately $267.9 million. As of December 31, 2017, the Company had approximately $4.264 billion in total assets and approximately $7.118 billion in total liabilities, debt and financing obligations—including estimated future obligations under the MLSA—on a consolidated basis.

**B.     Business Segments**

**1.     *Long-Term Care Business***

16.     As of the Petition Date, the Long-Term Care Business operated 295 SNFs and ALFs in twenty-five (25) states, with the majority of such facilities located in Florida, Illinois, Michigan, Ohio, and Pennsylvania.  The Long-Term Care Business is conducted through the 289 Leased Facilities leased from QCP and six facilities leased from third parties other than QCP.

17.     The SNFs operate primarily under the Heartland Health Care Center® and ManorCare Health Services® brands, and the ALFs operate primarily under the Arden Courts® brand.  The SNFs treat a wide range of patients who are transitioning from hospital to home or to a lower level of care.  The SNFs also include rehabilitation units, which are separate and distinct units within Heartland and ManorCare SNFs designed for patients' rehabilitation after shorter hospital stays.  The ALFs primarily provide specialized memory care in a residential

---

[7] Certain of these Employees are employed as contractors only.

environment designed exclusively for patients living with dementia such as Alzheimer's disease. The Long-Term Care Business treated more than 143,000 patients in 2017.

18.     The Long-Term Care Business generates revenue from four primary sources: Medicare, Medicaid, insurance, and private payers.  Although Medicare is one of the largest revenue sources for the Long-Term Care Business, total revenues received from Medicare have decreased over the past several years due to the growing prevalence of Medicare Advantage plans available through private insurers (*i.e.*, managed Medicare), which has reduced reimbursement rates, average length of stay and average daily census.

### 2.     *4H Business*

19.     The 4H Business is conducted through direct and indirect Non-Debtor Provider subsidiaries of HCR Healthcare.  As of the Petition Date, the 4H Business operated more than 100 offices and agencies located in twenty-three (23) states (the "4H Agencies").  None of the entities operating within the 4H Business are subject to the MLSA or any other lease with QCP, and none are debtors in this case.

20.     The 4H Business is comprised of two primary lines of business.  First, "Home Health Care" provides nursing and rehabilitation services to patients at home and in independent or assisted living facilities.  Home Health Care provides services to patients who have been certified by a physician as home-bound and require the services of a registered nurse, occupational therapist or physical therapist.  Home Health Care also provides non-skilled nursing services such as companion care and/or assistance with daily living activities that are not covered by Medicare.  Second, "Hospice" provides services to patients with a life expectancy of six months or less.  Caregivers including physicians, registered nurses, social workers, licensed practical nurses, and spiritual advisers provide services to help manage patients' pain and symptoms.

01:22949845.1

### 3.    *Outpatient Rehab and Other Businesses*

21.    The Outpatient Rehab and Other Businesses are operated through direct and indirect Non-Debtor Provider subsidiaries of HCR Healthcare.  None of the entities operating within the Outpatient Rehab and Other Businesses are subject to the MLSA or any other lease with QCP, and none are debtors in this case.

22.    The licensed therapists in the Company's fifty-two (52) outpatient rehabilitation clinics (the "Outpatient Rehab Clinics"), which are operated through non-debtor Heartland Rehabilitation Services, LLC and certain of its Non-Debtor Provider subsidiaries, provide comprehensive programs in sports medicine and industrial, pediatric, physical, occupational, speech, and orthopedic therapy for patients recovering from major surgery, strokes, heart attacks, neurological, and orthopedic conditions, and other illnesses, injuries and disabilities.  The Outpatient Rehab Clinics are operated under the Heartland Rehabilitation Services® brand and are primarily located in Florida, Kentucky, New Jersey, Ohio, and Virginia.  In addition to the Outpatient Rehab Clinics, the Company also provides comprehensive outpatient rehabilitation services through certain SNFs and in homes, schools, hospitals and third-party independent and assisted living facilities.

23.    In addition, one of the Debtor's non-debtor subsidiaries, Heartland Services, LLC, holds a 50% ownership and voting interest in Heartland Healthcare Services, LLC, a joint venture with Omnicare, Inc. (a subsidiary of CVS Health Corporation), which provides pharmaceutical services to the Company's patients, including patients within the Leased Facilities.

### C.    **Summary of Prepetition Indebtedness**

24.    As of the Petition Date, the Debtor's primary debt obligations consisted of the following, each of which is detailed further below:

01:22949845.1

- The Debtor's guaranty of obligations under the MLSA.  Pursuant to the Plan Sponsor Agreement, the Debtor and its non-debtor subsidiaries have stipulated that, as of the date thereof, QCP was owed approximately $180,571,590 in unpaid Rent (as defined in the MLSA) and approximately $265,225,000 in unpaid Deferred Rent Obligations (as defined in the MLSA), for a total of  $445,796,590.  As noted above, the Debtor guarantees the obligations of HCR III under the MLSA pursuant to the Guaranty.  Moreover, Minimum Rent under the MLSA will continue to accrue at approximately $39,500,000 per month.

- The Debtor's guaranty of approximately $550,000,000 plus accrued interest under the Credit Facility (as defined below).  The Debtor is among several holdco guarantors of the Credit Facility obligations.  HCR Home Health Care and Hospice, LLC, the borrower under the Credit Facility ("HCR Hospice" or the "Borrower"), is not a debtor in this chapter 11 case.  The Credit Agreement (as defined below) provides that the commencement of a chapter 11 case for the Debtor (as a "Specified Entity" thereunder) shall not constitute an Event of Default under the Credit Facility.

- Liabilities (if any) in respect of claims and lawsuits related to patient care and treatment, received primarily in the Long-Term Care Business conducted by the Non-Debtor Providers, which claims and lawsuits are common for the types of businesses operated by the Company ("General and Professional Liability Claims").  Even though the Company provides patient care and treatment only through the Non-Debtor Providers, the Debtor is often named in such claims and lawsuits along with one or more of its non-debtor subsidiaries.  As of the Petition Date, there were approximately 160 such claims pending against the Debtor.

1.    *MLSA and Subleases*[8]

25.    The MLSA is a long-term, "triple-net" master lease agreement between QCP, as Lessor, and HCR III, as Lessee.  As noted above, the Debtor guarantees HCR III's obligations under the MLSA pursuant to the Guaranty.  As of the Petition Date, as noted above, QCP leased 289 Leased Facilities to HCR III under the MLSA.[9]  The MLSA groups the Leased Facilities into four pools with initial terms that expire in 2029, 2030, 2032, and 2033.

---

[8] Unless otherwise stated, capitalized terms used but not previously defined herein or otherwise defined in this Part I.C shall have the meanings ascribed to such terms in the MLSA or in the Subleases, as applicable.

[9] At the time that HCR III entered into the MLSA, the Leased Property under the MLSA included 334 properties in thirty (30) states.  The number of properties subject to the MLSA has decreased through certain divestitures by HCP (as defined below), the predecessor-in-interest to QCP under the MLSA, and through the sale or closure of certain properties by the Company.

01:22949845.1

26.     The MLSA requires HCR III, as Lessee, to pay the Minimum Rent to QCP for the Leased Facilities on a monthly basis, in advance, on or before the first day of each calendar month (provided that such day is a Business Day).  The amount of Minimum Rent is determined pursuant to certain formulas set forth in the MLSA.  Although the MLSA allocates the Minimum Rent among the Leased Facilities for certain limited purposes,[10] HCR III, as Lessee, is responsible for the monthly payment of the entire Minimum Rent amount.  In 2016, HCR III paid approximately $442 million in Minimum Rent to QCP, for an average of approximately $37 million per month.  In 2017, HCR III's actual rent payments declined to approximately $290 million, for an average of $24 million per month.  In addition to Minimum Rent payments, the MLSA requires HCR III to pay for certain "Additional Charges" and other amounts specified in the MLSA (including taxes, utility charges, maintaining certain insurance and paying insurance premiums) and to spend a minimum annual amount for capital projects.

27.     HCR III is an intermediate non-debtor holding company of which the sole source of revenue is the sublease payments it receives from the Sublease OpCos.  The MLSA and the related Agreements Regarding Subleases dated as of April 7, 2011, October 23, 2015, February 16, 2016 and March 14, 2016, respectively (collectively, the "Agreements Regarding Subleases"), contemplate this arrangement and prescribe the form of sublease between HCR III and each of the Sublease OpCos.[11]  The Subleases require the Sublease OpCos to pay Initial Annual Rent to HCR III in advance, in equal consecutive installments, on the first day of each month.  Initial Annual Rent for each Sublease OpCo is equal to the amount set forth on Schedule II to the Agreements Regarding Subleases.

---

[10] As provided in the definition of "Allocated Minimum Rent," the Minimum Rent is allocated among the Leased Facilities for purposes of determining adjustments to the Minimum Rent in the event one or more Leased Facilities is sold, purchased by HCR III, or otherwise separated from the MLSA.

[11] Generally, each Sublease OpCo operates one Facility, although, under certain circumstances, a Sublease OpCo may operate more than one Facility or a Facility may be operated by more than one Sublease OpCo.

## 2.    *Credit Facility*

28.    On July 17, 2017, the Borrower (*i.e.*, HCR Hospice), an indirect non-debtor subsidiary of the Debtor, entered into that certain Credit Agreement (as amended from time to time, the "Credit Agreement") with RD Credit, LLC (in its capacity as Administrative Agent and Collateral Agent, the "Prepetition Agent"), providing for a $400 million term loan (the "Term Loan") and a $150 million revolving credit facility (the "Revolving Facility" and, together with the Term Loan, the "Credit Facility").[12]    The Credit Agreement was amended on August 25, 2017 and December 22, 2017.    The Credit Facility matures on January 17, 2019 and bears interest at a rate per annum of 9.5%, payable quarterly in arrears in cash.    Proceeds of the Credit Facility were used for general corporate purposes and to repay the then-existing credit facility (the "Prior Credit Facility") pursuant to that certain Credit Agreement, dated as of April 6, 2011, by and between HCR Healthcare as borrower, and JPMorgan Chase Bank, N.A. as Administrative Agent and Collateral Agent.    As further explained below, the Company negotiated and entered into the Credit Agreement after the lenders under the Prior Credit Facility accelerated the obligations thereunder.

29.    Under that certain Guarantee and Collateral Agreement dated as of July 17, 2017 (the "Guarantee and Collateral Agreement"), the Borrower's obligations under the Credit Facility are guaranteed by the Debtor, certain non-debtor holding company subsidiaries of the Debtor (together with the Debtor, the "Holdcos") and certain indirect non-debtor subsidiaries of HCR Healthcare (the "Subsidiary Guarantors" and, together with the Borrower, Holdcos and Subsidiary Guarantors the "Loan Parties").    Neither HCR III nor any of the Sublease OpCos are Loan Parties under the Credit Facility.    Consistent with the Prior Credit Facility, Loan Parties'

---

[12] As noted above, Section 8(f) of the Credit Agreement provides that the commencement of a chapter 11 case for the Debtor (as a "Specified Entity" thereunder) shall not constitute an Event of Default.

obligations under the Credit Facility and the Guarantee and Collateral Agreement are secured by a first lien on substantially all of the Loan Parties' assets (*i.e.*, the assets comprising the 4H Business and the Outpatient Rehab and Other Businesses).

30.     The Credit Agreement contains various significant restrictions on the transfer of funds from any Loan Party to HCR III or any of its direct and indirect subsidiaries.  On December 22, 2017, however, the Loan Parties and the Prepetition Agent entered into a second amendment to the Credit Agreement ("December 2017 Amendment") to permit the Company to use some cash generated by the 4H Business and Outpatient Rehab and Other Businesses (the "4H Cash") for the Long-Term Care Business, including for rent due under the MLSA, up to a maximum amount of $50 million, subject to payment of certain fees and other limitations.  The December 2017 Amendment also extended the maturity date of the Credit Facility to January 17, 2019.

31.     The Credit Agreement permits a bankruptcy filing by the Debtor and the restructuring embodied in the Plan and related documents.  The Credit Agreement further permits the transfer of $25 million of 4H Cash to the Debtor for payment of certain fees and costs related to a bankruptcy filing by the Debtor.  Accordingly, the Borrower transferred $25 million to a bank account owned by the Debtor shortly before the Petition Date.  These funds are the subject of the Cash Collateral Motion, which is more fully described in Part III.B.1 below.

32.     As of the Petition Date, the Loan Parties had principal amounts outstanding of $400 million under the Term Loan and $150 million under the Revolving Facility. Approximately $77 million of the borrowings under the Revolving Facility were used to cash collateralize outstanding letters of credit provided to various counterparties in the ordinary

01:22949845.1

14

course of the Company's businesses, including approximately $64 million used to cash collateralize obligations related to the Long-Term Care Business.

### 3.    *Retirement Savings Programs and Incentive Plans*

33.    The Company maintains certain pension, retirement and deferred compensation programs (collectively, the "Retirement Savings Programs") for the Employees, including four current members and one former member of the Debtor's senior management who are parties to employment contracts with the Debtor (collectively, the "Debtor Executives").    Non-debtor Manor Care, Inc. ("Manor Care") is the obligor under the Retirement Savings Programs.    The Debtor is not a plan administrator or plan sponsor of the Retirement Savings programs.

34.    The Company also maintains certain key-employee and long-term incentive plans (the "KEIP" and the "LTIP," respectively).    Non-debtor Heartland Employment Services, LLC ("HES") is the obligor under the KEIP, and certain other non-debtors are obligors under the LTIP.    The Debtor is not a plan administrator or plan sponsor of the KEIP or the LTIP.    The Debtor does not anticipate that any KEIP amounts will be payable to Employees, including the Debtor Executives, during the pendency of this chapter 11 case, and the Debtor will not make any KEIP payments during this case absent further order of the Bankruptcy Court.    None of the Debtor Executives are beneficiaries under the LTIP.

### 4.    *Claims and Lawsuits*

#### (a)    General and Professional Liability Claims

35.    The Company and other companies in the healthcare industry are from time to time subject to General and Professional Liability Claims related to patient care and treatment. As of December 31, 2017, there were approximately 700 General and Professional Liability Claims pending against the Company, 160 of which named the Debtor in addition to one or more of its non-debtor subsidiaries.    The vast majority of these pending actions relate to services

provided in connection with the Long-Term Care Business.  The Debtor believes that it is not liable for any of the claims.  In addition to currently pending lawsuits, the Company is also liable for ongoing settlement payments in connection with previously settled claims and additional claim-related costs.

36.    The Company's consolidated balance sheet maintains a reserve that includes the expected cost, including legal fees, to settle reported claims and an amount, based on past experience, for costs incurred but not yet reported.  The monthly expense related to this estimated reserve is allocated to the Company's operating businesses (*i.e.*, entities other than the Debtor).  Expenses for insurance premiums and other administrative costs are allocated to the Company's operating entities based on their percentage of total Company revenue.  After the Company began the process of segregating cash as described in Part II.B.3 below, settlement payments, judgments and litigation-related costs (primarily attorneys' fees) related to the allegations against the Sublease OpCos have been paid from the funds segregated for the benefit of the Sublease OpCos.  As of December 31, 2017, the reserve for estimated defense, settlement and similar costs related to these claims was approximately $305 million.  Total cash outlays for expenses relating to General and Professional Liability Claims (excluding insurance premium payments and related fees) were $78.7 million for the year ended December 31, 2017.  As explained above, all of such amounts were paid by non-debtors.

(b)    Shareholder Litigation

37.    There are four actions currently pending against the Debtor (among other defendants not affiliated with the Company) by shareholders of HCP, Inc. ("HCP"), the predecessor-in-interest to QCP under the MLSA:

- a putative class action against the Debtor, certain officers of the Debtor, HCP, and certain officers of HCP, asserting claims that the defendants deceived the

investing public, causing the putative class members to purchase shares of HCP at artificially inflated prices;[13]

- two consolidated shareholder derivative actions against the Debtor, HCP and certain officers of HCP asserting, among other things, that by engaging in Medicare fraud, the Debtor aided and abetted certain wrongful acts alleged to have been committed by HCP and the individual defendants;[14] and

- two additional shareholder derivative actions against the Debtor, HCP and certain current and former officers and directors of HCP asserting, among other things, that the Debtor engaged in certain fraudulent billing practices.[15]

The Debtor believes the allegations in each of the foregoing actions are unfounded, and it is vigorously defending itself in connection therewith.

### D.    The Company's Centralized Administrative Support Services

38.    Certain entities within the Company provide critical support services to the Non-Debtor Providers that operate the Company's businesses.    For example, HCR ManorCare Services, LLC ("HCR Services") administers the Company's cash management system and provides accounting, tax, regulatory and other services for the entire Company.    Non-debtor HES "co-employs" substantially all of the Employees and performs human resources functions for all of the Company's businesses.    The consolidation of these support services has led to increased efficiency and consistency of administration across all of the Non-Debtor Providers throughout the United States.    As explained below, substantially all of these intercompany arrangements are governed by contracts between the service-providing entities, on the one hand, and the recipient entities, on the other.

---

[13] The putative class action is styled as *Boynton Beach Firefighters' Pension Fund v. HCP, Inc., et al.*, Case No. 16-01106 (N.D. Ohio).

[14] These actions are styled as *Subodh v. HCR ManorCare, Inc., et al.* Case No. 30-2016-00858497 (Cal. Sup. Ct., Orange County).

[15] These actions are styled as *Kelley v. HCR ManorCare, Inc., et al.*, Case No. 17-02493 (N.D. Ohio) and *Weldon v. HCR ManorCare, Inc., et al.*, Case No. 17-00755 (N.D. Ohio), respectively.    On January 23, 2018, the court in *Kelley* entered an order directing plaintiff to file a brief as to, *inter alia*, the consolidation of the action with *Weldon*.

### 1.    *The Cash Management System*

39.    The Company uses HCR Services to administer the cash management system (the "Cash Management System") that assists the Non-Debtor Providers in this regard.  In the ordinary course of business, the Cash Management System utilizes a comprehensive, consolidated system for recording intercompany payables and receivables among the various Non-Debtor Providers in order to process, receive and disburse cash on behalf all such entities.  As the administrator, HCR Services is responsible for (a) monitoring and processing substantially all treasury functions, (b) ensuring that the revenues, disbursements and expenses of each operating affiliate within the Company are attributed to the appropriate business unit, (c) properly allocating and disbursing funds to third parties in furtherance of the Company's operations, and (d) with the assistance of its non-debtor affiliate HES, ensuring that wages and benefits are paid and provided to the Company's employees in a timely manner.  Pursuant to the Cash Management System, HCR Services monitors and processes substantially all receipts and disbursements for the Non-Debtor Providers through a series of bank accounts in the name of HCR Services, HES and HCR III.  At all times, HCR Services adheres to strict accounting controls in order to properly identify cash generated by and costs incurred by each business unit within the Company.

40.    The Debtor does not participate in the Cash Management System, and no expenses are allocated to the Debtor through the Cash Management System.  All of the Debtor's prepetition obligations have historically been paid by HCR Services or HES and allocated as expenses of the Non-Debtor Providers through the intercompany arrangements described in greater detail below.

## 2.    *The Administrative Support Services Agreement*

41.     HCR Services provides all treasury, financing and other functions and services to all Company entities pursuant to a series of substantially identical administrative support services agreement between HCR Services and each of the Company affiliates, including the Debtor (collectively, the "Administrative Support Services Agreement").  In exchange for the services provided under the Administrative Support Services Agreement, each affiliate has agreed to pay HCR Services a monthly service fee (the "Service Fee"), equal to a percentage of such entity's annual net revenue for the applicable calendar year.   Because the Debtor has no direct operations, it does not pay any Service Fee to HCR Services.

42.     Pursuant to the Administrative Support Services Agreement, HCR Services provides the following services to assist each of the Non-Debtor Providers:

- accounting, reimbursement, and internal audit support services, including maintenance of accounting systems administered in accordance with generally accepted accounting principles (GAAP), accounts payable and receivable functions and financial reporting;

- tax support services, including preparation of tax returns and other administrative functions regarding income, franchise, sales, use and property tax at all jurisdictional levels;

- legal and regulatory compliance support services, including litigation management, maintenance of trademarks and names and monitoring, and assistance in connection with reviewing and negotiating contracts for goods and services, or for or related to the provision of services;

- information systems support services, including computer/software support, information security, end user computing support and cross-functional IT services such as administration of maintenance contracts, license compliance, asset inventory administration and other administrative functions;

- purchasing support services related to vendor administration, purchase order administration, supplier contract negotiations, and other administrative functions;

- treasury support services, including administering the Cash Management System, financing for operations, and administering credit lines and facilities;

- human resources support services, including payroll administration and accounting, benefits administration, workers' compensation compliance and other regulatory compliance;

- marketing support services including market research, advertising, and community relations;

- government and public relations support services related to community relations, lobbying and monitoring legislation relevant to each Business;

- business strategic planning support services including assistance with budgeting, forecasting, financial planning and business combination facilitation;

- clinical support services to assist each entity in maintaining quality clinical care, including drafting Quality Assessment and Performance Improvement (QAPI) policies and procedures, auditing of clinical and QAPI systems and analysis of clinical performance;

- risk management support services in connection with insurance needs, insurance procurement and claims administration;

- policy maintenance services, including drafting and maintaining policies designed to promote operational consistency at each entity;

- contract services, including drafting, negotiating and entering into contracts for the benefit of each affiliate, by HCR Services or a designated affiliate; and

- other strategic advisory and administrative support services as the Debtor and the other non-debtor affiliates may request and HCR Services may agree to provide.

### 3.    *The Master Intercompany Loan Agreement*

43.    In addition to the Administrative Support Services Agreement and in connection with the Cash Management System, Manor Care and certain other Company affiliates—other than the Debtor—have entered into that certain Master Inter-Company Loan Agreement (the "Intercompany Loan Agreement").  Pursuant to the Intercompany Loan Agreement, each such Company affiliate has agreed to, among other things, permit its cash receipts to be transmitted to

HCR Services to facilitate the operation of the Cash Management System (each such transaction, an "Intercompany Transaction").  Any amounts transmitted to HCR Services as an Intercompany Transaction is a "Loan" under the Intercompany Loan Agreement, and HCR Services may apply cash received pursuant to Intercompany Transactions as an offset against the intercompany "Loan" balance then outstanding against the applicable affiliate.  Pursuant to the Intercompany Loan Agreement, all Intercompany Transactions are accounted for as a payable or receivable against HCR Services, and are reflected in each affiliate's books and records as a payable or receivable solely against HCR Services.  Manor Care acts as a guarantor of all Intercompany Transactions under the Intercompany Loan Agreement.

### 4.    *Company Employees*

44.    Substantially all of the Employees are "co-employed" by HES, an indirect non-debtor subsidiary of the Debtor, on the one hand, and a particular operating non-debtor affiliate, on the other hand, in accordance with a series of substantially identical Professional Employer Agreements (the "Employer Services Agreements") between HES and the applicable operating affiliate.  Through this co-employer relationship, HES performs certain administrative human resources functions and provides certain services, including administration of payroll and benefits, for the Employees.  In addition, as noted above, the Debtor Executives are parties to employment agreements with the Debtor.  As of the Petition Date, the Debtor Executives were not owed any outstanding wages.  Consistent with practices employed for all of the Company's other Employees, the Debtor Executives are paid by HES in the ordinary course of business.

### PART II

### A.    **Factors Leading to the Commencement of This Chapter 11 Case**

45.    On April 7, 2011, the Company sold the real property utilized in operating a significant number of its Long-Term Care Business to HCP, a publicly traded real estate

investment trust (REIT) based in Irvine, California (the "2011 Transaction").    The 2011 Transaction was structured as a sale-leaseback pursuant to which HCP, as "Lessor," leased the acquired properties back to HCR III, as Lessee, pursuant to the MLSA.    In 2016, HCP created QCP as a new, wholly owned subsidiary and transferred the Leased Facilities to QCP.    QCP and its affiliates assumed the role of Lessor under the MLSA and, on October, 31, 2016, HCP completed a spin-off of QCP as an independent, publicly traded company.

46.    At the time of the 2011 Transaction, the business environment in the post-acute/skilled nursing sector was favorable due to a number of factors, including an aging population, expected increases in aggregate skilled nursing expenditures, and supply constraints in the skilled nursing sector due to substantial barriers to entry.    The parties negotiated the amount of rent payable under the MLSA against this background.

47.    Since the consummation of the 2011 Transaction, however, the operating environment for post-acute/skilled nursing facility operators has become significantly more challenging.    Unfavorable trends for operators of skilled nursing facilities include (a) a shift away from a traditional fee-for-service model toward new managed-care models, which base reimbursement on patient outcome measures; (b) increased penetration of Medicare Advantage plans, which has reduced reimbursement rates, average length of stay and average daily census; (c) increased competition from alternative healthcare services such as home health agencies, life care at home, community-based service programs, senior housing, retirement communities and convalescent centers; and (d) reductions in reimbursement rates from government payors.

48.    This challenging business environment has resulted in decreasing revenues from the Long-Term Care Business and impeded HCR III's ability to pay Minimum Rent under the MLSA from its receipt of rent under the Subleases.    Beginning as early as June 2012, the "Rent

Coverage Ratio" under the MLSA, which measures the ratio of the Long-Term Care Business's net cash flows and Rent obligations, fell below 1.1x, which resulted in a "Rent Coverage Trigger Event."[16]  Also beginning in 2012, the Leased Facilities' net cash flows in certain months were insufficient to allow the Sublease OpCos to make the required rent payments to HCR III under the Subleases and, in turn, would have rendered HCR III unable to make its rent payments to QCP under the MLSA absent support from the Company's other business segments.  Since 2012, despite the parties' agreement upon certain deferrals of rent obligations from time to time, the Company's other business segments—the 4H Business and the Outpatient Rehab and Other Businesses—frequently advanced the additional funds necessary to permit HCR III to make its rent payments to QCP under the MLSA.

49.    Unlike the Long-Term Care Business, the 4H Business and Outpatient Rehab Business have continued to grow and, in the case of the 4H Business, been increasingly profitable in recent years.  As noted above, the 4H Business and the Outpatient Rehab Business repeatedly have provided funds that were used by the Long-Term Care Business to help it meet its obligations.[17]  Since 2011, HCR III and its subsidiaries have received more than $500 million in intercompany funds from the Company's other business segments to assist HCR III and its subsidiaries in meeting their obligations.  These transfers continued until April 2017, when a default occurred under the Prior Credit Facility and the lenders thereunder prohibited any further transfers of their cash collateral to the Long-Term Care Business, including, without limitation, for the payment of rent under the MLSA.

---

[16] Upon the occurrence of a Rent Coverage Trigger Event, among other things, HCR III was required to set up impound accounts for funding insurance premiums and real estate taxes and incur additional charges under the MLSA.  HCR III established an impound account in the first quarter of 2017.  These funds were returned to the Company in accordance with the April 2017 Forbearance Agreement (as defined below).

[17] These transfers were made pursuant to the Intercompany Loan Agreement and recorded as part of the intercompany accounting protocol.

B.    **Events Leading to the Plan, Plan Sponsor Agreement, and Restructuring Support Agreement**

1.    *Prior Agreements and Amendments*

50.    In the years prior to the Debtor's commencement of this case, HCR III, HCP and its successor-in-interest under the MLSA, QCP, executed a series of agreements and amendments relating to the MLSA, which afforded HCR III certain deferrals and temporary reductions of their rent obligations under the MLSA.  As detailed below, however, none of these agreements and amendments provided a long-term solution addressing HCR III's inability to meet its rent obligations under the MLSA (absent asset sales) and the financial difficulties facing the Long-Term Care Business.

(a)    Sale of Non-Strategic Facilities

51.    On February 6, 2015, HCR III and HCP entered into a letter agreement (the "Cooperation Agreement") whereby HCR III and HCP agreed to cooperate in selling at least forty-eight (48) non-strategic Leased Facilities covered by the MLSA, resulting in a negotiated reduction of the amount of Minimum Rent payable under the MLSA.  Overall, fifty-one (51) Leased Facilities were sold under the Cooperation Agreement, resulting in a $27.3 million reduction in the annual Minimum Rent under the MLSA.

(b)    Tenth Amendment to the MLSA

52.    Effective April 1, 2015, HCR III and HCP entered into the Tenth Amendment to Master Lease and Security Agreement (the "Tenth Amendment"), which provided for, among other things, (a) certain deferred rent payments; (b) the resetting of rent escalations to 3.0% per year (from 3.5% per year for certain pools of Leased Facilities) during the term of the MLSA; and (c) the extension of the initial term of the MLSA by five years.  To temporarily reduce HCR III's monthly payments under the MLSA, the Tenth Amendment deferred $525 million of HCR

III's Rent obligations (the "<u>Deferred Rent Obligation</u>").  The Deferred Rent Obligation was divided into two tranches of $275 million (the "<u>Tranche A DRO</u>") and $250 million (the "<u>Tranche B DRO</u>"), respectively.  The Tenth Amendment provides that, together with each of its monthly payments of Minimum Rent, HCR III shall also make monthly payments equal to a percentage of the outstanding Tranche A DRO until the time that the Tranche A DRO is fully paid.

53.      Also as part of the Tenth Amendment, the Company agreed to sell to HCP nine of its long-term care facilities not subject to the MLSA for a purchase price of $275 million (the "<u>Additional Facilities Purchase Price</u>").  In accordance with the terms of the Tenth Amendment, the Company used the Additional Facilities Purchase Price to pre-pay the Tranche A DRO upon the closing of the sale transactions.  On July 15, 2017, QCP provided notice to HCR III that, as a result of the occurrence of an Event of Default under the MLSA, the aggregate outstanding amount of the Tranche B DRO of approximately $265.225 million, was immediately due and payable.  The Tranche B DRO remained outstanding as of the Petition Date.

(c)      <u>2016–17 Rent Deferrals</u>

54.      HCR III and QCP agreed to certain further deferrals of Minimum Rent in November 2016 (the "<u>Rent Deferral Agreement</u>").  Specifically, HCR III and QCP agreed to one-time deferral, in the aggregate amount of $30 million, which consisted of (a) a $5 million deferral for November 2016, (b) a $15 million deferral for December 2016 and (c) a $10 million deferral for January 2017, subject to certain conditions.

(d)      <u>The April 2017 Forbearance Agreement</u>

55.      Following the execution of the Tenth Amendment and the Rent Deferral Agreement, the Sublease OpCos continued to have difficulty generating sufficient revenues to meet their rent obligations under the Subleases and pay their ordinary course operating expenses.

Beginning in November 2016, various representatives of the Company and QCP, and their respective advisors, engaged in extensive negotiations regarding a potential long-term solution to the financial difficulties facing the Long-Term Care Business.    To facilitate a continuing dialogue in furtherance of a consensual restructuring and to temporarily defer upcoming payments of Minimum Rent, QCP, HCR III and the Debtor entered into the Forbearance Agreement on April 5, 2017 (the "April 2017 Forbearance Agreement").    Pursuant to the April 2017 Forbearance Agreement, QCP, HCR III and the Debtor agreed, among other things, that:

- HCR III's obligation to pay Minimum Rent in excess of $32 million per month would be deferred for the months of April, May and June 2017, with payment of the deferred portion of the Minimum Rent (approximately $7.5 million per month) due on the Deferred Payment Date;[18]

- The Debtor would deliver audited financials to QCP no later than April 10, 2017; and

- QCP would extend credit to HCR Hospice, pursuant to a multi-draw secured note (the "Multi-Draw Note"), of up to $7 million per month during each of April, May and June of 2017 (up to $21 million in the aggregate), which were to be used to pay rent due under the MLSA.

Advances under the Multi-Draw Note were secured by second-priority liens in certain assets of the 4H Business and a pledge of interests in certain entities operating within the 4H Business. On April 5, 2017, HCR Hospice drew an aggregate total of $7 million under the Multi-Draw Note.

### 2.    *Default and Acceleration of the Prior Credit Facility*

56.    As a result of the Company's ongoing financial difficulties, the Company's financial statements for the fiscal year ending December 31, 2016 were issued with a "going

---

[18] Pursuant to the April 2017 Forbearance Agreement, "Deferred Payment Date" meant the earlier of (a) July 5, 2017, and (b) the date on which the April 2017 Forbearance Agreement is terminated pursuant to the terms thereof.

concern" exception. This exception was a default under the Prior Credit Facility,[19] which was secured by substantially all of the assets of the 4H Business, the Outpatient Rehab and Other Businesses and the Company's "services" entities, including HCR Services. Consequently, beginning in April 2017, the Company commenced negotiations with an ad hoc group of lenders comprising a substantial majority of the commitments under the Prior Credit Facility (the "Ad Hoc Lender Group") regarding a short-term forbearance from the exercise of remedies under the Prior Credit Facility. On May 4, 2017, HCR Healthcare, as the borrower under the Prior Credit Facility, Manor Care, and the Ad Hoc Lender Group entered into a short-term forbearance agreement (the "Prior Credit Facility Forbearance Agreement"). Under the terms of the Prior Credit Facility Forbearance Agreement, in exchange for the Ad Hoc Lender Group's agreement to forbear from exercising remedies under the Prior Credit Facility until May 12, 2017, HCR Healthcare agreed to, *inter alia*:

- amend the Prior Credit Facility credit agreement to prohibit further transfers of cash to the Long-Term Care Business from the Company's other business segments, which are operated by the obligors under the Prior Credit Facility;

- enter into deposit account control agreements (DACAs) in favor of the collateral agent with respect to each of the bank accounts of HCR Services by no later than May 19, 2017—ultimately, no DACAs were executed for the reasons explained below; and

- pay a forbearance fee equal to 0.50% of the outstanding principal amount of the sum of outstanding commitments under the Prior Credit Facility.

57.     Upon execution of the Prior Credit Facility Forbearance Agreement, the parties immediately commenced negotiations regarding a longer-term forbearance agreement. Ultimately, the Ad Hoc Lender Group and the Company failed to reach agreement on a longer-term forbearance, and the forbearance period ended before HCR Services executed DACAs in

---

[19] The Company's defaults under the Prior Credit Facility also included failure to timely deliver a budget for fiscal year 2017 and failure to comply with certain financial covenants in connection with the Company's consolidated EBITDAR.

01:22949845.1

favor of the collateral agent.  On May 16, 2017, upon instruction by the Ad Hoc Lender Group, the administrative agent under the Prior Credit Facility transmitted a notice of acceleration to the Company (the "Acceleration Notice").  The Acceleration Notice terminated all commitments under the Prior Credit Facility and declared all outstanding amounts under the Prior Credit Facility immediately due and payable.

**3.    *The Company's Segregation of Cash and HCR III's Subsequent Rent Payments***

58.    During forbearance negotiations, the Ad Hoc Lender Group made clear that it would not permit any further transfers of cash collateral (*i.e.*, cash generated by the 4H Business and the Outpatient Rehab and Other Businesses) to the Long-Term Care Business, including to help fund rent payments under the MLSA.  Consequently, until the execution of the December 2017 Amendment of the new Credit Facility, the Company, with assistance from its financial advisors at AlixPartners, took steps to ensure that cash generated by the Long-Term Care Business ("SNF Cash"), on the one hand, was used solely to satisfy obligations of the Long-Term Care Business, and that 4H Cash, on the other hand, was used solely to satisfy obligations of the 4H Business and Outpatient Rehab and Other Businesses.

59.    Beginning in May 2017, HCR III began making monthly rent payments to QCP based on the SNF Cash generated by the Sublease OpCos after payments of the Sublease OpCos' operating expenses while retaining sufficient cash to continue operations of the Long-Term Care Business.  During this period, AlixPartners made these calculations and projections on behalf of the Company with input from management and the Company's other advisors.  The amount of available SNF Cash has been insufficient, however, to enable HCR III to meet its full rent obligations in any month since institution of the cash segregation protocol.  During this time period, HCR III made the following Minimum Rent payments to QCP:

| Payment Dates | Amounts Paid |
|---|---|
| June 2, 2017 | $15,000,000[20] |
| July 7, 2017 | $8,220,000 |
| August 3, 2017 | $23,040,000 |
| September 8, 2017 | $10,000,000 |
| September 19, 2017 | $3,000,000 |
| September 20, 2017 | $4,630,000 |
| October 10, 2017 | $8,500,000 |
| October 19, 2017 | $4,000,000 |
| October 25, 2017 | $8,500,000 |
| November 10, 2017 | $9,500,000 |
| November 24, 2017 | $9,500,000 |
| December 8, 2017 | $4,000,000 |
| December 15, 2017 | $5,000,000 |
| December 29, 2017 | $14,500,000 |
| January 10, 2018 | $9,000,000 |
| January 16, 2018 | $500,000 |
| March 2, 2018 | $23,500,000 |

**4.    *Negotiation of and Entry into the Credit Facility***

60.    Following its receipt of the Acceleration Notice, the Company began to actively explore alternative financing arrangements to refinance the Prior Credit Facility.  With the assistance of Moelis & Company, its investment banker, the Company solicited proposals from a number of interested parties for a replacement credit facility with substantially the same security package as the Prior Credit Facility.  On June 30, 2017, HCR Hospice, LLC, as the Borrower, entered into a binding commitment letter securing a commitment from Centerbridge Partners, LP for a $550 million secured credit facility.  On July 17, 2017, the parties entered into the Credit

---

[20] This amount consisted of $8.0 million in Minimum Rent due under the MLSA and $7.0 million in repayment of amounts previously drawn under the Multi-Draw Note.

Agreement, and the Company repaid all outstanding amounts under the Prior Credit Facility.  In addition to the terms described above, the Credit Agreement provides that: (a) no entity within the Long-Term Care Business is a borrower or a guarantor under the Credit Facility; (b) the collateral securing the Company's obligations under the Credit Facility does not include the capital stock of any entity within the Long-Term Care Business; (c) non-SNF Cash may not be transferred to the Long-Term Care Business, subject to certain exceptions;[21] and (d) the Company will continue to establish cash management protections in order to eliminate any commingling of SNF Cash and non-SNF Cash.

### 5.    *Filing of the Receivership Proceeding and Entry into the December 2017 Forbearance Agreement*

61.    On July 7, 2017, QCP sent a notice to HCR III and the Debtor stating, among other things, that pursuant to Section 16.1(b) of the MLSA, HCR III, as Lessee, had failed to pay in full the installments of Minimum Rent due for April, May, June and July 2017, as well as certain late charges and interest with respect to the April, May and June 2017 installments, totaling $79,628,590 plus interest (the "Default Amount").  QCP demanded immediate payment in full of the Default Amount and stated that a failure to pay the Default Amount within five business days of receipt of the notice would constitute an Event of Default and permit the exercise of remedies by QCP under the MLSA.

62.    On July 15, 2017, QCP sent another notice to HCR III and the Debtor stating that their failure to pay the Default Amount on or prior to July 14, 2017 (as requested in the July 7, 2017 letter) had resulted in the occurrence of an Event of Default under the MLSA affecting all Leased Facilities.  As a result of the alleged Event of Default, QCP demanded, among other

---

[21] As noted above, the Credit Agreement permits a bankruptcy filing by the Debtor and the restructuring embodied in the Plan and related documents.  The Credit Agreement further permits the transfer of $25 million of 4H Cash to the Debtor for payment of certain fees and costs related to a bankruptcy filing by the Debtor.

things, immediate payment of (a) the Default Amount and (b) the total amount of the Deferred

Rent Obligation in the aggregate amount of $265.225 million.  In addition, QCP directed each

Sublease OpCo, pursuant to Section 2(d) of the Agreements Regarding Subleases, to pay all rents

and other amounts owing to HCR III, as lessor under the Subleases, directly to QCP.  QCP also

demanded that the Debtor, as guarantor under the MLSA, immediately pay the Default Amount

and all other amounts owed under the MLSA.  QCP also noted, however, that the MLSA, the

Agreements Regarding Subleases and the Guaranty remained in full force and effect and had not

been terminated.

63.     Throughout this period, the parties continued to engage in negotiations in an

effort to reach agreement on a potential comprehensive restructuring of the Company and the

Long-Term Care Business in particular.  On August 17, 2017, however, after months of

negotiations without an agreement on a long-term restructuring, QCP filed a complaint against

the Debtor, HCR III and "John Does 1–50" in Los Angeles County Superior Court, styled as

*Quality Care Properties, Inc. and HCP Properties, LP* v. *HCR III Healthcare, LLC et al.*, Los

Angeles County Super. Ct. No. BC672837 (the "Receivership Proceeding").  In the Receivership

Proceeding, QCP sought, among other things, the appointment of a receiver for HCR III, who

would, *inter alia*:

- pending resolution of QCP's claims against the Debtor and HCR III, take
  possession of various receivership property (collectively, the "Receivership
  Property"), including, among other things, the following: (a) HCR III's
  interest in or claims to the Leased Property and any Capital Additions (each as
  defined in the MLSA), including HCR III's membership interests and other
  investments in its subsidiaries and its rights arising under or relating to the
  MLSA and the subleases involving the Leased Property; (b) any Personal
  Property (as defined in the MLSA) at the Leased Facilities that QCP or HCR
  III would have the right to levy or attach for payment of unpaid rent following
  termination of the MLSA or applicable sublease; and (c) all of the revenues,
  earnings, income, products, rents and/or profits thereof;

- exercise the rights and powers of HCR III, as member and/or controlling owner of its subsidiaries, to appoint managers, officers and directors of such subsidiaries;

- take possession of all assets, bank accounts and other financial accounts and books and records relating to the Receivership Property and to take steps to segregate such bank accounts and funds from other assets and properties;

- pay or cause the Sublease OpCos to pay QCP monthly for use and occupancy of the Leased Property in an amount equal to the amount due under the MLSA or such lesser amount as the receiver determines can be paid without leaving the receiver unable to pay other operating expenses;

- be vested with all powers, authorities, rights and privileges possessed by HCR III and its agents, and/or any Sublease OpCos and their agents, with respect to the Receivership Property, including the exclusive authority to file a federal bankruptcy petition on behalf of HCR III and any entities controlling a membership interest in which constitutes Receivership Property; and

- market any of the Receivership Property by leasing or selling such property to third parties, subject to confirmation by the receivership court.

64.     Following the filing of the Receivership Proceeding, the parties continued negotiations for a comprehensive restructuring of the Company.  In furtherance of these discussions, QCP and the Company entered into a series of stipulations extending the deadline by which the Company was required to file a response in the Receivership Proceeding.  In addition, on December 22, 2017, QCP, HCR III, and the Debtor entered into a forbearance agreement under the MLSA (the "December 2017 Forbearance Agreement") in connection with continued restructuring negotiations.  Pursuant to the December 2017 Forbearance Agreement, QCP, HCR III, and the Debtor agreed that HCR III would pay "Reduced Cash Rent" under the MLSA from November 30, 2017 until November 30, 2018, in the amount of $23.5 million per month, with the remaining amounts of Minimum Rent due during the period to be deferred.  The December 2017 Forbearance Agreement acknowledged HCR III's expectation that it would be

01:22949845.1

unable to pay a material portion of Reduced Cash Rent during part or all of the period ending November 30, 2018.

65.     On January 26, 2018, the Debtor filed a demurrer objecting to and requesting the dismissal of the Receivership Proceeding.   On February 9, 2018, QCP filed an amended complaint.  On February 15, 2018, the court issued a tentative case management order setting a schedule for the Receivership Proceeding, subject to comment by the parties.  The Plan provides that the Receivership Proceeding shall be deemed dismissed with prejudice as of the effective date of the Plan and that QCP shall cause the complaint filed in the Receivership Proceeding to be withdrawn from the relevant court docket as soon as practicable after the effective date of the Plan.

### 6.     *Appointment of CRO and Independent Directors*

66.     In connection with its ongoing restructuring negotiations, the Company took additional steps to address issues raised by QCP with respect to the Company's corporate governance.   Effective August 31, 2017, I was hired as Chief Restructuring Officer of the Debtor.   As CRO, I am charged with working with the Debtor's board of directors, senior management of the Company, and other Employees of the Company to lead and support the Company's restructuring efforts, among other duties.  In addition, effective as of September 14, 2017, the board of directors of the Debtor appointed two new directors independent of the Company, Sherman Edmiston III and Kevin P. Collins, and established a special restructuring committee of the Debtor's board of directors to develop plans, proposals and recommendations for a financial restructuring of the Company, with the assistance of the CRO and the Company's other advisors, and provide direction to Company management in connection therewith.  Mr. Edmiston and Mr. Collins, as the independent directors, are the two members of the special restructuring committee.

### 7.    *The Plan Sponsor Agreement and the Plan*

67.    After more than fifteen months of extensive negotiations, on March 2, 2018, QCP, and the Company agreed to a comprehensive restructuring of the Debtor in accordance with the terms of the Restructuring Support Agreement, the Plan Sponsor Agreement, and the Plan.

68.    The Plan and the related Plan Sponsor Agreement require the Debtor to seek confirmation of the Plan within forty (40) days of the Petition Date.  Beginning as soon as practicable following the Petition Date, QCP and the Company will work to obtain the governmental and regulatory approvals necessary for QCP to own and operate the Company's healthcare businesses, which approval may take three to six months.  The Debtor expects the Effective Date of the Plan to occur as soon as reasonably practicable following such governmental and regulatory approval.  The Debtor expects to file separately a confirmation brief and related declaration, which will provide further information about the Plan and the transactions contemplated thereby.

## PART III

69.    The Debtor has filed several First Day Motions, consisting of motions to schedule the Combined Hearing, administrative motions and motions relating to the Debtor's transition into chapter 11.  The Debtor's advisors and other management believe, and I agree, that the approval of each First Day Motion is an important element of its reorganization efforts.  I have reviewed each of the First Day Motions or had their contents explained to me by Company personnel and the Company's advisors, including the exhibits thereto.  With respect to the First Day Motions set forth in Part III.A below, I believe that the Debtor would suffer immediate and irreparable harm absent the ability to obtain the relief requested in such First Day Motions.  Factual information with respect to each First Day Motion is provided below and in each First

Day Motion.  Capitalized terms, to the extent not defined in Part III of this Declaration, shall have the meanings ascribed to such terms in the respective First Day Motions.

**A.      Motions Requesting Immediate Relief**

**1.      *Debtor's Motion for Entry of an Order (I) Scheduling Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing the Plan and Disclosure Statement Objection Deadline and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Form and Manner of Notice, (V) Directing that a Meeting of Creditors Not Be Convened, and (VI) Conditionally Waiving Requirement of Filing Schedules and Statements and Rule 2015.3 Reports* (the "<u>Scheduling Motion</u>")[22]**

70.    The Debtor is pursuing an expedited plan confirmation process in order to implement the consensual, prepackaged Plan, which has support from the Debtor's primary stakeholders.   To that end, the Debtor is filing the Scheduling Motion, requesting that the Bankruptcy Court approve and/or schedule certain confirmation-related dates and deadlines on the following timeline:

| Event | Date[23] |
| --- | --- |
| Voting Record Date | March 1, 2018 |
| Commencement of Solicitation | March 3, 2018 |
| Voting Deadline | March 3, 2018 |
| Petition Date | March 4, 2018 |
| Mailing of Notice | March 7, 2018 |
| Plan Supplement Deadline | April 2, 2018 |
| Objection Deadline | April 5, 2018 at 4:00 p.m. (prevailing Eastern Time) |
| Reply Deadline | April 9, 2018 |
| Confirmation Order Deadline | April 9, 2018 |
| Confirmation Brief Deadline | April 9, 2018 |
| Combined Hearing | April 12, 2018 |

---

[22] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Scheduling Motion, filed contemporaneously herewith.

[23] Certain of the proposed dates are subject to the Bankruptcy Court's availability.

71.     The Debtor commenced solicitation with respect to the Plan prior to the Petition Date in accordance with the prepetition procedures for the solicitation of votes to accept the Plan (the "Solicitation Procedures").  On March 3, 2018, the Debtor caused its solicitation agent, Epiq Bankruptcy Solutions, LLC (the "Solicitation Agent") to distribute a solicitation package containing the Disclosure Statement, the Plan, and the Ballot (the "Solicitation Package") to each Holder of a Class 4 QCP Claim, which is the only Class of Claims or Interests entitled to vote to accept or reject the Plan (the "Voting Class").  The Voting Deadline was set for March 3, 3018, at 11:59 p.m. (prevailing Eastern Time) (the "Voting Deadline").  After the expiration of the Voting Deadline, the Solicitation Agent tabulated the Ballots submitted by the Voting Class and, concurrently herewith, filed the Voting Declaration.  I understand that the Debtor has received support for the Plan from 100% of the outstanding amount voted and 100% in number of the Voting Class, as evidenced by the Voting Declaration.

72.     In addition to proposing the foregoing timeline of events, the Debtor requests approval of: (a) scheduling the Combined Hearing; (b) the Solicitation Procedures; and (c) the form and manner of notice of the commencement of the Debtor's chapter 11 case and the Combined Hearing.  By the Scheduling Motion, the Debtor also requests that the Bankruptcy Court conditionally (i) direct the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") not to convene a meeting of creditors pursuant to section 341(a), and (ii) waive the requirement that the Debtor file schedules of assets and liabilities and statements of financial affairs and the periodic reports of financial information with respect to entities in which the Debtor's estate holds a controlling or substantial interest pursuant to Bankruptcy Rule 2015.3(a)—in each case until May 18, 2018, which is approximately seventy-five (75) days from the Petition Date.

73.      I believe that the proposed schedule of confirmation-related dates is fair to all parties in interest and is consistent with the Debtor's need to comply with the Plan Sponsor Agreement in seeking confirmation of the Plan within forty (40) days of the Petition Date.  Such compliance is critical to the restructuring.  The proposed schedule also provides parties with sufficient time to evaluate their rights in respect of the Plan before the Combined Hearing.  Similarly, I believe that the requested conditional waivers and the request for conditional approval, on a first-day basis, of the Solicitation Procedures and the Combined Notice will permit the Debtor to proceed expeditiously toward confirmation without unnecessary delays or distractions.  Additionally, as noted above, the single Voting Class under the Plan is comprised of QCP and certain of its affiliates.  The Debtor negotiated the Plan directly with QCP in accordance with the terms of the Plan Sponsor Agreement.  Consequently, I believe that the time period between the distribution of the Solicitation Package and the Voting Deadline (the same day) was reasonable under the circumstances.  Moreover, I understand that all eligible Holders of Claims in the Voting Class—*i.e.*, QCP and certain of its affiliates—timely submitted Ballots accepting the Plan, thereby demonstrating the sufficiency of the time for voting.  For these reasons, I believe that the time for voting was reasonable and sufficient for Holders of Claims in the Voting Class to make an informed decision to accept or reject the Plan.

**2.      *Debtor's Motion for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363, 507 and 552 and Bankruptcy Rules 2002, 4001, 6004 and 9014 (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Cash Collateral Motion")**

74.      Before the commencement of this chapter 11 case, the Debtor executed that certain Subordinated Secured Demand Note, dated as of March 1, 2018 (the "Prepetition Affiliate Note"), in favor of non-debtor affiliate HCR Home Health Care and Hospice, LLC (the

"Affiliate Lender"). The Prepetition Affiliate Note provides for a $25,000,000 subordinated secured loan to the Debtor (the "Affiliate Loan"), the proceeds of which will be used to pay the administrative expenses of this case as expressly permitted by the terms of the Credit Agreement. The Affiliate Lender is the borrower under the Credit Agreement, and the Debtor is a guarantor of the Affiliate Lender's obligations thereunder. The security interests in the Debtor's personal property granted to the Affiliate Lender under the Prepetition Affiliate Note are subordinate in all respects to the security interests of the Prepetition Agent in such property under the Prepetition Credit Agreement.

75.    I believe that the Debtor's continued access to the proceeds of the Affiliate Loan is necessary to effectuate its consensual, prepackaged restructuring through this chapter 11 case. The proceeds of the Affiliate Loan constitute Cash Collateral of the Prepetition Agent and the Affiliate Lender, which hold a first-priority and second-priority security interest in such property, respectively. Absent the Debtor's ability to use Cash Collateral and to implement the adequate protection arrangements proposed herein, the Debtor would lack sufficient available sources of capital and would be unable to pay its restructuring expenses, to the severe detriment of the estate and creditors. The Debtor does not anticipate using Cash Collateral before entry of the Final Order. Nevertheless, out of an abundance of caution and as adequate protection for any potential use of any Prepetition Collateral by the Debtor, the Prepetition Agent has requested that the Debtor obtain entry of the Interim Order approving the Adequate Protection Claims, Adequate Protection Liens (each to the extent of any actual Diminution in Value of the Prepetition Agent's interests in the Prepetition Collateral, including Cash Collateral) and the Adequate Protection Payments provided for therein on an interim basis. Accordingly, the Debtor is requesting authorization to use Cash Collateral, on a consensual basis.

01:22949845.1

76.    The Prepetition Secured Parties have consented to the Debtor's use of Cash Collateral in exchange for adequate protection against the post-petition diminution in value of their interests in the Prepetition Collateral resulting from the Debtor's use of such property, including the following Adequate Protection Obligations: (a) allowed administrative expense claims against the Debtor with priority over any and all other administrative claims against the Debtor; (b) payment of actual, reasonable and documented fees and expenses of the legal and financial advisors and consultants required in connection with the Debtor's chapter 11 case for the Prepetition First Lien Secured Parties; and (c) additional and replacement valid, binding, enforceable, non-avoidable, and effective and automatically perfected post-petition security interests and liens on the Debtor's property solely to the extent of any actual diminution in value of their interests in the Prepetition Collateral.

77.    The foregoing protections were negotiated requirements of the Prepetition Secured Parties, and without these additional protections, I believe the Debtor would not have been able to secure the Prepetition Secured Parties' consent to the relief requested herein and could potentially have faced litigation regarding collateral usage and/or been required to obtain debtor-in-possession financing, in either case imperiling its business and restructuring process.

      **3.**    ***Debtor's Motion for Entry of an Order (I) Authorizing Continued Use of Prepetition Bank Account, (II) Authorizing Continued Use of Existing Business Forms, (III) Waiving the Requirements of 11 U.S.C. § 345(b) and (IV) Granting Related Relief* (the "<u>Bank Account Motion</u>")**

78.    As of the Petition Date, the Debtor owns only one bank account (the "<u>Bank Account</u>"), the details of which are attached to the proposed order as Exhibit 1. The Bank Account is held at Huntington National Bank ("<u>Huntington</u>"). Huntington is an authorized depository under the Operating Guidelines (as defined below), and the Bank Account is insured by the Federal Deposit Insurance Corporation. The Debtor opened the Bank Account shortly

before the Petition Date and deposited into the Bank Account the cash proceeds of the Affiliate

Loan from the Affiliate Lender.  The cash in the Bank Account constitutes cash collateral of (a)

the Prepetition Agent and (b) the Affiliate Lender (whose security interests in cash collateral are

subordinate in all respects to the security interests of the Prepetition Agent).  As stated in the

Cash Collateral Motion, the Credit Facility permits the Debtor to use the Affiliate Loan proceeds

to pay fees and costs of the Debtor's chapter 11 case.  Accordingly, I believe that the Debtor's

continued access to the Bank Account is essential to the Debtor's restructuring efforts.

79.      As a holding company, the Debtor does not have revenue-generating operations of

its own, and neither the Debtor nor the Bank Account are part of the Cash Management System.

Unlike the Debtor, each of the operating entities within the Company participates in the Cash

Management System.  Additional information regarding the Cash Management System is set

forth in the Intercompany Payment Motion, as defined and discussed below.

80.      I understand that the U.S. Trustee has promulgated the *Operating Guidelines for

Chapter 11 Cases* (the "Operating Guidelines"), which require, among other things, that a

chapter 11 debtor: (a) close all existing bank accounts upon filing of its petition and open new

"debtor-in-possession" accounts in certain financial institutions designated as authorized

depositories by the U.S. Trustee; (b) establish one debtor-in-possession account for all estate

monies required for the payment of taxes; and (c) maintain a separate debtor-in-possession

account for cash collateral.

81.      I believe the Bankruptcy Court's entry of an order authorizing the Debtor's

continued use of the Bank Account is particularly warranted given that the Debtor is a holding

company with no operations, uses the Bank Account for a limited purpose, and has the ability to

easily monitor cash inflows and outflows.  I believe that requiring the Debtor's strict compliance

with the Operating Guidelines under these circumstances, on the other hand—including the requirement to close the Bank Account and reopen a new bank account—would unnecessarily disrupt the Debtor's restructuring efforts and provide no apparent benefit to the estate or creditors.  Specifically, disrupting the Debtor's use of the Bank Account would, subject to entry of the order granting the Cash Collateral Motion, prevent the Debtor from accessing the funds needed to administer this case.

82.     The Debtor recently opened the Bank Account and has never made any payments from such account.  The funds from the Affiliate Loan were deposited into the Bank Account less than one week before the Petition Date.  Therefore, no unauthorized payments will be made on account of obligations incurred before the Petition Date.

83.     By the Bank Account Motion, the Debtor is also requesting authority to continue to use all checks and business forms existing immediately before the Petition Date without reference to the Debtor's status as a debtor in possession.  The parties that will receive payment from the Debtor during this case—primarily including the U.S. Trustee, the estate's professionals and the Prepetition Agent's professionals (under the terms set forth in the Cash Collateral Motion)—will be aware of the Debtor's status as a debtor in possession.  Accordingly, I believe that requiring the Debtor to change its current business forms would be unnecessary and unduly burdensome, and appropriate care can be taken to assure the proper use of the existing forms.

**4.      *Debtor's Application for Entry of an Order Appointing Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent,* Nunc Pro Tunc *to the Petition Date* (the "<u>Section 156(c) Application</u>")**

84.     I understand that the Bankruptcy Court is authorized to utilize agents and facilities other than the Office of the Clerk of the Bankruptcy Court for the administration of bankruptcy cases.  I believe that the appointment of Epiq Bankruptcy Solutions, LLC as the claims and noticing agent (the "<u>Claims and Noticing Agent</u>") in this chapter 11 case will expedite the

distribution of notices and the processing of claims, facilitate other administrative aspects of this chapter 11 case, and relieve the Clerk of these administrative burdens.  I have also reviewed the Claims and Noticing Agent's retention agreement, the description of services that the Claims and Noticing Agent has agreed to provide, and the compensation and other terms of the engagement as provided in the application of the Claims and Noticing Agent.  Based on that review, I believe that the appointment of the Claims and Noticing Agent is in the best interests of the Debtor's estate, creditors and other parties in interest.

      **B.**      **Motions Requesting "Second Day" Relief**

           **1.**      ***Debtor's Motion for Entry of an Order Authorizing the Continuation of its Ordinary Course Non-Debtor Affiliate Arrangements for the Payment of Certain Prepetition Tax and Insurance Obligations*** **(the "<u>Intercompany Payment Motion</u>")**

85.      As the Debtor is a holding company, all business operations of the Company are conducted by the operating subsidiaries and affiliates of the Debtor (the "<u>Non-Debtor Affiliates</u>"), and all liabilities of the Company historically have been paid by one or more of the Non-Debtor Affiliates.  The Non-Debtor Affiliates are not anticipated to file chapter 11 cases, and the Company expects ordinary-course operations to continue substantially uninterrupted during and after this chapter 11 case.  Accordingly, much of the customary first-day relief in a chapter 11 case is not needed here.

86.      The Company has identified certain prepetition tax and insurance obligations for which the Debtor may be liable under relevant contractual arrangements or theories of joint liability.  These tax and insurance obligations historically have been paid by HCR Services and recorded on the books and records of the applicable operating subsidiary—not on the books and records of the Debtor—in the ordinary course of business and in accordance with the Cash Management System and intercompany arrangements described in more detail in Part I above.

01:22949845.1

Although the Company believes it is current on all tax and insurance liabilities as of the Petition Date, the Debtor expects that certain tax and insurance obligations relating to periods prior to the Petition Date will come due during the pendency of this chapter 11 case.

87.     With respect to tax obligations, in the ordinary course of business the Company collects and incurs certain taxes, including sales and use, franchise, property, income, and other taxes (collectively, the "Taxes").    The Taxes are payable directly to various foreign, federal, state, and local taxing authorities (the "Taxing Authorities"), and HCR Services, as the administrator on behalf of all Company affiliates, remits such Taxes to the applicable Taxing Authorities.[24]    The Company files U.S. federal corporate income taxes, Arizona state income taxes, Delaware franchise taxes, and Ohio commercial activity taxes under the Debtor's tax identification number (collectively, the "Debtor-ID Taxes").    While the Debtor nominally has liability for such Debtor-ID Taxes, the Debtor-ID Taxes, like the other Taxes, are paid by HCR Services on behalf of all Company affiliates and allocated to either HCR Services itself, or operating subsidiaries pursuant to the Administrative Support Services Agreement.    The Debtor believes that the Company is current on all of the Debtor-ID Taxes that were due as of the Petition Date, but expects that certain Debtor-ID Taxes relating to the pre-petition period will come due during the pendency of this chapter 11 case (the "Prepetition Taxes").    The Debtor estimates that approximately $500,000 in Prepetition Taxes will be due during the pendency of this case.

88.     With respect to insurance obligations, the Company is able to obtain better rates for certain insurance coverage (the "Insurance Coverage") by maintaining group coverage for the

---

[24] HCR Services also pays, on behalf of the operating subsidiaries certain applicable license fees, state assessments, Medicare and Medicaid settlements, and other fees and charges relating to the operation of skilled nursing facilities, assisted living facilities, outpatient rehabilitation clinics and other healthcare services (the "Licenses & Fees"). However, the Debtor is not contractually or otherwise liable for such Licenses & Fees, and thus I expect such Licenses & Fees will be paid by the Non-Debtor Affiliates in the ordinary course.

benefit of all affiliates in the Company.  Most of the insurance policies list the Debtor as the policy holder for the group coverage, and the Debtor is the contract counterparty to the Broker Services Agreement with Hylant Group, Inc., the Company's insurance broker.  These insurance policies include general and healthcare professional liability coverage, workers' compensation and employers' liability coverage, and excess liability coverage.  HCR Services, as the administrator on behalf of all Company affiliates, pays all premiums and broker fees for Insurance Coverage on behalf of all covered Company entities.  The costs associated with Insurance Coverage premiums and broker fees are apportioned among the Non-Debtor Affiliates in accordance with the Administrative Support Services Agreement, based on such affiliate's annual revenue.  As of the Petition Date, there are no costs associated with Insurance Coverage apportioned to the Debtor.

89.    The Debtor believes that the Company is current on all of its obligations relating to Insurance Coverage that were due as of the Petition Date, but expects that certain prepetition obligations relating to the Insurance Coverage may come due during the pendency of this chapter 11 case, including obligations due under existing, extended, or new insurance policies (the "Prepetition Insurance Obligations").  The Debtor estimates that up to $50,000 in Prepetition Insurance Obligations may be due during the pendency of the chapter 11 case.

90.    The Debtor's estate assets will not be used to pay the Prepetition Taxes and Prepetition Insurance Obligations, and the Debtor will not be charged with any liability for such claims, consistent with the historical practices of the Company, the operation of the Cash Management System, and the intercompany arrangements used in the ordinary course of the Company's businesses.  I believe that the payment of Prepetition Taxes and Prepetition Insurance Obligations is important to maintaining the continuous and smooth operations of the

Company during the chapter 11 case.  I further believe that such payment is neutral to the Debtor's estate, as the payments will be made by a Non-Debtor Affiliate, and will not be recorded as expenses of the Debtor on the Company's books and records.

   **2.** ***Debtor's Motion for Entry of an Order Waiving Appointment of Patient Care Ombudsman Pursuant to 11 U.S.C. § 333* (the "<u>Ombudsman Waiver Motion</u>")**

  91. As discussed above, the health care businesses of the Company are conducted entirely by the Non-Debtor Providers that provide health care services to patients and are not part of this bankruptcy proceeding.  I understand that these Non-Debtor Providers are separately and individually licensed and certified, and the Debtor is not licensed to provide health care services nor is it certified to participate in the Medicare or Medicaid programs.  I believe that the regulation of the Non-Debtor Providers by various governmental authorities and programs will not be impacted by this chapter 11 case and will continue in the ordinary course.  Additionally, HCR Services already provides extensive internal administrative support services to the Non-Debtor Providers through the Administrative Support Services Agreement with each of the Non-Debtor Providers.  The administrative support services provided by HCR Services include extensive internal resources provided to maintain and enhance the quality of patient care and will continue unaffected by this chapter 11 case.  Consequently, it is my belief that the Company's businesses will continue to operate as usual during the pendency of the Debtor's case through the continued operation of the Non-Debtor Providers, and appointment of a patient care ombudsman is not necessary for the protection of the Non-Debtor Providers' patients.

  92. I understand that the SNFs, the 4H Agencies, and the Outpatient Rehab Clinics and the associated services within these business segments have been recognized for their delivery of high quality care, both through objective metrics and independent review, and detailed information regarding these businesses is discussed in detail above.  Additionally, the

Company has made significant investments in the SNFs' post-acute clinical capabilities, clinical support systems, and specialty programs to treat patients requiring intensive rehabilitation, as well as focusing on the coordination and integration of care between acute care and post-acute care providers.  SNF staffing levels are scheduled at or above the required state minimum staffing standards.  The ALFs are designed for individuals who require assistance with activities of daily living but do not require care in a SNF.  The ALFs specialize in memory care services in a residential environment designed exclusively for patients living with dementias such as Alzheimer's disease, in addition to facilities that offer various long-term residential options featuring varying levels of care and independence for residents.  Staffing levels are scheduled at or above any applicable required state minimum staffing standards for ALFs.  With respect to the Outpatient Rehab Clinics, professional physical therapists, occupational therapists, and speech therapists are each individually licensed in and regulated by the respective states in which they work.

93.    Additionally, I understand that each of the Company's business segments, including the Long-Term Care Business, is highly regulated and subject to oversight by a number of federal and/or state regulatory and licensing authorities.  Specifically, several governmental authorities and programs provide significant and stringent oversight of the Non-Debtor Providers and the services they provide to patients, including CMS, the respective state survey agencies that carry out the CMS certification process and enforce standards (collectively, the "State Survey Agencies") for each state in which the Non-Debtor Providers operate, state licensing agencies, state long-term care ombudsmen, and Medicaid fraud control units.[25]

---

[25] For purposes of the following discussion, it should be noted that the ALFs are not subject to CMS federal regulations, and only certain of the ALFs are subject to Medicaid regulations.

01:22949845.1

94.     Each of the Non-Debtor Providers—specifically, the individual SNFs, the 4H Agencies, and the Outpatient Rehab Clinics—are independently and individually certified as Medicare and Medicaid providers.  The SNFs and the 4H Agencies are also subject to various CMS regulations, including the Medicare Conditions of Participation (the "<u>Conditions of Participation</u>"), which are evaluated through regular surveys, Conditions for Coverage, and billing rules.  The Conditions of Participation are certain health and safety standards related to ethics, provision of care treatment, medication management, environment of care, and human resources, among other categories.  SNFs and 4H Agencies that do not comply with the Conditions of Participation risk sanctions or losing certification for Medicare and Medicaid reimbursement, which are vital sources of revenue across the Company's business segments.  Thus, I believe it is essential that the Non-Debtor Providers focus on providing compliant, patient-centered quality care in compliance with the Conditions of Participation and the health and safety standards established therein.

95.     The SNFs' compliance with applicable federal quality standards are assessed through surveys by the State Survey Agencies in each state in which the SNFs operate.  For example, the applicable State Survey Agency regularly evaluates each SNF through surveys conducted by qualified health professionals, which involve regular unannounced visits to the SNFs to determine whether and how each SNF satisfies the CMS standard.  Surveys are aided in certain states by CMS's Quality Indicator Survey, a computer-assisted long-term care survey process used by selected State Survey Agencies and CMS.  Among many others, SNFs are surveyed on categories including, but not limited to, infection control, kitchen, dining, nutrition, medication administration and storage, staffing, activities of daily living, management of behavioral and emotional needs, pain management, management of resident trust funds, and

protection from abuse and neglect. State Survey Agencies communicate the certification results to the applicable CMS regional office, which determines whether a facility is eligible to participate in the Medicare and Medicaid programs.

96.     CMS has also implemented Five-Star Quality Rating Systems for nursing homes and home health care and hospice providers to help consumers, their families, and caregivers compare providers and provide increased transparency and data to the public. For example, CMS calculates SNF star ratings based on three domains: health inspection results, staffing, and quality measures. CMS uses a formula to provide an overall star rating as well. The health inspection rating contains information from the previous three years of onsite inspections by trained inspectors, who go onsite to evaluate whether a SNF has met Medicare and Medicaid's minimum quality requirements. As of the end of 2017, the SNFs had an average star rating of 4.52, with 87.1% of SNFs maintaining a four- or five-star rating as such relates to quality measures of the rating system. Similarly, the 4H Agencies are subject to a quality rating system, with ratings and data publicly available for Home Health Care on Medicare's home health care comparison website. The star rating system is based on a variety of sources, including outcome and assessment information sets reported to CMS, Medicare claims data, and patient experience surveys. Hospice is also subject to hospice quality reporting requirements, with penalties for hospice centers that fail to report, and a quality star rating system publicly available online through Medicare's website.

97.     In addition to these regulations, both the Hospice and Home Health Care lines of the 4H Business are fully accredited by ACHC, which offers a CMS-approved accreditation program. Accreditation through a national accreditation organization such as ACHC is voluntary and is not required for Medicare certification, although the Secretary of the United States

Department of Health and Human Services may deem all certification requirements met if an accreditation body demonstrates that a provider has met or exceeded all applicable conditions.

98.     I understand that state authorities also heavily regulate the Non-Debtor Providers in the ordinary course of business.  With operations in thirty (30) states, the Non-Debtor Providers within the Long-Term Care Business, the 4H Business, and the Outpatient Rehab and Other Businesses are subject to a wide array of state monitoring and inspection programs from various regulatory agencies and organizations in each state, such as State Survey Agencies, state departments of health services, state licensing agencies, state long-term care ombudsman programs, and Medicaid fraud control units.  In particular, the state long-term care ombudsman program is available in each state the Non-Debtor Providers operate in and protects the rights of older persons who live in long-term care facilities.  Pursuant to the federal Older Americans Act, 42 U.S.C. §§ 3001–3058ff, and various state laws, each state is mandated to have an ombudsman program in place that addresses patient complaints and protects and promotes the rights and quality of life for people who reside in long-term care facilities.  This mandate is implemented through regional ombudsmen, who maintain a working relationship with the residents and staff of the facilities within their program areas.  I have learned that substantial internal resources are dedicated to maintaining substantial compliance with the requirements of applicable federal and state regulatory agencies, and ensuring that any identified deficiency is promptly corrected.

99.     In addition to federal and state oversight, I understand that HCR Services provides extensive internal support resources to the Non-Debtor Providers for monitoring and safeguarding the quality of patient care.  These support services will continue during this chapter 11 case.  Examples of available resources within the overall corporate compliance program (the "Compliance Program") are as follows:

01:22949845.1

(a)   **HCR ManorCare Independent Advisory Committee on Quality**: The HCR ManorCare Independent Advisory Committee on Quality is appointed by and reports regularly to the quality committee of the Debtor's board of directors (the "Board"). Its sole function is to provide advice and recommendations to enhance the quality of care and services provided by the Non-Debtor Providers. It is comprised of professionals in health policy and academia.

(b)   **Compliance Committee**: The Compliance Committee consists of the Company's Chief Compliance Officer and other top management and reports to the Board's audit committee. It is responsible for developing health care and privacy-related compliance policies, conducting internal investigations, and recommending corrective actions.

(c)   **HCR ManorCare Standards of Business Conduct**: The HCR ManorCare Standards of Business Conduct sets forth the Company's legal and ethical standards by which employees conduct the business affairs of the Company.

(d)   **Auditing and Monitoring**: The Company's Internal Audit Department conducts periodic audits of the operations of each Company business unit on behalf of the Board's audit committee and reports the results to management on a regular basis.

(e)   **Education and Training**: HCR Services provides extensive education and training on the Compliance Program for employees at the Non-Debtor Providers, including ongoing training and guidance on specific health care regulatory requirements and federal and state clinical education requirements through "HCR ManorCare University."

(f)   **Communication**: The Company maintains a variety of communication mechanisms, including the maintenance of the HCR ManorCare Care Line, a telephone number and email address by which employees, patients, and relatives may report (anonymously if they wish) patient care and safety issues for investigation and corrective action, as appropriate.

(g)   **Internal Investigations**: Internal compliance investigations are conducted with the assistance of the Legal Department, as appropriate.

100.   Based on the foregoing, I believe that the facts and circumstances of this case justify the Bankruptcy Court's exercise of its discretion to decline to appoint an ombudsman (to the extent Debtor qualifies as a "health care business" pursuant to the Bankruptcy Code, which

01:22949845.1

the Debtor does not concede), because an ombudsman is not necessary for the protection of the patients of the Non-Debtor Providers.

*[Remainder of Page Intentionally Left Blank]*

Dated:  March 4, 2018
Wilmington, Delaware

Respectfully submitted,

*/s/ John R. Castellano*
_____

John R. Castellano
Chief Restructuring Officer
HCR ManorCare, Inc.

**<u>Exhibit A</u>**

**Simplified Organizational Chart of the Company**

## Exhibit A

## Simplified Organizational Chart of the Company

