SOLICITATION VERSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HCR MANORCARE, INC., | Case No. 18-_____ (___) |
| Debtor.[1] | |

## DISCLOSURE STATEMENT FOR THE PREPACKAGED
## PLAN OF REORGANIZATION FOR HCR MANORCARE, INC.

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT A CHAPTER 11 PREPACKAGED PLAN OF REORGANIZATION FOR HCR MANORCARE, INC. HCR MANORCARE, INC. HAS NOT FILED FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, AND THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR APPROVED BY THE BANKRUPTCY COURT OR THE SECURITIES AND EXCHANGE COMMISSION. IN THE EVENT THAT THIS COMPANY FILES A PETITION FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND SEEKS CONFIRMATION OF THE PLAN DESCRIBED HEREIN, THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL.**

SIDLEY AUSTIN LLP
Larry J. Nyhan
Dennis M. Twomey
William A. Evanoff
Allison Ross Stromberg
Matthew E. Linder
One South Dearborn Street
Chicago, Illinois  60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Justin H. Rucki (No. 5304)
Ian J. Bambrick (No. 5455)
Tara C. Pakrouh (No. 6192)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253

*Proposed Attorneys for the Debtor and Debtor in Possession*

**Dated:  March 3, 2018**

---

[1] The last four digits of the Debtor's federal tax identification number are 9231.  The Debtor's mailing address is 333 N. Summit St., Toledo, OH 43604.

## **IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

HCR ManorCare, Inc. (the "Debtor") is providing you this document and the accompanying materials (this "Disclosure Statement") because you may be a creditor entitled to vote to accept or reject the *Prepackaged Plan of Reorganization for HCR ManorCare, Inc.* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "Plan"),[2] which is attached hereto as **Exhibit A**. The Debtor is commencing the solicitation of votes to approve the Plan (the "Solicitation") before the Debtor commences a voluntary case under chapter 11 of the Bankruptcy Code.

Because the Debtor has not yet commenced a chapter 11 case, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. The Debtor will, upon the Debtor's commencement of a chapter 11 case, promptly seek entry of an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the Solicitation as having been in compliance with section 1126(b) of the Bankruptcy Code, (c) confirming the Plan and (d) granting related relief.

## **SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

**The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued upon the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933 (as amended, the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority, and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtor is relying on section 4(a)(2) of the Securities Act and any applicable Blue Sky Laws provisions to exempt from registration under the Securities Act and Blue Sky Laws the offer to Holders of QCP Claims of New Common Stock prior to the Petition Date, including, without limitation, in connection with the Solicitation.**

**After the Petition Date, the Debtor will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and applicable Blue Sky Laws the offer of New Company Stock under the Plan. Neither the solicitation of votes in connection with the Plan nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.**

## **DISCLAIMER**

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain anticipated events in the Chapter 11 Case. Although the Debtor

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

ACTIVE 228469046

believes that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtor's management except where otherwise specifically noted.

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. Although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so, except as otherwise provided in the Plan or in accordance with applicable law. The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtor and its non-debtor affiliates, the financial information regarding the Debtor and the liquidation analyses relating to the Debtor, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of the Debtor's attempt to settle and resolve claims and controversies pursuant to the Plan. This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to Holders of Claims against, or Interests in, either the Debtor or the Reorganized Debtor. The Debtor does not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission. Except where specifically noted, the financial information contained in this Disclosure Statement and the exhibits hereto has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

The Debtor has not authorized any Person or Entity in connection with this Disclosure Statement, the Plan or the Solicitation to give any information or make any representation or statement regarding this Disclosure Statement, the Plan or the Solicitation, in each case, other than that which is contained in this Disclosure Statement and the exhibits hereto or as otherwise incorporated by reference or referred to herein. If any such information, representation or statement is given or made, it may not be relied upon as having been authorized by the Debtor.

The Debtor's management, in consultation with the Debtor's financial advisors, prepared the financial projections provided in this Disclosure Statement. While the Debtor has presented these projections with numerical specificity, it has necessarily based the projections on a variety of estimates and assumptions that, although considered reasonable by management, may not be realized, and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which will be beyond the Debtor's or the Reorganized Debtor's control. The Debtor cautions that it cannot make any representations as to the accuracy of these projections or to the Debtor's or Reorganized Debtor's ability to achieve the projected results. Some assumptions inevitably will not materialize. Furthermore, events and circumstances occurring subsequent to the date on which these projections were prepared may differ from any assumed facts and circumstances. Alternatively,

ACTIVE 228469046

any events and circumstances that come to pass may well have been unanticipated, and thus may affect financial results in a materially adverse or materially beneficial manner.  The projections, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur.

Certain of the information contained in this Disclosure Statement is by its nature forward looking and contains estimates, assumptions and projections that may be materially different from actual future results.  The words "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in <u>ARTICLE VII</u>, "Risk Factors."   In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.  Except as required by law, the Debtor disclaims any obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

ACTIVE 228469046

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARTICLE I. THE PLAN ........................................................................................................2

    A.    New Capital Structure ............................................................................2
    B.    Sources of Cash Consideration for Plan Distributions .........................2
    C.    Master Lease Amendment ......................................................................2
    D.    Release of Guaranty ...............................................................................2
    E.    Occurrence of the Effective Date ...........................................................2
    F.    Overview – Satisfaction of Claims and Interests ...................................2
    G.    Unclassified Claims ...............................................................................3
    H.    Classified Claims and Interests .............................................................5
    I.    Transfer of New Common Stock ...........................................................9

ARTICLE II. VOTING PROCEDURES AND REQUIREMENTS ...........................................10

    A.    Class Entitled to Vote on the Plan ........................................................10
    B.    Votes Required for Acceptance by a Class ............................................10
    C.    Certain Factors to Be Considered Prior to Voting ................................10
    D.    Classes Not Entitled to Vote on the Plan ..............................................11
    E.    Solicitation Procedures ..........................................................................11
    F.    Voting Procedures .................................................................................12

ARTICLE III. BUSINESS OVERVIEW, CORPORATE HISTORY  AND THE MASTER
                LEASE AND SECURITY AGREEMENT ......................................................13

    A.    Business Overview .................................................................................13
    B.    The MLSA and the Guaranty .................................................................14
    C.    Employees ..............................................................................................15
    D.    Prepetition Capital Structure .................................................................15

ARTICLE IV. EVENTS LEADING TO THE CHAPTER 11 FILING .......................................16

    A.    Industry-Wide Trends ............................................................................16
    B.    Transfers of Cash to the Long-Term Care Business from the 4H Business and the
           Outpatient Rehab and Other Businesses ...............................................16
    C.    Prior Agreements and Amendments ......................................................17
    D.    Default and Acceleration of the Prior Credit Facility ...........................18
    E.    The Company's Segregation of Cash and HCR III's Subsequent Rent Payments 18
    F.    Filing of the Receivership Complaint and Entry Into the December 2017
           Forbearance Agreement .........................................................................18

ARTICLE V. OTHER KEY ASPECTS OF THE PLAN AND THE PLAN SPONSOR
              AGREEMENT ........................................................................................20

    A.    Distributions ..........................................................................................20

    B.     Restructuring Transactions ...................................................................21
    C.     Regulatory Approvals...........................................................................22
    D.     Treatment of Executory Contracts and Insurance Policies...................22
    E.     Discharges, Releases, Exculpations and Injunctions; Survival of Indemnification and Exculpation Obligations....................................................................24
    F.     Excess Severance Payments; Former CEO Settlement Agreement.......................28

ARTICLE VI. CONFIRMATION PROCEDURES.......................................................................28

    A.     Combined Hearing on Confirmation and Approval of Disclosure Statement and Solicitation............................................................................................28
    B.     Requirements for Confirmation of the Plan...........................................29
    C.     Best Interests of Creditors / Liquidation Analysis ...............................30
    D.     Feasibility...............................................................................................32
    E.     Acceptance by Impaired Class...............................................................32
    F.     Confirmation Without Acceptance by Impaired Class ..........................33
    G.     Alternatives to Confirmation and Consummation of the Plan...............34

ARTICLE VII. RISK FACTORS ..............................................................................................34

    A.     Bankruptcy-Specific Considerations .....................................................34
    B.     Risks Related to the Debtor's and the Reorganized Debtor's Business ................39

ARTICLE VIII. IMPORTANT SECURITIES LAW DISCLOSURE .........................................42

    A.     Plan Securities.......................................................................................42
    B.     Issuance and Resale of Plan Securities under the Plan .........................43

ARTICLE IX. CERTAIN UNITED STATES FEDERAL INCOME  TAX CONSEQUENCES OF THE PLAN ............................................................................44

    A.     Certain Federal Income Tax Consequences to the Debtor.....................45
    B.     Certain Federal Income Tax Consequences to Holders of a QCP Claim .............46
    C.     Reservation of Rights.............................................................................47

ARTICLE X. CONCLUSION AND RECOMMENDATION .....................................................47

ACTIVE 228469046

## **TABLE OF EXHIBITS**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Financial Projections

ACTIVE 228469046

# INTRODUCTION

This Disclosure Statement provides information, pursuant to section 1125 of the Bankruptcy Code, regarding the *Prepackaged Plan of Reorganization for HCR ManorCare, Inc.* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "Plan"),[3] dated March 3, 2018.  A copy of the Plan is attached hereto as **Exhibit A**.  The rules of interpretation set forth in Article I of the Plan shall govern the interpretation of this Disclosure Statement.

The Debtor's board of directors has approved the Plan and believes the Plan is in the best interests of the Debtor's Estate.  The primary features of the Plan are as follows:

- QCP (or its designee(s)) will receive 100% of the stock of the Reorganized Debtor in full satisfaction of its Claims against the Debtor (arising under the Debtor's guarantee of the lease obligations owed to QCP by non-debtor HCR III, as described in detail below).

- No creditors other than QCP will be impaired.

- Equity holders will receive no distributions; however, holders of more than 80% of the equity of the Debtor (the "Majority Stockholders") have agreed to support the Plan.

- The Effective Date of the Plan is contingent upon, among other things, the closing of the Plan Sponsor Agreement executed by the Debtor and QCP immediately prior to the Petition Date, which sets forth detailed terms and conditions for the transfer of the Company's business to QCP.  The Plan Sponsor Agreement is attached as an exhibit to the Plan.

- HCR III, QCP and the Lessors will enter into the Master Lease Amendment on the Effective Date, and, on or prior to the seventh day after the Effective Date, QCP shall cause the Lessors and HCR III to terminate, release and discharge, the Guaranty pursuant to the Plan Sponsor Agreement.

The Debtor and QCP anticipate that it may take three to six months after Confirmation to obtain the Governmental Approvals necessary for consummation of the transaction and, therefore, effectiveness of the Plan.

As described below, only Holders of Class 4 Claims (QCP Claims) are entitled to vote to accept or reject the Plan.  The Debtor and QCP engaged in more than fifteen (15) months of extensive negotiations prior to the execution of the Plan Sponsor Agreement and the Restructuring Support Agreement.  A copy of the Restructuring Support Agreement is attached hereto as **Exhibit B**.  During such time, QCP was entitled to, and was provided, significant access to financial and operational information regarding the Debtor and the Company under the terms of

---

[3] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

the MLSA.  This information included, among other things, audited annual and unaudited quarterly consolidated balance sheets of the Debtor, HCR III and their respective consolidated subsidiaries and related consolidated income statements and monthly facility-level statements of income and detailed operational statistics.

# ARTICLE I.
# THE PLAN

### A.    New Capital Structure

On the Effective Date, the Debtor will effectuate the transactions contemplated by the Plan Sponsor Agreement.  As a result, QCP (or its designee(s)) will receive 100% of the New Common Stock in full satisfaction of all of the QCP Claims, *i.e.*, all Claims of QCP and its subsidiaries against the Debtor arising under the Guaranty and due and unpaid as of the Effective Date. Otherwise, the capital structure will remain largely unchanged.  The secured Credit Facility and Intercompany Note will be Reinstated on existing terms, and the remainder of the Debtor's obligations will be paid in full in Cash, Reinstated, or otherwise left Unimpaired.

### B.    Sources of Cash Consideration for Plan Distributions

The Reorganized Debtor shall fund distributions and satisfy applicable Allowed Claims under the Plan with Cash on hand.

### C.    Master Lease Amendment

On the Effective Date, the Reorganized Debtor shall cause HCR III to, and QCP and the Lessors shall, enter into the Master Lease Amendment, substantially in the form of Exhibit C to the Plan.

### D.    Release of Guaranty

On or prior to the seventh day after the Effective Date, HCR III and the Lessors shall terminate, release and discharge the Guaranty pursuant to the Plan Sponsor Agreement.

### E.    Occurrence of the Effective Date

The Effective Date of Plan is contingent upon, among other things, the closing of the Plan Sponsor Agreement executed by the Debtor and QCP prior to the Petition Date, which sets forth detailed terms and conditions for the transfer of the Company's business to QCP.  The Plan Sponsor Agreement is attached as Exhibit D to the Plan.

### F.    Overview – Satisfaction of Claims and Interests

The Plan provides for the satisfaction of Claims and Interests through: (a) the issuance of New Common Stock to QCP (or its designee(s)); (b) the Reinstatement of certain Claims; and (c) payment of Cash.  As more fully described herein:

ACTIVE 228469046

- Holders of Allowed Other Priority Claims, if any, will be paid in full in Cash, Reinstated, or otherwise rendered Unimpaired;

- Holders of Allowed Secured Claims, if any, will be paid in full in Cash, Reinstated, receive delivery of the collateral securing their claims, or otherwise rendered Unimpaired;

- Holders of Allowed Credit Facility Claims will have their claims Reinstated and their liens retained with the same priority as of the Petition Date;

- Holders of Allowed QCP Claims will have their claims converted into 100% of the New Common Stock of the Reorganized Debtor;

- Holders of Allowed General Unsecured Claims will be paid in full in Cash, Reinstated, or otherwise rendered Unimpaired;

- Holders of Allowed Severance Claims will be paid in Cash up to the maximum amount permitted under the applicable provisions of the Bankruptcy Code;

- Holders of Allowed Section 510(b) Claims, if any, will have their Claims discharged and extinguished and will not receive or retain any property;

- Holders of Interests in the Debtor will have their Interests cancelled, annulled and extinguished and will not receive or retain any property nor receive any distributions;

- All Intercompany Claims will either be (a) Reinstated, (b) deemed satisfied, or (c) discharged and extinguished and eliminated, and in no event shall Intercompany Claims be Allowed as General Unsecured Claims or entitled to any distribution under the Plan; provided, however, that any Intercompany Claim held by an obligor under the Credit Facility shall not be discharged or extinguished without the express written consent of the Credit Facility Agent; and

- Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Professional Fee Claims will be: (a) paid in full in Cash; (b) Reinstated; or (c) otherwise rendered Unimpaired, as applicable.

**G.    Unclassified Claims**

### 1.    *Unclassified Claims Summary*

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| Administrative Claims | Paid in full in Cash | 100% |
| Professional Fee Claims | Paid in full in Cash | 100% |
| Priority Tax Claims | Paid in full in Cash | 100% |

ACTIVE 228469046

## 2. *Unclassified Claims Details*

### a. Administrative Expense Claims

Subject to the terms of Confirmation Order and Section 2.1(b) of the Plan, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Administrative Expense Claim, payment of Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim (i) on the Effective Date or as soon as reasonably practicable thereafter, (ii) such other date as the Reorganized Debtor and such Holder shall have agreed, or (iii) as otherwise ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims not yet due or that represent obligations incurred by the Debtor in the ordinary course of its business during the Chapter 11 Case, or assumed by the Debtor during the Chapter 11 Case, shall be paid or performed when due in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations.

### b. Professional Fee Claims

All Professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and/or section 1103 of the Bankruptcy Code for services rendered before the Effective Date (including, without limitation, any compensation requested by any Professional or any other entity for making a substantial contribution in the Chapter 11 Case) shall file and serve final requests for payment of Professional Fee Claims no later than the first Business Day that is forty-five (45) days after the Effective Date. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtor and the applicable Professional within thirty (30) days after the filing of the final fee application with respect to the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice by the Professional asserting such Professional Fee Claim.

### c. Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim against the Debtor shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, payment in full in Cash, on the latest of: (a) the Effective Date; (b) the date such Priority Tax Claim becomes an Allowed Claim; and (c) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law.

### d. Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional or other fees and expenses related to the implementation and consummation of the Plan incurred by the Reorganized Debtor following the Effective Date. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any professional for services rendered or expenses

4

incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

### H.    Classified Claims and Interests

#### 1.    *Classified Claims and Interests Summary*

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes the classification, treatment, voting rights, and estimated recoveries, estimated as of the Petition Date, of the Claims and Interests, by Class, under the Plan. Amounts assumed in the liquidation recovery analysis are estimates only. The projected liquidation recoveries are based on certain assumptions described herein. Accordingly, recoveries received by Holders of Claims and Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

| Class | Claim or Interest | Voting Rights | Treatment | Plan Recovery | Liquidation Recovery |
|-------|-------------------|---------------|-----------|---------------|----------------------|
| 1 | Other Priority Claims | Not Entitled to Vote / Presumed to Accept | Paid in full in Cash/Reinstated/ Unimpaired | 100% | 100% |
| 2 | Secured Claims | Not Entitled to Vote / Presumed to Accept | Paid in full in Cash/Reinstated/ Collateral Returned/ Unimpaired | 100% | 100% |
| 3 | Credit Facility Claims | Not Entitled to Vote / Presumed to Accept | Reinstated | 100% | 100% |
| 4 | QCP Claims | Entitled to Vote | Impaired | < 100% | > 0% |
| 5 | General Unsecured Claims | Not Entitled to Vote/ Presumed to Accept | Paid in full in Cash/Reinstated/ Unimpaired | 100% | 100% |
| 6 | Severance Claims | Not Entitled to Vote / Presumed to Accept | Paid in full in Cash | 100% | 100% |
| 7 | Section 510(b) Claims | Not Entitled to Vote / Deemed to Reject | Extinguished | 0% | 0% |
| 8 | Interests in Debtor | Not Entitled to Vote / Deemed to Reject | Canceled | 0% | 0% |

#### 2.    *Classified Claims and Interests Details*

Except to the extent that the Debtor and a Holder of an Allowed Claim or Interest, as applicable, agree to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

ACTIVE 228469046

a.      **Class 1 – Other Priority Claims**

(i)      <u>Classification</u>:  Class 1 consists of any Other Priority Claims.

(ii)     <u>Treatment</u>:  Each Holder of an Allowed Other Priority Claim will receive, in the sole discretion of the Reorganized Debtor, (i) payment in full in Cash as promptly as reasonably practicable on the later of (a) the Effective Date and (b) the date on which such Other Priority Claim becomes an Allowed Claim payable under applicable law or any agreement relating thereto, or (ii) treatment of such Allowed Other Priority Claim in any other manner that renders the Claim Unimpaired, including Reinstatement.  All Allowed Other Priority Claims not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

(iii)    <u>Voting</u>:  Allowed Claims in Class 1 are Unimpaired.  Each Holder of an Allowed Claim in Class 1 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

b.      **Class 2 – Secured Claims**

(i)      <u>Classification</u>:  Class 2 consists of Secured Claims.

(ii)     <u>Treatment</u>:  Except to the extent a Holder of a Secured Claim agrees to different treatment of that Secured Claim, each Holder of an Allowed Secured Claim shall, in the sole discretion of the Reorganized Debtor, receive on the Effective Date (or as promptly thereafter as reasonably practicable) or in the ordinary course of the Reorganized Debtor's business (a) payment in full by Reorganized Debtor in Cash, including the payment of any interest Allowed and payable under section 506(b) of the Bankruptcy Code, (b) delivery of the collateral securing such Allowed Secured Claim, or (c) treatment of such Allowed Secured Claim in any other manner that renders the Claim Unimpaired, including Reinstatement.

(iii)    <u>Voting</u>:  Allowed Claims in Class 2 are Unimpaired.  Each Holder of an Allowed Claim in Class 2 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

ACTIVE 228469046

c.    **Class 3 – Credit Facility Claims**

(i)    <u>Classification</u>:  Class 3 consists of the Credit Facility Claims.

(ii)    <u>Treatment</u>:  On the Effective Date, the Credit Facility Claims shall be Reinstated and any liens held by the Credit Facility Agent, on behalf of itself and the Credit Facility Lenders, against the assets of the Debtor securing the Credit Facility Claims shall survive the Effective Date in the same priority as they existed as of the Petition Date.

(iii)    <u>Voting</u>:  Claims in Class 3 are Unimpaired.  Each Holder of an Allowed Claim in Class 3 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

d.    **Class 4 – QCP Claims**

(i)    <u>Classification</u>:  Class 4 consists of all QCP Claims.

(ii)    <u>Allowance</u>:  The QCP Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $445,796,590.

(iii)    <u>Treatment</u>:   The Holders of the QCP Claims (or the designee(s) of QCP) shall receive on the Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, their QCP Claims, 100% of the New Common Stock of Reorganized Debtor.

(iv)    <u>Voting</u>:   Allowed Claims in Class 4 are Impaired.  The Holder of an Allowed QCP Claim in Class 4 shall be entitled to vote to accept or reject the Plan.

e.    **Class 5 – General Unsecured Claims**

(i)    <u>Classification</u>:   Class 5 consists of all General Unsecured Claims.

(ii)    <u>Treatment</u>:   Except to the extent a Holder of an Allowed General Unsecured Claim agrees to different treatment of that General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, in the sole discretion of the Reorganized Debtor,  (1) payment in full in Cash of such Claim (a) on the Effective Date or as promptly thereafter as reasonably practicable  (b) in the ordinary course of the Reorganized Debtor's business, or (c) on the date such Allowed General Unsecured Claim becomes due

7

and payable according to its terms; or (2) satisfaction of such Allowed General Unsecured Claim in any other manner that renders the Allowed General Unsecured Claim Unimpaired, including Reinstatement.

(iii)    <u>Voting</u>:  Allowed Claims in Class 5 are Unimpaired.  Each Holder of an Allowed Claim in Class 5 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

f.    **Class 6 – Severance Claims**

(i)    <u>Classification</u>:  Class 6 consists of all Severance Claims.

(ii)    <u>Allowance</u>:  On the Effective Date, the Severance Claims shall be Allowed in the maximum amount permitted under the applicable provisions of the Bankruptcy Code.

(iii)    <u>Treatment</u>:  Each Holder of an Allowed Severance Claim shall receive, in the sole discretion of QCP, payment in full in Cash on account of such Allowed Severance Claim (a) on the Effective Date or as soon as thereafter as reasonably practicable or (b) as otherwise agreed by the Reorganized Debtor and such Holder of a Severance Claim.

(iv)    <u>Voting</u>:  Allowed Claims in Class 6 are Unimpaired, and the Holders of such Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

g.    **Class 7 – Section 510(b) Claims**

(i)    <u>Classification</u>:  Class 7 consists of all Section 510(b) Claims.

(ii)    <u>Treatment</u>:  On the Effective Date, all Section 510(b) Claims shall be discharged and extinguished and the Holders thereof shall not receive or retain any property under the Plan on account of such Section 510(b) Claims.

(iii)    <u>Voting</u>:  Claims in Class 7 are Impaired.  Each Holder of an Allowed Claim in Class 7 shall be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

ACTIVE 228469046

h.      **Class 8 –Interests in the Debtor**

(i)      <u>Classification</u>:  Class 8 consists of all Interests in the Debtor.

(ii)     <u>Treatment</u>:  On the Effective Date, all Interests in the Debtor shall be cancelled, annulled, and extinguished and the Holders of such Interests shall not receive or retain any property under the Plan on account of such Interests nor receive any distributions or property under the Plan on account of such Interests.

(iii)    <u>Voting</u>:  Interests in Class 8 are Impaired.  Each Holder of an Allowed Claim in Class 8 shall be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

3.      *Intercompany Claims*

On the Effective Date, in the sole discretion of the Reorganized Debtor, all Intercompany Claims shall either be (i) Reinstated, in whole or in part, (ii) deemed satisfied, or (iii) discharged and extinguished, in full or in part, and shall be eliminated as of the Effective Date, in whole or in part, in which case the Holders thereof shall not be entitled to and shall not receive or retain any property or interest on account of such discharged and extinguished portion under the Plan; <u>provided</u>, <u>however</u>, that prior to such discharge and extinguishment such Intercompany Claims may be contributed to capital, transferred, setoff or subject to any other arrangement in the sole discretion of the Reorganized Debtor; <u>provided further</u>, that any Intercompany Claim held by an obligor under the Credit Facility shall not be discharged or extinguished without the express written consent of the Credit Facility Agent.

For the avoidance of doubt, the Intercompany Note Claim evidenced by the Intercompany Note shall be Allowed in the amount of $25,000,000 plus accrued and unpaid interest thereon and be Reinstated under the Plan and any liens held by HCR Home Health Care and Hospice, LLC against the assets of the Debtor securing the Intercompany Note shall survive the Effective Date in the same priority as such liens existed as of the Petition Date.  In no event shall Intercompany Claims be Allowed as General Unsecured Claims or entitled to any distribution under the Plan (other than Reinstatement).

**I.      Transfer of New Common Stock**

On the Effective Date, QCP or its designee(s) shall receive, and the Debtor shall issue, transfer, and deliver to QCP or its designee(s), 1,000,000 newly issued shares of New Common Stock of the Debtor, par value $0.01 per share, which shall constitute all of the issued and outstanding capital stock and rights to purchase or otherwise acquire capital stock of the Debtor, free and clear of any lien, charge, pledge, security interest, claim, or other encumbrance, in full satisfaction of all of the QCP Claims.

ACTIVE 228469046

## ARTICLE II.
## VOTING PROCEDURES AND REQUIREMENTS

### A.    Class Entitled to Vote on the Plan

The following Class is the only Class entitled to vote to accept or reject the Plan (the "Voting Class"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 4 | QCP Claims | Impaired |

If your Claim or Interest is not included in the Voting Class, you are not entitled to vote and you will not receive a Solicitation Package, including a Ballot setting forth detailed voting instructions.  If your Claim is included in the Voting Class, you should read your Ballot and carefully follow the instructions included in the Ballot.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtor, or the Solicitation Agent (as defined below) on behalf of the Debtor, otherwise provided to you.

### B.    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.

### C.    Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors, which may impact recoveries under the Plan, include the following:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtor believes that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtor can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtor may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

ACTIVE 228469046

- any delays of either Confirmation or the occurrence of Effective Date could result in, among other things, increased Administrative Expense Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Class or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Class.

For a further discussion of risk factors, please refer to ARTICLE VII, entitled "Risk Factors" of this Disclosure Statement.

**D.      Classes Not Entitled to Vote on the Plan**

Under the Bankruptcy Code, Holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan.  Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Credit Facility Claims | Unimpaired | Presumed to Accept |
| 5 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 6 | Severance Claims | Unimpaired | Presumed to Accept |
| 7 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 8 | Interests in the Debtor | Impaired | Deemed to Reject |

**E.      Solicitation Procedures**

**1.      *Solicitation Agent***

The Debtor has retained Epiq Bankruptcy Solutions, LLC to act, among other things, as the solicitation agent (the "Solicitation Agent") in connection with the solicitation of votes to accept or reject the Plan.

**2.      *Solicitation Package***

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Class:

- the Ballot and applicable voting instructions; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto.

ACTIVE 228469046

3.    *Distribution of the Solicitation Package*

The Debtor caused the Solicitation Agent to distribute the Solicitation Packages to Holders of Claims in the Voting Class via electronic mail before 11:59 p.m. prevailing Eastern Time on March 3, 2018 (the "Voting Deadline").

**F.    Voting Procedures**

March 1, 2018 (the "Voting Record Date") is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

In order for the Holder of a Claim in the Voting Class to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by electronic mail to tabulation@epiqsystems.com (reference "HCR ManorCare" in the subject line) so that such Holder's Ballot is actually received by the Solicitation Agent on or before the Voting Deadline, *i.e.* March 3, 2018 at 11:59 p.m. prevailing Eastern Time.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTOR DETERMINES OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM IN THE VOTING CLASS BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE  COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM IN THE VOTING CLASS MUST VOTE ALL OF ITS CLAIMS WITHIN  SUCH CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN THE VOTING CLASS WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTOR THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE  BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.  IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE VOTING CLASS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASS FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

ACTIVE 228469046

## ARTICLE III.
## BUSINESS OVERVIEW, CORPORATE HISTORY
## AND THE MASTER LEASE AND SECURITY AGREEMENT

### A.    Business Overview

Headquartered in Toledo, Ohio, the Debtor is a holding company that conducts business operations through more than 300 wholly owned or controlled non-debtor subsidiaries. Such subsidiaries, together with the Debtor, are collectively referred to herein as the "Company." The Company is a leading national healthcare provider that, through certain non-debtor providers, operates an extensive network of more than 450 locations across three business segments—the Long-Term Care Business, the 4H Business, and the Outpatient Rehab and Other Businesses.

### 1.    *Long-Term Care Business*

As of the Petition Date, the Long-Term Care Business operated 295 skilled nursing facilities (each, a "SNF") and memory care or assisted living facilities (each, an "ALF") in twenty-five (25) states, with the majority of such facilities located in Florida, Illinois, Michigan, Ohio, and Pennsylvania. The Long-Term Care Business is conducted through 289 facilities leased from QCP and six facilities leased from third parties other than QCP.

The SNFs operate primarily under the Heartland Health Care Center® and ManorCare Health Services® brands, and the ALFs operate primarily under the Arden Courts® brand. The SNFs treat a wide range of patients who are transitioning from hospital to home or to a lower level of care. The SNFs also include rehabilitation units, which are separate and distinct units within Heartland and ManorCare SNFs designed for patients' rehabilitation after shorter hospital stays. The ALFs primarily provide specialized memory care in a residential environment designed exclusively for patients living with dementia such as Alzheimer's disease. The Long-Term Care Business treated more than 143,000 patients in 2017.

The Company's Long-Term Care Business is primarily conducted through non-debtor subsidiaries of non-debtor HCR III, an intermediate holding company and indirect subsidiary of the Debtor.

### 2.    *4H Business*

As of the Petition Date, the 4H Business operated more than 100 offices and agencies located in twenty-three (23) states. None of the entities operating within the 4H Business are subject to leases with QCP, and none are debtors in the Chapter 11 Case.

The 4H Business is comprised of two primary lines of business. First, "Home Health Care" provides nursing and rehabilitation services to patients at home and in independent or assisted living facilities. Home Health Care provides services to patients who have been certified by a physician as home-bound and requiring the services of a registered nurse, occupational therapist or physical therapist. Home Health Care also provides non-skilled nursing services such as companion care and/or assistance with daily living activities that are not covered by Medicare. Second, "Hospice" with a life expectancy of six months or less. Caregivers including physicians,

registered nurses, social workers, licensed practical nurses, and spiritual advisers provide services to help manage patients' pain and symptoms.

### 3.    *Outpatient Rehab and Other Businesses*

As of the Petition Date, the Outpatient Rehab and Other Businesses operated fifty-two (52) outpatient rehabilitation clinics under the Heartland Rehabilitation Services® brand. The rehabilitation clinics are primarily located in Florida, Kentucky, New Jersey, Ohio and Virginia. None of the entities operating within the Outpatient Rehab and Other Businesses are subject to leases with QCP, and none are debtors in the Chapter 11 Case.

The licensed therapists in the Company's outpatient rehabilitation clinics, which are operated through non-debtor Heartland Rehabilitation Services, LLC and certain of its subsidiaries, provide comprehensive programs in sports medicine and industrial, pediatric, physical, occupational, speech and orthopedic therapy for patients recovering from major surgery, strokes, heart attacks, neurological and orthopedic conditions, and other illnesses, injuries and disabilities. In addition to the outpatient rehab clinics, the Company also provides comprehensive outpatient rehabilitation services through certain SNFs and in homes, schools, hospitals and third-party independent and assisted living facilities.

In addition, non-debtor Heartland Services, LLC holds a 50% ownership and voting interest in Heartland Healthcare Services, LLC, a joint venture with Omnicare, Inc. (a subsidiary of CVS Health Corporation), which provides pharmaceutical services to the Company's patients, including patients within SNFs and ALFs.

### B.    The MLSA and the Guaranty

On April 7, 2011, the Company entered into a sale-lease-back transaction with HCP, Inc. and certain of its affiliates ("HCP") pursuant to which (i) the Company sold the real property used in the operation of a significant portion of its skilled nursing and assisted living facilities to HCP (the "Sale-Lease-Back Properties") and (ii) non-debtor HCR III leased the Sale-Lease-Back Properties from HCP pursuant to a Master Lease and Security Agreement, dated as of April 7, 2011 (as amended from time to time, the "MLSA") between HCR III and HCP. The MLSA is a long-term triple-net master lease, and the Debtor guaranteed the obligations of HCR III under the MLSA pursuant to that certain Guaranty of Obligations, effective as of February 11, 2013 (as amended or modified from time to time, the "Guaranty"). As noted above, the leased property under the MLSA currently comprise 289 SNFs and ALFs nationwide (collectively, the "Leased Facilities"). The MLSA groups the Leased Facilities into four pools with initial terms that expire in 2029, 2030, 2032, and 2033.

In 2016, HCP created QCP as a new, wholly owned subsidiary and transferred the Leased Facilities to QCP. QCP and its affiliates assumed the role of lessor under the MLSA and, on October 31, 2016, HCP completed a spin-off of QCP as an independent, publicly traded company.

The MLSA requires HCR III to pay monthly rent to QCP. The monthly rent amount is determined pursuant to certain formulas set forth in the MLSA. In addition to monthly rent payments, the MLSA requires HCR III to pay certain additional charges and other amounts

specified in the MLSA (including taxes, utility charges, maintaining certain insurance and paying insurance premiums) and to spend a minimum annual amount for capital projects.

HCR III subleases the Leased Facilities to certain of its direct and indirect subsidiaries and affiliates (each a "Sublease OpCo" and, collectively, the "Sublease OpCos") pursuant to certain subleases. QCP, HCR III and the Sublease OpCos have also entered into certain Agreements Regarding Subleases made and entered as of April 7, 2011, October 23, 2015, February 16, 2016 and March 14, 2016 (as amended or modified from time to time, collectively, the "Agreements Regarding Subleases"). The MLSA and the Agreements Regarding Subleases contemplate this arrangement and prescribe the form of sublease between HCR III and the Sublease OpCos. The subleases require the Sublease OpCos to pay monthly rent to HCR III in accordance with the Agreements Regarding Subleases.

### C.    Employees

Five current or former members of the Company's senior management are parties to employment agreements with the Debtor. The Debtor's non-debtor affiliates employ approximately 50,000 individuals in full- and part-time positions, including nurses, therapists, medical directors and other health professionals, maintenance technicians, administrative support and other staff and corporate personnel.

### D.    Prepetition Capital Structure

The Debtor is a party to that certain Credit Agreement, dated as of July 17, 2017 (as amended on August 25, 2017 and December 22, 2017), among HCR Home Health Care and Hospice, LLC, an indirect non-debtor subsidiary of the Debtor, as borrower; the Debtor and certain of its direct and indirect non-debtor subsidiaries, as holdcos; the several lenders from time to time party thereto; and RD Credit, LLC, as administrative agent and collateral agent (the "Credit Facility Agent"). The Credit Agreement provides for a $400 million term loan (the "Term Loan") and a $150 million revolving credit facility (the "Revolving Facility" and, together with the Term Loan, the "Credit Facility").

The Credit Facility is scheduled to mature on January 17, 2019. Interest on the Credit Facility is payable quarterly at a rate per annum of 9.5%. Proceeds of the Credit Facility were used for general corporate purposes and to repay the previous $575 million credit facility, dated as of April 6, 2011, by and between HCR Healthcare, LLC, as borrower, and JPMorgan Chase Bank, N.A, as administrative agent and collateral agent (the "Prior Credit Facility").

The Debtor is also a party to that certain Guarantee and Collateral Agreement dated as of July 17, 2017 (the "Guarantee and Collateral Agreement"). Under the Guarantee and Collateral Agreement, the Debtor, the other holdcos and certain other indirect non-debtor subsidiaries of the Debtor have guaranteed the borrower's obligations under the Credit Facility. The parties' obligations under the Credit Facility and the Guarantee and Collateral Agreement, including the Debtor's guarantee obligations, are secured by a first lien on substantially all of the parties' assets, including the Debtor's assets.

The Credit Agreement provides that the commencement of the Chapter 11 Case shall not constitute an event of default thereunder.

15

# ARTICLE IV.
# EVENTS LEADING TO THE CHAPTER 11 FILING

### A.    Industry-Wide Trends

At the time the Company entered into the MLSA in 2011, the business environment in the post-acute/skilled nursing sector was favorable due to a number of factors, including an aging population, expected increases in aggregate skilled nursing expenditures, and supply constraints in the skilled nursing sector due to substantial barriers to entry.  The parties negotiated the amount of rent payable under the MLSA against this background.

Since that time, however, the operating environment for post-acute/skilled nursing facility operators has become significantly more challenging.  Unfavorable trends for operators of skilled nursing facilities include (a) a shift away from a traditional fee-for-service model toward new managed-care models, which base reimbursement on patient outcome measures; (b) increased penetration of Medicare Advantage plans, which has reduced reimbursement rates, average length of stay and average daily census; (c) increased competition from alternative healthcare services such as home health agencies, life care at home, community-based service programs, senior housing, retirement communities and convalescent centers; and (d) reduction of reimbursement rates from government payors.

### B.    Transfers of Cash to the Long-Term Care Business from the 4H Business and the Outpatient Rehab and Other Businesses

This challenging business environment has resulted in decreasing revenues from the Long-Term Care Business and impeded HCR III's ability to pay rent under the MLSA.  Beginning as early as June 2012, the "Rent Coverage Ratio" under the MLSA fell below the permitted threshold, which resulted in a "Rent Coverage Trigger Event."  Also beginning in 2012, the Facilities' net cash flows in certain months were insufficient to allow the Sublease OpCos to make the required rent payments to HCR III under the subleases and, in turn, would have rendered HCR III unable to make its rent payments to QCP under the MLSA absent support from the Company's other business segments.  Since 2012, despite the parties' agreement upon certain deferrals of rent obligations from time to time, the Company's other business segments—the 4H Business and the Outpatient Rehab and Other Businesses—frequently advanced the additional funds necessary to permit HCR III to make its rent payments to QCP under the MLSA.  Since 2011, HCR III and its subsidiaries have received more than $500 million in intercompany funds from the Company's other business segments to assist HCR III and its subsidiaries in meeting their obligations.  These transfers continued until April 2017, when a default occurred under the Prior Credit Facility and the lenders thereunder prohibited any further transfers of their cash collateral to the Long-Term Care Business, including, without limitation, for the payment of rent under the MLSA.

Unlike the Long-Term Care Business, the 4H Business and Outpatient Rehab and Other Businesses have continued to grow and, in the case of the 4H Business, has been increasingly profitable in recent years.

ACTIVE 228469046

### C.    Prior Agreements and Amendments

In the years prior to the Debtor's commencement of the Chapter 11 Case, HCR III, HCP and its successor-in-interest under the MLSA, QCP, executed a series of agreements and amendments relating to the MLSA, which afforded HCR III certain deferrals and temporary reductions of their rent obligations under the MLSA. As detailed below, however, none of these agreements and amendments provided a long-term solution addressing HCR III's inability to meet its rent obligations under the MLSA (absent asset sales) and the financial difficulties facing the Long-Term Care Business.

### 1.    *Sale of Non-Strategic Facilities*

On February 6, 2015, HCR III and HCP entered into a letter agreement whereby HCR III and HCP agreed to cooperate in selling at least forty-eight (48) non-strategic Facilities covered by the MLSA, resulting in a negotiated reduction of the amount of rent payable under the MLSA. Overall, fifty-one (51) Facilities were sold under the letter agreement, resulting in a $27.3 million reduction in the annual rent under the MLSA.

### 2.    *Tenth Amendment to the MLSA*

Effective April 1, 2015, HCR III and HCP entered into the Tenth Amendment to Master Lease and Security Agreement (the "Tenth Amendment"), which provided for, among other things, (a) certain deferred rent payments, (b) the resetting of rent escalations and (c) the extension of the initial term of the MLSA by five years. To temporarily reduce HCR III's monthly payments under the MLSA, the Tenth Amendment deferred $525 million of HCR III's rent obligations (the "Deferred Rent Obligation"). The Deferred Rent Obligation was divided into two tranches of $275 million (the "Tranche A DRO") and $250 million (the "Tranche B DRO"), respectively. The Tenth Amendment provides that, together with each of its monthly rent payments, HCR III shall also make monthly payments of a portion of the Tranche A DRO and the Tranche B DRO.

Also as part of the Tenth Amendment, the Company agreed to sell to HCP nine of its long-term care facilities not subject to the MLSA for a purchase price of $275 million. In accordance with the terms of the Tenth Amendment, the Company used the proceeds of the sale to pre-pay the Tranche A DRO upon the closing of the sale transaction. On July 15, 2017, QCP provided notice to HCR III that, as a result of the occurrence of an event of default under the MLSA, the aggregate outstanding amount of the Tranche B DRO of approximately $265.225 million, was immediately due and payable. The Tranche B DRO remained outstanding as of the Petition Date.

### 3.    *2016–17 Rent Deferrals*

HCR III and QCP agreed to certain additional rent deferrals in November 2016 (the "Rent Deferral Agreement"). Specifically, HCR III and QCP agreed to one-time deferral of rent, in the aggregate amount of $30 million, which consisted of (a) a $5 million deferral for November 2016, (b) a $15 million deferral for December 2016 and (c) a $10 million deferral for January 2017, subject to certain conditions.

ACTIVE 228469046

### 4. *April 2017 Forbearance Agreement*

Following the execution of the Tenth Amendment and the Rent Deferral Agreement, the Sublease OpCos continued to have difficulty generating revenues sufficient to meet their rent obligations under the subleases and pay their ordinary-course operating expenses. Beginning in November 2016, various representatives of the Company and QCP, and their respective advisors, engaged in extensive negotiations regarding a potential long-term solution to the financial difficulties facing the Long-Term Care Business. To facilitate a continuing dialogue in furtherance of a consensual restructuring and to temporarily defer certain rent payments, QCP, HCR III and the Debtor entered into the Forbearance Agreement on April 5, 2017 (the "April 2017 Forbearance Agreement"). Pursuant to the April 2017 Forbearance Agreement, QCP, HCR III and the Debtor agreed, among other things, that HCR III's rent obligations in excess of $32 million per month would be deferred for the months of April, May and June 2017, with payment of the deferred portion thereof (approximately $7.5 million per month) due on the earlier of (a) July 5, 2017 and (b) termination the April 2017 Forbearance Agreement.

### D. **Default and Acceleration of the Prior Credit Facility**

As a result of the Company's ongoing financial difficulties and in the absence of a long-term restructuring of the MLSA to reduce rents, the Company's financial statements for the fiscal year ending December 31, 2016 were issued with a "going concern" qualification. This qualification was a default under the Prior Credit Facility, which was secured by substantially all of the assets of the 4H Business, the Outpatient Rehab and Other Businesses and the Company's "services" entities, including HCR Services. On May 4, 2017, the Company entered into a short-term forbearance agreement with an ad hoc group of lenders comprising a substantial majority of the commitments under the Prior Credit Facility in the interest of facilitating continued discussions regarding a longer-term forbearance. Ultimately, the parties failed to reach agreement on a longer-term forbearance, and, on May 16, 2017, the administrative agent under the Prior Credit Facility transmitted a notice of acceleration to the Company. The acceleration notice terminated all commitments under the Prior Credit Facility and declared all outstanding amounts under the Prior Credit Facility immediately due and payable.

### E. **The Company's Segregation of Cash and HCR III's Subsequent Rent Payments**

Beginning in May 2017, HCR III began making monthly rent payments to QCP based on the cash generated by the Sublease OpCos after payments of the Sublease OpCos' operating expenses while retaining sufficient cash to continue operations of the Long-Term Care Business. The amount of available SNF Cash was not sufficient, however, to enable HCR III to meet its full rent obligations in any month since institution of the cash segregation protocol.

### F. **Filing of the Receivership Complaint and Entry Into the December 2017 Forbearance Agreement**

### 1. *July 2017 Default Notice*

On July 7, 2017, QCP sent a notice to HCR III and the Debtor stating, among other things, that HCR III had failed to pay in full the rent due under the MLSA for April, May, June and July

ACTIVE 228469046

2017, as well as late charges and interest with respect to such installments, totaling $79,628,590, plus interest (the "Default Amount"). On July 15, 2017, QCP sent another notice to HCR III and the Debtor stating that their failure to pay the foregoing amount on or prior to July 14, 2017 had resulted in the occurrence of an event of default under the MLSA affecting all Facilities. As a result of the alleged event of default, QCP demanded, among other things, immediate payment of (a) the Default Amount and (b) the total amount of the Deferred Rent Obligation in the aggregate amount of $265.225 million. QCP also demanded that the Debtor, as guarantor under the MLSA, immediately pay the Default Amount and all other amounts owed under the MLSA. QCP also noted, however, that the MLSA, the Agreements Regarding Subleases and the Guaranty remained in full force and effect and had not been terminated.

### 2.    *Receivership Complaint*

On August 17, 2017, after months of continued negotiations without an agreement on a long-term restructuring, QCP filed a complaint against the Debtor, HCR III and "John Does 1–50" in Los Angeles County Superior Court, styled as *Quality Care Properties, Inc. and HCP Properties, LP* v. *HCR III Healthcare, LLC et al.*, Los Angeles County Super. Ct. No. BC672837, seeking, among other relief, the appointment of a receiver for HCR III (the "Receivership Proceeding").

On January 26, 2018, the Debtor filed a demurrer objecting to and requesting the dismissal of the Receivership Proceeding. On February 9, 2018, QCP filed an amended complaint. On February 15, 2018, the court issued a tentative case management order setting a schedule for the Receivership Proceeding, subject to comment by the parties. The Plan provides that the Receivership Proceeding shall be deemed dismissed with prejudice as of the Effective Date and that QCP shall cause the complaint filed in the Receivership Proceeding to be withdrawn from the relevant court docket as soon as practicable after the effective date Plan.

### 3.    *December 2017 Forbearance Agreement*

Following the filing of the Receivership Complaint, the parties continued negotiations for a comprehensive restructuring of the Company. In furtherance of these discussions, QCP and the Company entered into a series of stipulations extending the deadline by which the Company was required to file a response in the Receivership Proceeding. In addition, on December 22, 2017, QCP, HCR III, and the Debtor entered into that certain Forbearance Agreement and Amendment to Master Lease and Security Agreement, dated as of December 22, 2017 (the "December 2017 Forbearance Agreement"). Pursuant to the December 2017 Forbearance Agreement, QCP, HCR III, and the Debtor agreed to a reduced cash rent under the MLSA from November 30, 2017 until November 30, 2018 in the amount of $23.5 million per month, with the remaining amounts of rent due during the period to be deferred.

The December 2017 Forbearance Agreement acknowledged HCR III's expectation that it would be unable to pay a material portion of Reduced Cash Rent during part or all of the period ending November 30, 2018.

### 4.    *Appointment of CRO and Independent Directors*

In connection with its ongoing restructuring negotiations, the Company took additional steps to address issues raised by QCP with respect to the Company's corporate governance. Effective August 31, 2017, John R. Castellano was hired as Chief Restructuring Officer of the Debtor. Mr. Castellano is charged with leading and supporting the Company's restructuring efforts with the Debtor's board of directors, senior management of the Company, and other employees of the Company, among other duties. In addition, effective as of September 14, 2017, the Debtor appointed two new independent directors to its board, Sherman Edmiston III and Kevin P. Collins. The Debtor also established a special restructuring committee of the Debtor's board of directors to develop plans, proposals and recommendations for a financial restructuring of the Company, with the assistance of the Chief Restructuring Officer and the Company's other advisors, and provide direction to Company management in connection therewith. Mr. Edmiston and Mr. Collins, as the independent directors, are the two members of the special restructuring committee.

### 5.    *The Plan Sponsor Agreement and the Plan*

After more than fifteen (15) months of extensive negotiations, on March 2, 2018, the Debtor and QCP agreed to a comprehensive restructuring of the Debtor in accordance with the terms of the Plan Sponsor Agreement, the Restructuring Support Agreement and the Plan.

## ARTICLE V.
## OTHER KEY ASPECTS OF THE PLAN AND THE PLAN SPONSOR AGREEMENT

### A.    **Distributions**

One of the key concepts under the Bankruptcy Code is that only claims and interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim or Interest means that the Debtor agrees, or if there is a dispute, the Bankruptcy Court determines, that the Claim or Interest, and the amount thereof, is in fact a valid obligation of the Debtor. Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties, on the Effective Date, the Debtor shall make initial distributions under the Plan on account of Allowed Claims, including those that become Allowed as of the Effective Date, subject to the Reorganized Debtor's right to object to Claims. A more detailed discussion of the treatment and anticipated means of satisfaction for each Class of Allowed Claims or Interests is set forth in ARTICLE I.E and ARTICLE I.F above.

During the period from the Confirmation Date through and until the Effective Date, the Debtor may continue to operate its business as debtor in possession in the ordinary course in a manner consistent with its obligations under the Plan Sponsor Agreement and the transactions contemplated by the Plan and the Plan Sponsor Agreement, subject to all applicable orders of the Bankruptcy Court and the provisions of the Bankruptcy Code.

### B.      Restructuring Transactions

#### 1.      *Debt Exchange*

On the Effective Date, QCP or its designee(s) shall receive, and the Debtor shall issue, transfer, and deliver to QCP or its designee(s), 1,000,000 newly issued shares of New Common Stock of the Debtor, par value $0.01 per share, which shall constitute all of the issued and outstanding capital stock and rights to purchase or otherwise acquire capital stock of the Debtor, free and clear of any lien, charge, pledge, security interest, claim, or other Encumbrance, in full satisfaction of all of the QCP Claims.

#### 2.      *New Master Lease*

On the Effective Date, the Reorganized Debtor shall cause HCR III to, and QCP and the Lessors shall, enter into the Master Lease Amendment, substantially in the form of Exhibit C to the Plan.  HCR III's obligations under the New Master Lease shall not be guaranteed, and, on or prior to the seventh day after the Effective Date, QCP shall cause the Lessors and HCR III to terminate, release and discharge the Guaranty pursuant to the Plan Sponsor Agreement.

Under the New Master Lease, HCR III, as lessee, will be obligated to pay, as partial payment of minimum rent for each month, all monthly free cash flow for such month, with the remaining minimum rent for each calendar month to be added to the amount of a new deferred rent obligation.  The new deferred rent obligation will be due and payable on the earliest to occur of the anniversary of the Effective Date in 2025 or the occurrence of certain other specified events.  The existing Tranche B DRO will be eliminated upon the Effective Date.

#### 3.      *Corporate Governance, Directors and Officers*

##### a.      Certificate of Incorporation; By-Laws

On the Effective Date, the Certificate of Incorporation and the By-Laws shall go into effect. Consistent with, but only to the extent required by, section 1123(a)(6) of the Bankruptcy Code, on the Effective Date, the Certificate of Incorporation will be amended to prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtor may amend and restate its certificates or articles of incorporation, by-laws, or similar governing documents, as applicable, as permitted by applicable law.

##### b.      Directors and Officers of Reorganized Debtor

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial directors and officers of the Reorganized Debtor on the Effective Date shall be selected by QCP, and identified prior to the Confirmation Hearing.  After the Effective Date, the Certificate of Incorporation and the By-Laws, as each may be amended thereafter from time to time, shall govern the designation and election of directors.

ACTIVE 228469046

4.      *Corporate Action*

On the Effective Date, (a) the selection of directors and officers for Reorganized Debtor, (b) the issuance and distribution of the New Common Stock, and (c) all other actions and transactions contemplated by the Plan and the Plan Sponsor Agreement shall be deemed authorized and approved in all respects (subject to the provisions of the Plan and the Plan Sponsor Agreement).  All matters provided for in the Plan and the Plan Sponsor Agreement involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan and the Plan Sponsor Agreement, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirement of further action by the security holders or directors of the Debtor or the Reorganized Debtor.  On and after the Effective Date, the appropriate officers of the Reorganized Debtor and members of the boards of directors or managers of the Reorganized Debtor shall be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan and the Plan Sponsor Agreement in the name of and on behalf of the Reorganized Debtor.

C.      **Regulatory Approvals**

The Debtor and the business conducted by certain of its affiliates are subject to regulatory oversight by a number of Governmental Entities.  Among other conditions precedent to the Effective Date, the effectiveness of the Plan is subject to obtaining certain Governmental Approvals, except to the extent such Governmental Approvals would not, in the aggregate, reasonably be expected to result in losses, costs, liabilities or expenses to the parties to the Plan Sponsor Agreement and their respective subsidiaries in excess of $5,000,000.  The Debtor and QCP anticipate seeking each of the necessary Governmental Approvals from the relevant Governmental Units as soon as practicable after the Petition Date.

D.      **Treatment of Executory Contracts and Insurance Policies**

1.      *Assumption or Rejection of Executory Contracts*

On the Effective Date, all Executory Contracts of the Debtor will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract (a) was previously assumed or rejected by the Debtor, (b) previously expired or terminated pursuant to its own terms, or (c) upon QCP's prior written consent or request, is subject to a motion to reject such Executory Contract filed prior to the Effective Date.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and the rejection of any Executory Contract for which a motion to reject has been filed, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each Executory Contract assumed pursuant to Article VI of the Plan shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume or reject Executory Contracts pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed

breached by, the assumption of such Executory Contract, including any "change of control" provision, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or to exercise any other default-related rights with respect thereto.

### 2.      *No Cure Obligations*

There are no anticipated cure obligations with respect to any Executory Contract  to which the Debtor is a party.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments will be required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to any Executory Contract assumed pursuant to the Plan.  Subject to the occurrence of the Effective Date, the entry of the Confirmation Order will be deemed to constitute a finding by the Bankruptcy Court that (i) each such assumption is in the best interest of the Debtor and its Estate, and (ii) the requirements of section 365(b)(l) of the Bankruptcy Code are deemed satisfied.

### 3.      *Insurance Policies and Agreements*

Insurance policies issued to, or insurance agreements entered into by, the Debtor prior to the Petition Date (including, without limitation, any policies covering directors' or officers' conduct) will continue in effect after the Effective Date.  To the extent that such insurance policies or agreements are considered to be Executory Contracts, the Plan will constitute a motion to assume or ratify such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtor and its Estate.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments will be required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to each such insurance policy.

### 4.      *Post-Petition Contracts and Leases*

All contracts, agreements and leases that were entered into by the Debtor or assumed by the Debtor after the Petition Date will be deemed assigned by the Debtor to the Reorganized Debtor on the Effective Date.

### 5.      *Modifications, Amendments, Supplements, Restatements or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements and restatements to prepetition Executory Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority or amount of any Claims that may arise in connection therewith.

ACTIVE 228469046

**E.      Discharges, Releases, Exculpations and Injunctions; Survival of Indemnification and Exculpation Obligations**

1.      *Discharges*

a.      Discharge of Claims and Termination of Interests

Except as otherwise provided in the Plan or in the Confirmation Order including with respect to any Claims that are Reinstated under the Plan, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and Interests of any nature whatsoever, whether known or unknown, against the Debtor or its Estate, assets, properties or interest in property, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests. On the Effective Date, except for Reinstated Claims, the Debtor shall be deemed discharged and released under section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims and Interests, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, General Unsecured Claims, and Interests in the Debtor.

b.      Discharge Injunction

As of the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities (other than holders of Reinstated Claims solely in their capacities as such) shall be precluded from asserting against the Debtor or the Reorganized Debtor and their respective assets and property or the Estate, any other or further Claims (other than those Reinstated under the Plan), or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, relating to the Debtor or Reorganized Debtor or any of their respective assets and property or the Estate, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all non-Reinstated Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtor, the Reorganized Debtor, or its respective assets, property and Estate at any time, to the extent such judgment is related to a discharged Claim, debt or liability.  Except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons or Entities who have held, hold or may hold Claims or Interests that arose prior to the Effective Date and all other parties-in-interest, along with their respective present or former employees, agents, officers, directors, principals, representatives and Affiliates, are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim (including a Section 510(b) Claim) against or Interest in the Reorganized Debtor or property of the Reorganized Debtor, other than to enforce any right to a distribution pursuant to the Plan, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Reorganized Debtor or property of the Reorganized Debtor, other than to enforce any right to a distribution pursuant to the Plan, (iii) creating, perfecting or enforcing any Lien or encumbrance of any kind against the

24

Reorganized Debtor or against the property or interests in property of the Reorganized Debtor, other than to enforce any right to a distribution pursuant to the Plan or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Reorganized Debtor or against the property or interests in property of the Reorganized Debtor, with respect to any such Claim or Interest. Such injunction shall extend to any successors or assignees of the Reorganized Debtor and their respective properties and interest in properties. For the avoidance of doubt, the provisions of Section 9.2.2 of the Plan shall not apply with respect to Claims that are Reinstated under the Plan, including, without limitation, the Credit Facility Claims and the Intercompany Note Claims.

### 2. *Releases*

#### a. **Releases by the Debtor**

**Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each of the Debtor and Reorganized Debtor on its own behalf and as a representative of its respective Estate, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims and Causes of Action (including, without limitation, Avoidance Actions), any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, direct or derivative, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to the Debtor, the Reorganized Debtor, their respective assets and property, and the Estate, the Chapter 11 Case, the Plan, the Plan Supplement or this Disclosure Statement that may be asserted by or on behalf of the Debtor, the Reorganized Debtor or the Estate against any of the Released Parties; provided, however, that nothing in Section 9.3 of the Plan shall be construed to release any party from fraud, willful misconduct or gross negligence as determined by a Final Order.**

#### b. **Releases by Certain Holders of Claims**

**Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Holder of a Claim or an Interest that votes to accept the Plan shall be deemed to have completely and forever released, waived, and discharged unconditionally each of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, direct or derivative, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to the Debtor, the**

ACTIVE 228469046

**Reorganized Debtor or their respective assets and property, and the Estate, the Chapter 11 Case, the Plan, the Plan Supplement, and/or this Disclosure Statement; _provided_, _however_, that nothing in Section 9.4 of the Plan shall be construed to release (x) any party from fraud, willful misconduct or gross negligence as determined by a Final Order or (y) any Reinstated Claims including, without limitation, the Credit Facility Claims and the Intercompany Note Claims.**

3.       *Exculpations*

a.       Exculpation

From and after the Effective Date, the Exculpated Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, formulating, negotiating or implementing the Plan, the Plan Supplement, this Disclosure Statement, the Plan Sponsor Agreement, the Restructuring Support Agreement, the New Master Lease, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, the administration of the Plan, the property to be distributed under the Plan, the consummation of the transactions contemplated by the Plan Sponsor Agreement, or any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Case or implementation of the Plan; _provided_, _however_, that Section 9.5 of the Plan shall not apply to release (x) obligations under the Plan, and obligations under the Plan Sponsor Agreement, the Restructuring Support Agreement, the New Master Lease and the contracts, instruments, releases, agreements, and documents delivered, Reinstated or assumed under the Plan (including, without limitation, the Credit Facility and the Intercompany Note), and (y) any Claims or Causes of Action arising out of fraud, willful misconduct or gross negligence as determined by a Final Order.  Any of the Released Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under the Plan.

Notwithstanding the foregoing, solely to the extent provided by section 1125(e) of the Bankruptcy Code, the Debtor and the Reorganized Debtor shall neither have, nor incur any liability to any Entity for any exculpated Claim; _provided_, _however_, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, willful misconduct or gross negligence.

Any of the Exculpated Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under the Plan.

b.       Injunctions

(i)       Injunction Related to Exculpation

Except as expressly provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons and Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action or liability of any nature whatsoever,

26

of the types described in Section 9.5 of the Plan and relating to the Debtor, the Reorganized Debtor or any of their respective assets and property and/or the Estate, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or the, any amount against any liability or obligation that is discharged under Section 9.1 of the Plan; and/or (v) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

(ii)     Injunction Related to Releases

Except as expressly provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons and Entities that hold, have held, or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, Cause of Action or liability of any nature whatsoever, of the types described in Section 9.4 of the Plan and relating to the Debtor, the Reorganized Debtor or any of their respective assets and property and/or the Estate, the Chapter 11 Case, the Plan, the Plan Supplement and/or this Disclosure Statement are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 9.1 of the Plan; and/or (v) commencing or continuing in any manner any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

## 4.     *Survival of Indemnification and Exculpation Obligations*

The obligations of the Debtor to indemnify and exculpate any past and present directors, officers, agents, employees and representatives who provided services to the Debtor prior to or after the Petition Date, pursuant to certificates or articles of incorporation, by-laws, contracts

and/or applicable statutes, in respect of all actions, suits and proceedings against any of such officers, directors, agents, employees and representatives, based upon any act or omission related to service with, for or on behalf of the Debtor, shall not be discharged or Impaired by Confirmation or consummation of the Plan and shall be assumed by the Reorganized Debtor. For the avoidance of doubt, Section 9.7 of the Plan affects only the obligations of the Debtor and Reorganized Debtor with respect to any indemnity or exculpation owed to or for the benefit of past and present directors, officers, agents, employees and representatives of the Debtor, and shall have no effect on nor in any way discharge or reduce, in whole or in part, any obligation of any other Person, including any provider of director and officer insurance, owed to or for the benefit of such past and present directors, officers, agents, employees and representatives of the Debtor. For further avoidance of doubt, the provisions regarding indemnification, exculpation and directors' and officers' insurance contained in section 4.7 of the Plan Sponsor Agreement shall be deemed incorporated into the Plan as if set forth fully herein.

### F.    Excess Severance Payments; Former CEO Settlement Agreement

Section 1.5(b) of the Plan Sponsor Agreement provides, in pertinent part, that QCP shall establish an account to fund Excess Severance Payments (as defined in the Plan Sponsor Agreement) and, following the Effective Date, shall cause such account to be funded with all amounts necessary to make the Excess Severance Payments and, subject to certain conditions and requirements set forth in the Plan Sponsor Agreement, cause the Excess Severance Payments to be paid to each of the current Chief Executive Officer, Chief Financial Officer, General Counsel and Chief Operating Officer of the Debtor.

The Debtor also intends to, with the consent of QCP, offer to the Former CEO (as defined in the Plan Sponsor Agreement) a settlement agreement in the form attached to the Plan Sponsor Agreement as Exhibit 3 (the "Former CEO Settlement Agreement"), which, if entered into among the Debtor, QCP and the Former CEO, would entitle the Former CEO to certain amounts and payments in respect of the Former CEO's claimed interests in and entitlements to certain deferred compensation, severance and other benefits. Under the terms of the Plan Sponsor Agreement and the Former CEO Settlement Agreement, such amounts and payments would be made to the Former CEO no earlier than the Effective Date.

### ARTICLE VI.
### CONFIRMATION PROCEDURES

### A.    Combined Hearing on Confirmation and Approval of Disclosure Statement and Solicitation

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. On the Petition Date, the Debtor will file a motion requesting that the Bankruptcy Court set a date and time approximately forty (40) days after the Petition Date for the Confirmation Hearing. In this case, the Debtor will also request that the Bankruptcy Court approve this Disclosure Statement at the Confirmation Hearing. The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the

entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code and the Plan Sponsor Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  The Debtor, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file Plan objections.  All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections as set forth therein.

## B.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation are that the Plan is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of Holders of Claims and Interests that are Impaired under the Plan.  The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization.   The Plan fully complies with the statutory requirements for Confirmation listed below.

- The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtor (or any other proponent of the Plan) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, in connection with the Plan and incident to the Chapter 11 Case is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtor has disclosed the identity and affiliations  of any individual proposed to serve, after Confirmation, as a director, or officer, the Reorganized Debtor, any Affiliate of the Debtor reorganized under the Plan, or any successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and Holders of Interests and with public policies.

- The Debtor has disclosed the identity of any Insider that will be employed or retained the Reorganized Debtor and the nature of any compensation for such Insider.

ACTIVE 228469046

- With respect to each Holder within an Impaired Class of Claims or Interests, each such Holder has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a Class of Claims or Interests is Impaired under the Plan, at least one Class of Claims or Interests that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtor, or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

**C.    Best Interests of Creditors / Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code. Three Classes of Claims or Interests (other than Intercompany Claims) are Impaired under the Plan: QCP Claims (Class 4), Section 510(b) Claims (Class 7) and Interests of the Debtor (Class 8). The Holders of QCP Claims, as the only voting Class under the Plan, must accept the Plan in order for the Plan to be confirmed, thereby satisfying clause (a) above. The Holders of Section 510(b) Claims and Interests of the Debtor would receive no distribution if the Debtor were liquidated under chapter 7 of the Bankruptcy Code for the reasons explained below. Moreover, the Holders of approximately 90% of the Interests in the Debtor affirmatively support the Plan, and the Debtor is unaware of any Section 510(b) Claims.

If the Debtor were liquidated under chapter 7, QCP's Claim against the Debtor under the MLSA Guarantee is estimated to be no less than the amount of the QCP Claim plus, in accordance with section 502(b)(6) of the Bankruptcy Code, damages equal to the rent reserved by the MLSA, without acceleration, for the greater of one year, or fifteen percent (15%), not to exceed three years, of the remaining post-petition term of the MLSA (the "QCP Chapter 7 Claim"). The QCP Chapter 7 Claim would need to be paid in full before the Holders of Section

ACTIVE 228469046

510(b) Claims and Interests of the Debtor would be entitled to any distribution in the chapter 7 case.

Other than cash on hand, the Debtor's only material asset is the stock (the "Subsidiary Stock") of its direct subsidiary HCR ManorCare Operations II, LLC (the "Subsidiary"), which is an intermediate holding company. In a hypothetical case under chapter 7 of the Bankruptcy Code, the Debtor would be required to sell the Subsidiary Stock. The value of the Subsidiary Stock derives from the going-concern value of the Company's businesses: the Long-Term Care Business, the 4H Business and the Outpatient Rehab and Other Businesses. The Long-Term Care Business, which historically has generated approximately 80% of the Company's revenues, is operated through subsidiaries of HCR III (*i.e.*, the Sublease OpCos), the lessee under the MLSA. As explained above, the Long-Term Care Business is unable to generate sufficient cash flows for the Sublease OpCos to make their sublease payments to HCR III and, in turn, for HCR III to make the rent and other payments owing to QCP under the current version of the MLSA. Absent a restructuring of the MLSA, HCR III would continue to be unable to meet its obligations to QCP under the MLSA and would continue to be insolvent. Therefore, in a chapter 7 liquidation of the Debtor, the MLSA obligations owing to QCP would not be satisfied in full and therefore all of the value of the Long-Term Care Business would be absorbed by the direct liabilities of HCR III and the Sublease OpCos. Consequently, potential purchasers of the Subsidiary Stock would ascribe no value to the Long-Term Care Business.

Because the Long-Term Care Business would remain insolvent in a hypothetical chapter 7 case for the Debtor, the cash proceeds generated by a sale of the Subsidiary Stock would depend entirely upon the going-concern value of the 4H Business and the Outpatient Rehab and Other Businesses. More specifically, the sale proceeds would depend upon the value of those businesses in excess of the direct liabilities of the legal entities that operate such businesses and the liabilities of the intermediate holding companies (the "Excess 4H Value").[4] Such liabilities include:

- Approximately $550 million plus accrued interest outstanding under the Credit Facility; and

- Approximately $145 million in deferred compensation and other retirement obligations owed by an intermediate non-debtor subsidiary holding company, Manor Care, Inc.

Although the 4H Business and Outpatient Rehab Business are profitable and continue to grow, they historically have generated approximately 20% of the Company's revenues. The Financial Projections (as defined below) for the 4H Business and Outpatient Rehab Business are attached hereto as **Exhibit C**. Based on the foregoing, the Debtor and its investment bank, Moelis & Company LLC, believe the Excess 4H Value would be less—very likely significantly less— than the QCP Chapter 7 Claim. Accordingly, a sale of the Subsidiary Stock in a chapter 7 liquidation, coupled with cash on hand, would yield insufficient cash proceeds to provide any

---

[4] Claims against the intermediate non-debtor subsidiary holding companies of the Debtor are structurally senior to Claims against the Debtor and, therefore, would be paid in full before Claims against the Debtor receive any distribution.

distributions to the Holders of Section 510(b) Claims and Interests of the Debtor in a chapter 7 liquidation of the Debtor.

### D.    Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability, and that of its operating subsidiaries, to meet obligations under the Plan.  With respect to the non-debtor HCR III—which is subject to the MLSA and, after the Effective Date, will be subject to the New Master Lease—the monthly cash pay rent obligation under the New Master Lease is limited, until 2025, to the operating cash generated by the SNFs and ALFs that is available after paying and reserving for all other liabilities (the "Free Cash Flow").[5]  While the precise levels of Free Cash Flow for these businesses can vary from month to month and year to year, the Debtor is confident that Free Cash Flow for the foreseeable future will be substantially positive on a monthly basis and, accordingly, HCR III will be capable of timely satisfying all obligations as they come due through at least 2025.

With respect to the 4H Business and the Outpatient Rehab and Other Businesses, the Debtor, with the assistance of its advisors, has prepared projections for the calendar years 2018 through 2021, including management's assumptions related thereto, which are attached hereto as **Exhibit C** (the "Financial Projections").  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Debtor is unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtor's prospects.  As reflected in the Financial Projections, the Debtor anticipates that the 4H Business and the Outpatient Rehab and Other Businesses will timely meet all of their collective obligations and generate significant profits for the foreseeable future.

Upon the Effective Date, QCP shall make available, or cause to be made available, to the Reorganized Debtor such amounts as may be necessary to enable the Reorganized Debtor to fund or pay all of its obligations required to be funded or paid under the Plan (to the extent the Debtor does not have sufficient funds to pay such obligations when due).

Accordingly, the Debtor believes that Confirmation is not likely to be followed by liquidation or the need for further reorganization.

### E.    Acceptance by Impaired Class

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in ARTICLE VI.F below, each class of claims or interests that is impaired under a plan of reorganization, accept the plan.  A class that is not "impaired" under a plan is deemed to have

---

[5] The New Master Lease requires total monthly rent of $39.5 million.  The difference between the monthly Free Cash Flow and the total rent will (a) accrue, (b) bear payment-in-kind interest at the annual rate of four percent (4%), and (c) be payable in 2025.  Although the Debtor can make no assurances as to whether it will have the ability to satisfy the deferred rent (and accrued interest) in 2025, the Debtor does not believe that it will be in QCP's commercial interest, as indirect owner of the Long-Term Care Business, to enforce payment at that time.

ACTIVE 228469046

accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims or interests as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims or interests in that class, counting only those claims or interests that actually voted to accept or to reject the plan.  Thus, the Voting Class described herein will have voted to accept the Plan only if two-thirds in amount and a majority in number of Holders that actually vote on the Plan vote to accept.

### F.   Confirmation Without Acceptance by Impaired Class

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

#### 1.   *No Unfair Discrimination*

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."   The Debtor does not believe the Plan discriminates unfairly against any Impaired Class of  Claims or Interests.  The Debtor believes the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

#### 2.   *Fair and Equitable*

This test applies to Classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no Class of Claims or Interests receive more than 100% of the amount of the allowed Claims or Interests in such Class.  As to the dissenting Class, the test sets different standards depending on the type of Claims or Interests of the Debtor in such Class. In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- Class of Secured Claims:  That each holder of a secured claim: (a) retains its liens on property to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim; (b) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (c) receives the "indubitable equivalent" of its allowed secured claim.

- Class of Unsecured Claims:   That either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive or retain any property under the plan.

- Class of Equity Interests:  That either (a) each holder of an impaired interest will receive or retain under the plan property of a value equal to the greatest of

ACTIVE 228469046

the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest, or (b) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the plan.

The Debtor believes that the Plan satisfies the "fair and equitable" requirement notwithstanding that Classes 7 and 8 are deemed to reject the Plan, because, as to each such Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such class will receive or retain any property on account of the Claims or Interests in such Class.

### G.    Alternatives to Confirmation and Consummation of the Plan

The Debtor has evaluated several alternatives to the transactions set forth in Article VI of the Plan Sponsor Agreement.  After studying these alternatives, the Debtor believes that the Plan is the preferred approach to effectuating the Company's restructuring and maximizing the prospects of a successful turnaround and value for all stakeholders and, therefore, is in the best interests of all constituencies.  If the Plan is not confirmed, the Debtor's ability to continue operating as a going concern could be severely jeopardized.  The realistic alternatives likely will be either (1) the preparation and presentation of an alternative plan of reorganization, (2) a sale of some or all of the assets of the Company pursuant to section 363 of the Bankruptcy Code, or (3) a liquidation under chapter 7 of the Bankruptcy Code.

### ARTICLE VII.
### RISK FACTORS

The following provides a summary of various important considerations and other risk factors associated with the Plan; however, it is not exhaustive.  There are risks, uncertainties, and other important factors that could cause the Debtor's actual performance or achievements to be materially different from those they may project, and the Debtor undertakes no obligation to update any such statement.

### A.    Bankruptcy-Specific Considerations

### 1.    *General*

While the Debtor believes that the Chapter 11 Case will be of short duration and will not be materially disruptive to the Company's businesses, the Debtor cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have a material adverse effect on the Debtor and the Company's businesses.  A delay in the bankruptcy proceedings will also involve additional expense and may divert some of the attention of the Debtor's management away from business operations.

ACTIVE 228469046

2.    ***Objections to the Plan's Classification or Amounts of Claims and Interests***

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that parties in interest will not object to the classification or amounts of Claims and Interests under the Plan, or that the Bankruptcy Court will approve such classification or amounts.

3.    ***The Conditions Precedent to the Effective Date of the Plan May Not Occur***

As more fully set forth in Article VIII of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not satisfied or waived, the Effective Date will not occur.

4.    ***Failure to Obtain or Delay in Obtaining Governmental Approvals***

Among other conditions precedent to the Effective Date, the effectiveness of the Plan is subject to obtaining the Governmental Approvals set forth in Section 6.1(b) of the Debtor Disclosure Letter (as defined in the Plan Sponsor Agreement), except to the extent such Governmental Approvals would not, in the aggregate, reasonably be expected to result in losses, costs, liabilities or expenses to the parties to the Plan Sponsor Agreement and their respective subsidiaries in excess of $5,000,000. The Debtor anticipates seeking each of the necessary Governmental Approvals from the relevant Governmental Units as soon as practicable after the Confirmation Date.

Although the effectiveness of the Plan requires that all such Governmental Approvals be obtained, no assurance can be given that such Governmental Approvals will be obtained or such conditions to effectiveness of the Plan be satisfied or waived, as such Governmental Approvals are beyond the control of the parties to the Plan Sponsor Agreement. Even if all such Governmental Approvals are obtained and such conditions are satisfied or waived, no assurance can be given as to the terms, conditions and timing of such Governmental Approvals. For example, certain Governmental Entities providing such Governmental Approvals may require the Debtor or the Holders of Claims or the Holders of Interests to pay certain fees and/or accept certain conditions, requirements, limitations or restrictions that may be imposed by such Governmental Entities. Such fees, conditions, requirements, limitations or restrictions may jeopardize or delay consummation of the Plan or may result in the modification of the Plan, reducing the proposed treatment of the Voting Class and/or requirement the need for re-solicitation.

5.    ***Failure to Satisfy Voting Requirements***

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation.

ACTIVE 228469046

In the event that sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 6.    *Termination of Plan Sponsor Agreement*

The Plan Sponsor Agreement contains certain provisions that give certain parties the ability to terminate the Plan Sponsor Agreement upon the occurrence of certain events or if various conditions are not satisfied.  The Plan Sponsor Agreement is subject to automatic termination upon the occurrence of certain events, termination by mutual consent, and, depending on the termination event, the Debtor or QCP may terminate the Plan Sponsor Agreement.  Termination of the Plan Sponsor Agreement could result in a protracted Chapter 11 Case, which could significantly and detrimentally impact the Company's businesses.

### 7.    *Amendment of Plan Prior to Confirmation by the Debtor*

The Debtor, subject to the terms and conditions of the Plan and the Plan Sponsor Agreement, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for Confirmation.  The potential impact of any such amendment or waiver on Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  In addition, if the Debtor seeks to modify or amend the Plan after receiving sufficient acceptances, but prior to Confirmation, re-solicitation may be required.

### 8.    *Non-Confirmation or Delay of Confirmation of the Plan*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation of the Plan.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Court may determine that this Disclosure Statement and/or the solicitation procedures did not satisfy the requirements of the Bankruptcy Code or the Bankruptcy Rules or may decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.  If the Debtor fails to achieve Confirmation, the Chapter 11 Case would likely continue for a protracted period without indication of how or when the Chapter 11 Case may be completed.  Some of the risks that the Company faces in a bankruptcy

proceeding would become more acute in such a scenario, including certain risks that are beyond its control, such as further deterioration or other changes in economic conditions, changes in the industries in which the Company operates, potential revaluing of its assets due to chapter 11 proceedings, changes in patient demand for, and acceptance of, its services, regulatory difficulties and increasing expenses.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed.  A dissenting Holder of a Claim against the Debtor could challenge the solicitation procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the solicitation may be invalid.  If the Bankruptcy Court determined that the solicitation procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtor may not be able to successfully reorganize; (b) the distributions that Holders of Claims or Interests ultimately would receive, if any, with respect to their Claims or Interests is uncertain and (c) there is no assurance that the Debtor will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims or Interests.

### 9. *Non-Consensual Confirmation*

The Debtor intends to seek Confirmation notwithstanding the deemed rejection of the Plan by certain Classes of Claims or Interests.  The Bankruptcy Court may confirm the Plan pursuant to the "cram-down" provisions of the Bankruptcy Code if the Plan satisfies section 1129(b) of the Bankruptcy Code.  To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one Impaired Class (which cannot be an "insider" class) has accepted the Plan.

### 10. *Other Parties in Interest May Be Permitted to Propose Alternative Plans that Are Less Favorable to Certain Stakeholders*

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from filing.  Such exclusivity period can be reduced or terminated, however, upon order of the Bankruptcy Court.  If such an order were to be entered, other parties in interest would then have the opportunity to propose one or more alternative plans of reorganization.

### 11. *Conversion to Chapter 7*

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Case may be converted to case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to sell the Debtor's stock of the single direct subsidiary through which it owns interests in operating and non-operating subsidiaries within the Company and distribute the sale proceeds in accordance with the priorities established by the Bankruptcy Code.  See the

ACTIVE 228469046

description of the Liquidation Analysis in <u>ARTICLE VI.C</u> of this Disclosure Statement for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests.

### 12.    *Inability to Obtain Entry of Cash Collateral Order*

Upon commencing the Chapter 11 Case, the Debtor will file a motion with the Bankruptcy Court to authorize the Debtor to use cash collateral to fund the Chapter 11 Case and to provide customary adequate protection to the prepetition secured parties. Such access to cash collateral will provide liquidity during the pendency of the Chapter 11 Case. There can be no assurance that the Bankruptcy Court will approve such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Case takes longer than expected to conclude, the Debtor may exhaust its available cash collateral. There is no assurance that the Debtor will be able to obtain an extension of the right to use cash collateral, in which case, the liquidity necessary for the prosecution of this Chapter 11 Case may be materially impaired.

### 13.    *Failure to Obtain Approval of Releases, Injunctions and Exculpation*

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtor, the Reorganized Debtor, the other Released Parties and their respective Related Persons, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties may not be considered Released Parties or Exculpated Parties, and certain Released Parties may withdraw their support for the Plan.

### 14.    *Plan Based on Assumptions*

The Plan affects both the Debtor's capital structure and the ownership, structure, and operation of its businesses and reflects assumptions and analyses based on the Debtor's experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtor considers appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtor's expectations and assumptions depends on a number of factors, including but not limited to the Debtor's (a) ability to obtain adequate liquidity and financing sources; (b) ability to maintain the public's confidence in the Debtor's and Company's viability as a continuing entity and enterprise and to attract and retain sufficient business; and (c) ability to retain key employees, as well as the overall strength and stability of general economic conditions of industries in which the Company operates. The failure of any of these factors could materially adversely affect the successful reorganization of the Debtor's businesses.

In addition, the Plan relies upon the Financial Projections, including with respect to revenues, EBITDA, debt service, and cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they

do occur, that they will have the anticipated effects on the Debtor and its subsidiaries or their businesses or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful implementation of the Plan.

### 15. *Recoveries for Holders of New Common Stock in Future Cases of Bankruptcy, Liquidation, Insolvency or Reorganization*

Holders of the New Common Stock will be subordinated to all liabilities of the Reorganized Debtor and its subsidiaries, including the indebtedness under the Credit Agreement and the Intercompany Note, which, on the Effective Date, shall be Reinstated, with any corresponding liens against the assets of the Debtor securing the Credit Facility Claims and Intercompany Note, respectively, surviving the Effective Date. Therefore, the assets of the Reorganized Debtor will not be available for distribution to any holder of the New Common Stock in any bankruptcy, liquidation, insolvency or reorganization of the Debtor unless and until all indebtedness, if any, of the Reorganized Debtor, including the Credit Agreement and the Intercompany Note, to the extent any loans thereunder are outstanding, has been paid. The remaining assets of the Debtor and each of its subsidiaries may not be sufficient to satisfy the outstanding claims of its equity holders, including the holders of the New Common Stock.

### B. **Risks Related to the Debtor's and the Reorganized Debtor's Business**

### 1. *Reorganized Debtor's Dependence on Its Subsidiaries' Performance*

Upon the occurrence of the Effective Date, the Reorganized Debtor will continue to be a holding company and, as such, it will not have any independent operations, and its most significant asset will continue to be its ownership of the capital stock of its subsidiaries. As a consequence, the value of the New Common Stock will continue to be entirely dependent upon the future performance of its subsidiaries and will continue to depend upon the financial, business and other factors affecting its subsidiaries and the markets in which they do business, as well as general economic and financial conditions.

### 2. *Requirements of, or Changes to, Governmental Reimbursement Programs Such as Medicare or Medicaid May Adversely Affect the Reorganized Debtor's Ability to Meet Its Financial and Other Contractual Obligations*

The Debtor is, and the Reorganized Debtor will be, affected, directly or indirectly, by an extremely complex set of federal, state and local laws and regulations pertaining to governmental reimbursement programs. Such laws and regulations are subject to frequent and substantial changes that are sometimes applied retroactively. For the year ended December 31, 2017, the Long-Term Care Business generated a significant portion of its revenues from governmental payors, primarily Medicare and Medicaid. The Debtor is, and the Reorganized Debtor will be, affected by, directly or indirectly, among other things, statutory and regulatory changes; retroactive rate adjustments; recovery of program overpayments or set-offs; court decisions; administrative rulings; policy interpretations; payment or other delays by fiscal intermediaries or carriers; governmental funding restrictions (at a program level or with respect to specific facilities); and

interruption or delays in payments due to any ongoing governmental investigations and audits at such properties.

If the Reorganized Debtor and its affiliates fail to comply with the extensive laws, regulations and other requirements applicable to their businesses and the operation of their properties, they could become ineligible to receive reimbursement from governmental reimbursement programs, face bans on admissions of new patients or residents, suffer civil or criminal penalties or be required to make significant changes to their operations. These laws and regulations are enforced by a variety of federal, state and local agencies and can also be enforced by private litigants through, among other things, federal and state false claims acts, which allow private litigants to bring *qui tam* or "whistleblower" actions. The Reorganized Debtor would be adversely affected by the resources required to respond to an investigation or other enforcement action. In such event, the results of operations and financial condition of the Reorganized Debtor could be materially adversely affected. The Debtor is unable to predict future federal, state and local regulations and legislation, including the Medicare and Medicaid statutes and regulations, or the intensity of enforcement efforts with respect to such regulations and legislation, and any changes in the regulatory framework could have a materially adverse effect on the Reorganized Debtor.

Sometimes governmental payors freeze or reduce payments to healthcare providers, or provide annual reimbursement rate increases that are smaller than expected, due to budgetary and other pressures. Healthcare reimbursement will likely continue to be of significant importance to federal and state authorities. The Debtor cannot make any assessment as to the ultimate timing or the effect that any future legislative reforms may have on its costs of doing business and on the amount of reimbursement by government and other third-party payors. The failure of the Reorganized Debtor or its affiliates to comply with these laws and regulations, and significant limits on the scope of services reimbursed and on reimbursement rates and fees, could materially adversely affect the Reorganized Debtor's ability to meet its financial obligations.

**3.** ***Legislation to Address Federal Government Operations and Administration Decisions Affecting the Centers for Medicare and Medicaid Services Could Have a Materially Adverse Effect on the Reorganized Debtor's Liquidity, Financial Condition or Results of Operations***

Congressional consideration of legislation pertaining to the federal debt ceiling, the Patient Protection and Affordable Care Act, along with the Health Care and Education Reconciliation Act of 2010 (collectively, the "Affordable Care Act"), tax reform and entitlement programs, including reimbursement rates for physicians, could have a materially adverse effect on the Reorganized Debtor's and its affiliates' liquidity, financial condition or results of operations. In particular, reduced funding for entitlement programs such as Medicare and Medicaid may result in increased costs and fees for programs such as Medicare Advantage plans and additional reductions in reimbursements to providers. Additionally, amendments to the Affordable Care Act, implementation of the Affordable Care Act and decisions by the Centers for Medicare and Medicaid Services could impact the delivery of services and benefits under Medicare, Medicaid or Medicare Advantage plans and could affect the Reorganized Debtor and its affiliates and the manner in which they are reimbursed by such programs. Furthermore, the future of the Affordable

ACTIVE 228469046

Care Act, including its repeal, replacement or modification, is uncertain.  Any such changes could have a materially adverse effect on the Reorganized Debtor's and its affiliates' liquidity, financial condition or results of operations.

Furthermore, the U.S. Supreme Court's decision upholding the constitutionality of the individual healthcare mandate while striking down the provisions linking federal funding of state Medicaid programs with a federally mandated expansion of those programs has contributed to the uncertainty regarding the impact that the law will have on healthcare delivery systems over the next decade.

4.    ***Failure to Comply with Federal, State and Local Laws and Regulations, Including Licensure, Certification and Inspection Requirements, May Cause the Reorganized Debtor or Its Affiliates to Cease to Operate or Render Them Unable to Meet Their Financial and Other Contractual Obligations***

The Debtor is, and the Reorganized Debtor will be, subject to or impacted by extensive, frequently changing federal, state and local laws and regulations.  These laws and regulations include, among others: laws protecting consumers against deceptive practices; laws relating to the operation of our properties and how our tenants and operators conduct their business, such as fire, health and safety and privacy laws; federal and state laws affecting hospitals, clinics and other healthcare communities that participate in both Medicare and Medicaid that mandate allowable costs, pricing, reimbursement procedures and limitations, quality of services and care, food service and physical plants; resident rights laws (including abuse and neglect laws) and fraud laws; anti-kickback and physician referral laws; the Americans with Disabilities Act of 1990, as amended, and similar state and local laws; and safety and health standards set by the Occupational Safety and Health Administration or similar state and local agencies.  Certain of the Company's properties may also require a license, registration and/or certificate of need to operate.

The Reorganized Debtor's or its affiliates' failure to comply with any of these laws, regulations or requirements could result in loss of accreditation, denial of reimbursement, imposition of fines, suspension or decertification from government healthcare programs, loss of license or closure of the facility and/or the incurrence of considerable costs arising from an investigation or regulatory action.

5.    ***Ongoing Trends in the Healthcare Industry, Including a Shift Away From a Traditional Fee-for-Service Model and Increased Penetration of Government Reimbursement Programs with Lower Reimbursement Rates and Length of Stay, and Increased Competition in the Industry May Result in Lower Revenues and May Affect the Reorganized Debtor's and Its Affiliates' Ability to Meet Their Financial and Other Contractual Obligations***

Post-acute/skilled nursing operators, including the Debtor and its affiliates, have been, and the Reorganized Debtor and its affiliates will continue to be, impacted by a challenging operating environment, which has put downward pressure on revenues and operating income.  Ongoing trends in the post-acute/skilled nursing sector that are causing operators to adjust their business

41

models include, but are not limited to, (a) a shift away from a traditional fee-for-service model towards new managed care models, which base reimbursement on patient outcome measures; (b) increased penetration of Medicare Advantage plans (*i.e.*, managed Medicare), which has reduced reimbursement rates, average length of stay and average daily census, particularly for higher acuity patients; (c) increased competition from alternative healthcare services such as home health agencies, life care at home, community-based service programs, retirement communities and convalescent centers; and (d) increased regulatory scrutiny on government reimbursements. The Debtor is unable at this time to predict how these trends will affect the revenues and profitability of the Long-Term Care Business; however, if these trends continue, they may reduce the Reorganized Debtor's profitability.

The healthcare industry is also highly competitive.  The occupancy levels at, and fee income from, the Leased Facilities are dependent on the Debtor's ability to compete with other operators on a number of different levels, including the quality of care provided, reputation, the physical appearance of a property, price, the range of services offered, family preference, alternatives for healthcare delivery, the supply of competing properties, physicians, staff, referral sources, location, and the size and demographics of the population in the surrounding area.  In addition, the Debtor faces, and the Reorganized Debtor will face, an increasingly competitive labor market for skilled management personnel and nurses.  An inability to attract and retain skilled management personnel and nurses and other trained personnel could negatively impact the ability of the Reorganized Debtor to meet their obligations.  A shortage of nurses or other trained personnel or general inflationary pressures on wages may force the Reorganized Debtor to enhance pay and benefits packages to compete effectively for skilled personnel, or to use more expensive contract personnel, but the Reorganized Debtor may be unable to offset these added costs by increasing the rates charged to residents.  Any increase in labor costs and other property operating expenses or any failure by the Reorganized Debtor to attract and retain qualified personnel would likely adversely affect the Reorganized Debtor's cash flow and have a materially adverse effect on its business, results of operations and financial condition.

The Company also competes with numerous other companies providing similar healthcare services or alternatives such as home health agencies, life care at home, community-based service programs, senior housing, retirement communities and convalescent centers.  We cannot be certain that the Reorganized Debtor will be able to achieve occupancy and rate levels, and to manage its expenses, in a way that will enable it to meet all of its obligations.  Further, many competing companies may have resources and attributes that are superior to those of the Debtor.  The Reorganized Debtor may encounter increased competition that could limit its ability to maintain or attract residents or expand their businesses or to manage their expenses, either of which could materially adversely affect its ability to meet its financial and other contractual obligations.

## ARTICLE VIII.
## IMPORTANT SECURITIES LAW DISCLOSURE

### A.    Plan Securities

The Plan provides for the Reorganized Debtor to distribute New Common Stock to the Holders of QCP Claims (or their designees) (the "<u>Plan Securities</u>").  The Debtor believes that the

Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and all applicable state securities laws ("Blue Sky Laws").

## B. Issuance and Resale of Plan Securities under the Plan

### 1. Exemptions from Registration Requirements of the Securities Act and Blue Sky Laws

The Debtor is relying on exemptions from the registration requirements of the Securities Act, including, without limitation, section 4(a)(2) thereof, to exempt the offer of the Plan Securities that may be deemed to be made pursuant to the solicitation of votes on the Plan. Section 4(a)(2) of the Securities Act exempts transactions not involving a public offering, and section 506 of Regulation D of the Securities Act ("Reg D") provides a safe harbor under section 4(a)(2) for transactions that meet certain requirements, including that the investors participating therein qualify as "accredited investors" as defined in section 501 of Reg. D (17 C.F.R. § 230.501). The Debtor believes that the Holders of QCP Claims receiving Plan Securities are "accredited investors," and the Ballot includes a certification that the voting Holder of such Claims is an "accredited investor." In reliance upon these exemptions, the offer of the Plan Securities that may be deemed to be made pursuant to the solicitation of votes on the Plan will not be registered under the Securities Act or any applicable state Blue Sky Laws.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if: (x) the offer or sale occurs under a plan of reorganization; (y) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (z) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon these exemptions, the offer, issuance and distribution of the Plan Securities will not be registered under the Securities Act or any applicable state Blue Sky Laws.

### 2. Resales of Plan Securities; Definition of Underwriter

The issuance of Plan Securities is covered by section 1145 of the Bankruptcy Code. Accordingly, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in 1145 of the Bankruptcy Code. Section 1145(b)(1) of the Bankruptcy Code includes in its definition of an "underwriter" "affiliates" of the issuer of the securities, meaning all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. Recipients of Plan Securities that are affiliates of the Reorganized Debtor will be "underwriters" under section 1145 of the Bankruptcy Code with respect to the Plan Securities and hence subject to restrictions on the transfer of its Plan Securities. The Debtor believes that all recipients of Plan Securities are wholly owned direct and indirect subsidiaries of QCP and, therefore, affiliates.

ACTIVE 228469046

Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person certain conditions are met, including, if such seller is an affiliate of the issuer, public information, volume limitations and manner of sale requirements are met.  Given the nature of the Rule 144 requirements, it may not be possible for affiliates of the Reorganized Debtor to sell Plan Securities under Rule 144 of the Securities Act unless and until a trading market in the Plan Securities develops. The Debtor recommends that potential recipients of Plan Securities consult their own counsel concerning their ability to trade such securities without registration under the federal securities laws.

In addition, the Plan Securities may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to their ability to trade such securities without registration under state Blue Sky Laws.

## ARTICLE IX.
## CERTAIN UNITED STATES FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT**

ACTIVE 228469046

**THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### A.    Certain Federal Income Tax Consequences to the Debtor

As of December 31, 2017, for federal income tax purposes, the Company had approximately $270 million of consolidated net operating losses ("NOLs"), $27 million in tax credit carryforwards and approximately $736 million in amortizable tax basis in goodwill and other intangible assets.  In addition, the Company expects to generate additional consolidated NOLs and tax credit carryforwards during the 2018 taxable year.  The implementation of the Plan is not expected to materially reduce or otherwise significantly affect the amount of these tax attributes, except as noted below under "382(l)(5) Bankruptcy Exception."

The amount of the Company's consolidated NOLs, tax credit carryforwards and amortizable tax basis remains subject to adjustment by the IRS.  As a general rule, NOLs generated by a debtor in taxable years beginning on or before December 31, 2017 can be carried back and deducted from its taxable income generated within the two preceding taxable years and the remainder can be carried forward and deducted from the debtor's taxable income over the 20 succeeding taxable years.  NOLs generated in 2018 and later taxable years cannot be carried back and may only be used to offset up to 80% of a debtor's taxable income generated during the taxable year to which it is carried.  Any remainder can be carried forwarded indefinitely and used to offset taxable income in a future taxable year (subject to the 80% limitation described above).  Amortizable tax basis in intangible assets can generally be deducted ratably from the debtor's taxable income over the 15-year period commencing with the year the intangible asset is acquired.

Section 382 of the IRC contains certain rules limiting the ability of corporations to utilize NOLs when there has been an "ownership change" (the "Annual Section 382 Limitation").  An "ownership change" generally is defined as a more than 50 percentage point change in ownership of the value of the stock of a "loss corporation" (a corporation with NOLs) that takes place during the three-year period ending on the date on which such change in ownership is tested.

As a general rule, the Annual Section 382 Limitation equals the product of the value of the stock of the loss corporation (with certain adjustments) immediately before the ownership change and the applicable "long-term tax-exempt rate," a rate published monthly by the Treasury Department (2.18% for ownership changes that occur during March 2018).  Any unused portion of the Annual Section 382 Limitation generally is available for use in subsequent years.  The Annual Section 382 Limitation is increased in the case of a corporation that has net unrealized built-in gains ("NUBIG"), i.e., gains economically accrued but unrecognized at the time of the ownership change, in excess of a threshold amount.  Such a corporation can use NOLs in excess of its Annual Section 382 Limitation to the extent that it realizes those NUBIGs for U.S. federal income tax purposes in the five years following the ownership change.  For purposes of determining the Annual Section 382 Limitation for a consolidated tax group, the determination as to whether the group has a NUBIG generally is made on a consolidated basis (*i.e.*, by netting the built-in losses and built-in gains of all members of the group).

In addition to limiting a corporation's ability to use NOLs, the Annual Section 382 Limitation may also apply to certain losses or deductions which are "built-in" as of the date of the

45

ownership change and that are subsequently recognized. If a loss corporation has a net-unrealized built-in loss ("NUBIL") at the time of the ownership change, then any built-in losses or deductions (which for this purpose includes a portion of the depreciation or amortization of depreciable or amortizable assets that have a built-in loss) that are recognized during the following five years (up to the amount of the original built-in loss) generally will be subject to the Annual Section 382 Limitation. Special rules apply for purposes of determining the amount of built-in losses of a consolidated tax group that are subject to an Annual Section 382 Limitation. Absent an applicable exception (discussed below), a Company NUBIL would also be subject to the Annual Section 382 Limitation.

Section 382(l)(5) of the IRC provides an exception to the application of the Annual Section 382 Limitation when a corporation is under the jurisdiction of a court in a Title 11 case (the "382(l)(5) Bankruptcy Exception"). The 382(l)(5) Bankruptcy Exception provides that where an ownership change occurs pursuant to a bankruptcy reorganization or similar proceeding, the Annual Section 382 Limitation will not apply if the pre-change shareholders and/or "qualified creditors" (as defined by applicable Treasury Regulations) own at least 50 percent of the stock of the reorganized corporation immediately after the ownership change. However, under the 382(l)(5) Bankruptcy Exception, a corporation's pre-change losses and excess credits that may be carried over to a post-change year must be reduced to the extent attributable to any interest paid or accrued on certain debt converted to stock in the reorganization. In addition, if the 382(l)(5) Bankruptcy Exception applies, a second ownership change of the corporation within a two-year period will cause the corporation to forfeit all of its unused NOLs that were incurred prior to the date of the second ownership change. If a corporation qualifies for the 382(l)(5) Bankruptcy Exception, the use of its NOLs will be governed by that exception unless the corporation affirmatively elects for the provisions not to apply.

If a corporation in bankruptcy is not eligible for the 382(l)(5) Bankruptcy Exception or elects out of that provision, a special rule under Section 382(l)(6) of the IRC will apply in calculating the Annual Section 382 Limitation. Under this special rule, the Annual Section 382 Limitation will be calculated by reference to the lesser of the value of the corporation's stock (with certain adjustments) immediately after the ownership change (as opposed to immediately before the ownership change, as discussed above) or the value of the debtor's assets (determined without regard to liabilities) immediately before the ownership change.

Although it is expected that the Company will undergo an ownership change as a result of the implementation of the Plan, the Company intends to take the position that it qualifies for the 382(l)(5) Bankruptcy Exception described above. Accordingly, the Company does not expect to be subject to the Annual Section 382 Limitation as a result of the implementation of the Plan.

## B.    Certain Federal Income Tax Consequences to Holders of a QCP Claim

A Holder who receives New Common Stock of the Reorganized Debtor in exchange for a QCP Claim may realize income equal to the value of the New Common Stock received. Such Holder's initial basis in the New Common Stock received should likewise equal the value of such New Common Stock at the time of receipt. Such basis may be increased in respect of a subsequent termination of the Guaranty. A Holder should consult its tax advisor concerning the tax consequences of this and other related aspects of the Plan.

46

**C.**      **Reservation of Rights**

The foregoing discussion is subject to change (possibly substantially) based on, among other things, subsequent changes to the Plan and events that may subsequently occur that may impact the timeline for the transactions contemplated by the Plan.  The Debtor and their advisors reserve the right to further modify, revise or supplement this ARTICLE IX and the other tax related sections of the Plan and Disclosure Statement in accordance with the terms of the Plan and the Bankruptcy Code.

## ARTICLE X.
## CONCLUSION AND RECOMMENDATION

In the opinion of the Debtor, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtor's creditors than would otherwise result from any other scenario.  Any alternative to confirmation of the Plan, moreover, could result in extensive delays and increased administrative expenses.  Accordingly, the Debtor urges Holders of Claims in the Voting Class to evidence their acceptance of the Plan by returning their Ballots so that they are received by the Solicitation Agent no later than 11:59 p.m., prevailing Eastern Time, on March 3, 2018.

ACTIVE 228469046

Dated:  March 3, 2018
Wilmington, Delaware

Respectfully submitted,

HCR ManorCare, Inc.

*/s/ John R. Castellano*
John R. Castellano
Chief Restructuring Officer

SIDLEY AUSTIN LLP
Larry J. Nyhan
Dennis M. Twomey
William A. Evanoff
Allison Ross Stromberg
Matthew E. Linder
One South Dearborn Street
Chicago, Illinois  60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Justin H. Rucki (No. 5304)
Ian J. Bambrick (No. 5455)
Tara C. Pakrouh (No. 6192)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253

*Proposed Attorneys for the Debtor and Debtor in Possession*

**EXHIBIT A**

**PLAN OF REORGANIZATION**

**(INTENTIONALLY OMITTED)**

**EXHIBIT B**

**RESTRUCTURING SUPPORT AGREEMENT**

EXECUTION VERSION

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (this "**Agreement**") is made and entered into as of March 2, 2018, by and among (i) HCR ManorCare, Inc., a Delaware corporation (the "**Debtor**"), (ii) Carlyle MC Partners, L.P., a Delaware limited partnership, Carlyle Partners V-A MC, L.P., a Delaware limited partnership, Carlyle Partners V MC, L.P., a Delaware limited partnership, CP V Coinvestment A, L.P., a Delaware limited partnership, and CP V Coinvestment B, L.P., a Delaware limited partnership (collectively, the "**Majority Holders**"), and (iii) MC Operations Investments, LLC (the "**QCP Holder**," together with the Majority Holders, the "**Supporting Parties**," and together with the Debtor, the "**Parties**").

## RECITALS

WHEREAS, the Parties have engaged in arm's length, good faith discussions regarding a restructuring of the Debtor and certain of its subsidiaries (the "**Restructuring**");

WHEREAS, on the date hereof, the Debtor, Quality Care Properties, Inc. ("**QCP**"), and certain of QCP's direct and indirect subsidiaries have entered into a Plan Sponsor Agreement (the "**PSA**"), which, among other things, contemplates the acquisition by a subsidiary of QCP of 100% of the equity of the reorganized Debtor through a prepackaged Plan in form and substance consistent with the term sheet attached as Exhibit A hereto (the "**Plan Term Sheet**");[1] and

WHEREAS, the Supporting Parties intend to support the Restructuring and the prepackaged Plan upon the terms and conditions set forth herein:

## AGREEMENT

1. **Representations and Warranties**

   a. Representations and Warranties of the Debtor.  The Debtor represents and warrants to the Supporting Parties that, as of the date hereof:

      i. It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

      ii. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

      iii. Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, and except as set forth herein, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

---

[1]    Capitalized terms not otherwise defined in this Agreement shall have the meaning given to such terms in the PSA.

b.   <u>Representations and Warranties of the Supporting Parties</u>.  Each Supporting Party represents and warrants to the Debtor and to each other Supporting Party that, as of the date hereof:

i.   Such Supporting Party (A) is the sole beneficial owner of the shares set forth on its signature page hereto ("**<u>Debtor Shares</u>**") and (B) has full power and authority to bind or act on behalf of, vote and consent to matters concerning such shares and to dispose of, exchange, assign and transfer such shares.

ii.   Such Supporting Party has made no prior assignment, sale, participation, grant, conveyance or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title or interests in any of its shares that are subject to this Agreement that conflict with the representations and warranties of such Supporting Party herein or would render such Supporting Party otherwise unable to comply with this Agreement and perform its obligations hereunder.

iii.   This Agreement is the legally valid and binding obligation of each such Supporting Party hereto, enforceable against it in accordance with its terms.

**2.   Covenants of the Supporting Parties**

Subject to the terms and conditions hereof and for so long as this Agreement has not been terminated in accordance with its terms, and unless compliance is waived in writing by the Debtor and each Supporting Party, each Supporting Party, severally (and not jointly), agrees to, and to cause its direct and indirect subsidiaries and affiliates to:

a.   support, and take all reasonable actions necessary or reasonably requested by the Debtor to facilitate the solicitation, confirmation and consummation of the Plan and the transactions contemplated by the Plan, including, without limitation, voting in favor of the Plan;

b.   not take any other action, directly or indirectly, that could prevent, interfere with, delay or impede the solicitation of votes in connection with the Plan or the confirmation or consummation of the Plan;

c.   not object to or otherwise commence, or encourage any other person to commence, any proceeding or take any action opposing the Plan or Disclosure Statement; and

d.   not file any federal or state tax return, or any amendment to such a return, claiming any deduction for worthlessness of its Debtor Shares.

-2-

3.     **Information about the Majority Holders**

Subject to the terms and conditions hereof and for so long as this Agreement has not been terminated in accordance with its terms, and unless compliance is waived in writing by the Debtor and QCP, each Majority Holder, severally (and not jointly), agrees to:

a.     use their reasonable best efforts to provide such information requested in writing by Parent or the Debtor as is necessary regarding the Majority Holders for the Purchaser Entities to make or obtain the Governmental Approvals; and

b.     upon the reasonable written request by the Debtor or QCP, use their reasonable best efforts to furnish all information concerning such Majority Holders in connection with any statement, filing, notice or application made by or on behalf of a Purchaser Entity or the Debtor or any of their respective subsidiaries to any Governmental Entity in connection with making or obtaining the Governmental Approvals.

4.     **Transfer of Shares**

Each Supporting Party agrees that so long as this Agreement has not been terminated in accordance with its terms it shall not directly or indirectly sell, pledge, hypothecate or otherwise transfer or dispose of or grant, issue or sell any option, right to acquire, voting, participation or other interest in any Debtor Shares (each a "**Transfer**"), unless the transferee thereof, prior to such Transfer, agrees in writing for the benefit of the Parties to become subject to the terms and conditions of this Agreement as a "Supporting Party" and to be bound by this Agreement by executing the joinder attached hereto as <u>Exhibit B</u> (the "**Joinder Agreement**"), and delivering an executed copy thereof, within two (2) business days of such execution, to the Debtor, in which event (i) the transferee shall be deemed to be a Supporting Party hereunder and (ii) the transferor shall be deemed to relinquish its rights and be released from its obligations under this Agreement to the extent of such transferred rights and obligations.  Each Supporting Party agrees that any Transfer that does not comply with the foregoing shall be deemed void *ab initio*, and the Debtor and each other Supporting Party shall have the right to avoid such Transfer.  This Agreement shall in no way be construed to preclude any shareholder from acquiring additional shares; <u>provided</u> that any such additional shares shall, upon acquisition, automatically be deemed to be subject to all the terms of this Agreement.

5.      **Additional Supporting Parties**

A shareholder that is not a Supporting Party as of the date of this Agreement will become a Party to this Agreement as a Supporting Party on the date that it agrees in writing, for the benefit of the Parties, to become subject to the terms and conditions of this Agreement as a "Supporting Party" and to be bound by this Agreement by executing the Joinder Agreement and delivering an executed copy thereof, within two (2) business days of such execution, to the Debtor.  Upon such delivery, such Supporting Party shall immediately thereafter send a copy of such Joinder Agreement to all other Supporting Parties.

6.      **Termination**

This Agreement and all obligations of the Parties hereunder shall immediately terminate and be of no further force and effect as follows:

a.      upon the Effective Date of the Plan; and

b.      upon the termination of PSA.

Upon termination of this Agreement in accordance with its terms, this Agreement shall forthwith become void and of no further force or effect, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party.

7.      **No Monetary Liability**

Notwithstanding anything to the contrary contained in this Agreement or provided for under any applicable law, no Party shall be liable to any other person, either in contract or in tort, for any money damages relating to any breach of this Agreement.

8.      **Specific Performance**

It is understood and agreed by the Parties that money damages would not be a sufficient or appropriate remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach. Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

9.      **Entire Agreement; Prior Negotiations**

This Agreement, including all exhibits attached hereto, constitutes the entire agreement of the Parties and supersedes all prior negotiations and documents reflecting such prior negotiations between and among the Parties (and their respective advisors) with respect to the subject matter of this Agreement.

10.     **Amendments**

Except as otherwise provided herein, this Agreement may not be modified, amended or supplemented without prior written agreement signed by the Debtor and each Supporting Party.

-4-

11.    **Governing Law**

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware.  By its execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of Delaware.  By execution and delivery of this Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing, upon the commencement of the Bankruptcy Case, each of the parties hereto hereby agrees that, if the petition has been filed and the Bankruptcy Case is pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

12.    **Effective Date; Conditions to Effectiveness**

This Agreement shall become effective and binding upon each of the Parties upon the execution and delivery of this Agreement by each Party hereto.

13.    **No Solicitation**

Notwithstanding anything to the contrary, this Agreement is not and shall not be deemed to be (a) a solicitation of consents to the Plan or (b) an offer for the issuance, purchase, sale exchange, hypothecation or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act of 1933 and the Securities Exchange Act of 1934, each as amended.

14.    **Third-Party Beneficiary**

This Agreement is intended for the benefit of the parties hereto and no other person shall have any rights hereunder.

15.    **Counterparts**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this agreement may be delivered by electronic mail (in ".pdf" or ".tif" format), facsimile or otherwise, which shall be deemed to be an original for the purposes of this Agreement.

16.    **Settlement Discussions**

This Agreement and the Plan Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

-5-

**17.    No Waiver of Participation and Preservation of Rights**

Except as provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, but not limited to, claims against the Debtor, liens or security interests it may have in any assets of the Debtor, or its rights to participate fully in the Bankruptcy Case.  Without limiting the foregoing sentence in any way, if this Agreement is terminated in accordance with its terms for any reason, the Parties each fully reserve any and all of their respective rights, remedies and interests.

**18.    Notices**

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

If to the Debtor, to counsel at the following address:

> Sidley Austin LLP
> One South Dearborn
> Chicago, IL  60603
> Attention:  Larry Nyhan
> Email:  lnyhan@sidley.com

If to the QCP Holder, to counsel at the following address:

> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY 10004-2498
> Attn:  Andrew G. Dietderich
> Fax:  (212) 558-3588
> Email:  dietdericha@sullcrom.com

If to the Majority Holders, to counsel at the following address:

> Latham & Watkins LLP
> 555 Eleventh Street, NW, Suite 1000
> Washington, D.C.  20004-1304
> Attention:  Daniel T. Lennon
>                   Roger G. Schwartz
>                   J. Cory Tull
> Email:  daniel.lennon@lw.com
>                roger.schwartz@lw.com
>                cory.tull@lw.com

[Signature Pages Follow]

-6-

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers or other agents, solely in their respective capacity as officers or other agents of the undersigned and not in any other capacity, as of the date first set forth above.

**HCR MANORCARE, INC.**

By: _____

Name: John R. Castellano

Title: Chief Restructuring Officer

MC OPERATIONS INVESTMENTS, LLC

By: _____

Name:   Marc Richards
Title:   Chief Financial Officer

Debtor Shares: 4,232,244

**CARLYLE MC PARTNERS, L.P.**

By:    TC Group V, L.P., its general partner

By:    TC Group V, L.L.C., its general partner

Name: David B. Pearson

Title:  Authorized Person

Debtor Shares: 6,908,455

**CARLYLE PARTNERS V-A MC, L.P.**

By:    TC Group V, L.P., its general partner

By:    TC Group V, L.L.C., its general partner

Name: David B. Pearson

Title:  Authorized Person

Debtor Shares: 527,141

**CARLYLE PARTNERS V MC, L.P.**

By:    TC Group V, L.P., its general partner

By:    TC Group V, L.L.C., its general partner

Name: David B. Pearson

Title:  Authorized Person

Debtor Shares: 26,089,114

**CP V COINVESTMENT A, L.P.**

By:    TC Group V, L.P., its general partner

By:    TC Group V, L.L.C., its general partner

Name: David B. Pearson

Title:  Authorized Person

Debtor Shares: 1,015,490

*[Signature Page to Restructuring Support Agreement]*

**CP V COINVESTMENT B, L.P.**

By:    TC Group V, L.P., its general partner

By:    TC Group V, L.L.C., its general partner

Name:  David B. Pearson

Title:   Authorized Person

Debtor Shares:  129, 357

*[Signature Page to Restructuring Support Agreement]*

## EXHIBIT A

### Plan Term Sheet

*Exhibit Version*

EXHIBIT A

**HCR MANORCARE, INC.**
**RESTRUCTURING TERM SHEET**
**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS**
**March 2, 2018**

The following (this "Plan Term Sheet") describes the material terms of a proposed restructuring of HCR ManorCare, Inc. (the "Debtor"), which will be implemented through a prepackaged plan of reorganization (the "Prepackaged Plan") under title 11 of the United States Code (the "Bankruptcy Code"). The Debtor and Quality Care Properties, Inc. and certain of its subsidiaries (collectively, "QCP") are parties to the Plan Sponsor Agreement, dated as of March 2, 2018 (the "PSA"), which, among other things, set forth the manner in which the Prepackaged Plan will be pursued. Capitalized terms not otherwise defined herein shall have the meanings set forth in the PSA.

In addition, the Debtor, the Carlyle Holders and QCP are party to a Restructuring Support Agreement (the "RSA") pursuant to which, among other things, the Carlyle Holders and QCP have agreed to support the Prepackaged Plan described by the Plan Term Sheet.

This Plan Term Sheet outlines many of the principal terms of the Prepackaged Plan, but other material terms will be set forth in definitive documentation, including the PSA and RSA. Nothing contained herein shall constitute an offer susceptible to acceptance by the Debtor or any other party, or a legally binding obligation of any party, other than as set forth in the PSA and RSA. This Plan Term Sheet is a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 or any other applicable rule of evidence. THIS PLAN TERM SHEET DOES NOT CONSTITUTE A SOLICITATION OF VOTES FOR A PLAN OF REORGANIZATION FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR AN OFFER WITH RESPECT TO ANY SECURITIES. SUCH OFFER OR SOLICITATION WILL BE MADE IN COMPLIANCE WITH THE PSA AND THE RSA AND ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

| Transaction Overview | |
|---|---|
| **Solicitation** | The Debtor will pursue a prepetition solicitation of votes on the Prepackaged Plan (the "Solicitation") in accordance with the PSA and RSA. |

| Prepackaged Case | The Debtor will file a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), in accordance with its obligations under the PSA and RSA.  The date on which the Debtor's chapter 11 case is commenced shall be the "<u>Petition Date</u>." | |
|---|---|---|
| | In addition, on the Petition Date the Debtor will file "first-day" and "second-day" pleadings with the Bankruptcy Court. | |
| Funding of Chapter 11 Case | The cost of administering the Debtor's chapter 11 case will be funded by cash of the Debtor, ordinary course intercompany transfers through the cash management system of the Debtor and its subsidiaries, and, if necessary, additional intercompany borrowing from HCR ManorCare Services, LLC in accordance with the Centerbridge Facility.  The Debtor shall not incur any debtor-in-possession financing.  For the avoidance of doubt, the Debtor may seek entry of an order in the chapter 11 case authorizing the Debtor to use the cash collateral of Centerbridge and providing Centerbridge reasonable and customary protections in connection therewith. | |
| **Treatment of Claims and Interests** | | |
| Administrative Claims | Each holder of an Allowed[1] Administrative Claim[2] will receive, in the sole discretion of the reorganized Debtor, payment in full in cash of the unpaid portion of such Allowed Administrative Claim (a) on the date on which the Prepackaged Plan becomes effective (the "<u>Effective Date</u>" ) or as promptly thereafter as reasonably practicable, (b) in the ordinary course of the reorganized Debtor's business, or (c) as otherwise agreed by the reorganized Debtor and such holder.[3] | In accordance with section 1123(a)(1) of the Bankruptcy Code, the Prepackaged Plan does not classify Administrative Claims. |

---

[1]    "<u>Allowed</u>" means any claim that is determined to be Allowed (as defined in the Prepackaged Plan).

[2]    "<u>Administrative Claim</u>" means a claim arising under sections 503(b), 507(b) or to the extent applicable, 1114(e)(2) of the Bankruptcy Code.

[3]    Administrative Claims that become due prior to the Effective Date may be paid by the Debtor in the ordinary course during the chapter 11 case, subject to the PSA.

SC1:4574502.9

| Priority Tax Claims | Each holder of an Allowed Priority Tax Claim[4] will receive, in the sole discretion of the reorganized Debtor, payment in cash by the Reorganized Debtor in an amount of such holder's Allowed Priority Tax Claim on the later of the Effective Date or when such Allowed Priority Tax Claim becomes due. | In accordance with section 1123(a)(1) of the Bankruptcy Code, the Prepackaged Plan does not classify Priority Tax Claims. |
|---|---|---|
| **Class 1 –**<br>**Other Priority Claims** | Each holder of an Allowed Other Priority Claim[5] will receive payment in full in cash as promptly as reasonably practicable on the later of (a) the Effective Date and (b) the date on which such Other Priority Claim becomes an Allowed claim payable under applicable law or any agreement relating thereto. | Unimpaired – Deemed to Accept |
| **Class 2 –**<br>**Secured Claims** | Each holder of an Allowed secured claim will receive, in the sole discretion of the reorganized Debtor, on the Effective Date (or as promptly thereafter as reasonably practicable) or in the ordinary course of the reorganized Debtor's business, (a) payment in full by the reorganized Debtor in cash, including the payment of any interest Allowed and payable under section 506(b) of the Bankruptcy Code, (b) delivery of the collateral securing such Allowed secured claim or (c) treatment of such Allowed secured claim in any other matter that renders the claim unimpaired. | Unimpaired – Deemed to Accept |
| **Class 3 –**<br>**Centerbridge Claim** | On the Effective Date, Centerbridge's[6] secured contingent guaranty claim against the Debtor (the "<u>Centerbridge Claim</u>") will be reinstated and any liens held by Centerbridge against the assets of the Debtor securing the Centerbridge Claim shall survive the Effective Date, rendering the Centerbridge Claim unimpaired. | Unimpaired – Deemed to Accept |

---

[4]    "<u>Priority Tax Claim</u>" means a claim under section 507(a)(8) of the Bankruptcy Code.

[5]    "<u>Other Priority Claim</u>" means an Allowed claim under section 507(a) of the Bankruptcy other than an Administrative Expense Claim or Priority Tax Claim.

[6]    "<u>Centerbridge</u>" means RD Credit, LLC.

3

| Class 4 – QCP Claims | The QCP Claims[7] are deemed Allowed. Each holder of a QCP Claim (or its designee) shall receive on the Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, its QCP Claim, 100% of the common stock in the reorganized Debtor. | Impaired – Entitled to Vote |
|---|---|---|
| Class 5 – General Unsecured Claims | Each holder of an unsecured claim against the Debtor other than a QCP Guarantee Claim or a Severance Claim (a "General Unsecured Claim") will receive, in the sole discretion of the reorganized Debtor, (a) payment in full in cash of such claim (i) on the Effective Date or as promptly thereafter as reasonably practicable or (ii) in the ordinary course of the reorganized Debtor's business or (b) satisfaction of such claim in any other manner that renders the General Unsecured Claim unimpaired or as otherwise agreed by the reorganized Debtor and such holder. | Unimpaired – Deemed to Accept |
| Class 6 – Severance Claims | Each holder of a claim against the Debtor for damages resulting from the termination of an employment contract (a "Severance Claim) will receive, in the sole discretion of QCP, payment in full in cash of the Allowed amount of such claim (for the avoidance of doubt, subject to applicable limitations on the Allowed amount of such claim under the Bankruptcy Code) (a) on the Effective Date or as soon thereafter as reasonably practicable or (b) as otherwise agreed by the reorganized Debtor and such holder. | Unimpaired – Deemed to Accept |
| Class 7 – Section 510(b) Claims | On the Effective Date, section 510(b) claims (if any) will be discharged and eliminated, and the holders of any such claims will not receive any distributions or property under the Prepackaged Plan on account of such claims (if any such claims exist). | Impaired – Deemed to Reject Not entitled to any distributions under the Prepackaged Plan |

---

[7]    "QCP Claims" means all claims of QCP and its subsidiaries against the Debtor arising under the Guaranty and due and unpaid as of the Effective Date.

4

| **Class 8 – Equity Interests** | On the Effective Date, all existing common and preferred shares, options, warrants, rights, similar instruments, and other prepetition equity interests in the Debtor will be extinguished without payment.  Holders of such interests will not retain any such interests from or after the Effective Date or receive any distributions or property under the Prepackaged Plan on account of such interests. | Impaired – Deemed to Reject<br><br>Not entitled to any distributions under the Prepackaged Plan |
| --- | --- | --- |

5

| Other Provisions | |
|---|---|
| **Executory Contracts / Unexpired Leases** | All executory contracts and unexpired leases to which the Debtor is a party and are otherwise susceptible to assumption/assignment will be assumed on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code other than any executory contract or unexpired lease to which the Debtor is a party and which is rejected by the Debtor in accordance with the PSA or with the prior written consent of QCP (in its sole discretion). |
| **Bar Date** | None. |
| **Vesting of Assets Free and Clear of Liens and Claims** | As of the Effective Date, all property of the Debtor shall vest in the reorganized Debtor free and clear of all liens, claims, charges or other encumbrances or interests, provided, however, that any liens (a) held by Centerbridge against the assets of the Debtor securing the Centerbridge Claim and (b) held by HCR Home Health Care and Hospice, LLC securing the $25 million Subordinated Secured Demand Note, dated March [•], 2018, made by the Debtor to HCR Home Health Care and Hospice, LLC, in each case, shall survive the Effective Date. |
| **New Master Lease** | On the Effective Date, HCR III and the Lessor will amend the Master Lease in accordance with the PSA.  On or prior to the seventh day after the Effective Date, the Guaranty will be terminated and released in accordance with the PSA. |
| **Claim Allowance Process** | The Debtor shall have the right to object to or otherwise agree to the Allowance of all claims (other than QCP Claims) in accordance with its duties as debtor-in-possession, subject to QCP's right to object to such Allowance. |
| **Excess Severance** | Subject to Section 1.5(b) of the PSA, (a) on the Effective Date, QCP shall establish an account for the purpose of funding Excess Severance Payments (the "Severance Account") and, following the Closing, shall cause the Severance Account to be funded with all amounts necessary to make Excess Severance Payments and (b) each of the current CEO, CFO, GC and COO of the Debtor (an "Eligible Employee"), shall, unless otherwise agreed in writing between the reorganized Debtor and such person, receive from the Severance Account such Eligible Employee's Excess Severance Payment when due and payable in accordance with the terms of the applicable Separation Agreement. |

| | |
|---|---|
| **Tax Treatment of the Restructuring** | The restructuring of the Debtor is intended to qualify under section 382(l)(5) of the Internal Revenue Code of 1986, as amended, in order to preserve the net operating losses and other tax attributes available to the Debtor. |
| **Exemption from Registration** | The issuance of common stock of the reorganized Debtor will be exempt from SEC registration under applicable law. |
| **Governance of the Reorganized Debtor** | Board of Directors and officers to be determined by QCP. |
| **Releases and Exculpation** | Customary releases and exculpation by (x) the Debtor and (y) holders of claims and interests in the Debtor of: (a) the Debtor and the reorganized Debtor, (b) the current and former directors, officers, equity holders, controlling persons, employees, agents, attorneys, financial advisors, restructuring advisors, investment bankers, accountants, and other professional representatives of the Debtor and the reorganized Debtor, in their capacities as such, (c) QCP, and (d) with respect to each entity named in the preceding (a) through (c), each such entity's directors, officers, members, managers, equity holders, general or limited partners, controlling persons, employees, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assigns, attorneys, financial advisors, restructuring advisors, investment bankers, accountants and other professionals or representatives when acting in any such capacities, in each case, other than direct or indirect subsidiaries of the Debtor. |
| **Conditions to the Effective Date** | 1. The Confirmation Order shall have become a Final Order; <br><br> 2. All conditions precedent to the consummation of the transactions contemplated by the PSA (other than the occurrence of the Effective Date) shall have been satisfied; <br><br> 3. The PSA shall not have terminated in accordance with its terms; and <br><br> 4. All other actions necessary to implement the terms of the Prepackaged Plan on the Effective Date shall have been taken. |

## EXHIBIT B

## Joinder Agreement

This Joinder Agreement to the Restructuring Support Agreement, dated as of [•], 2018, by and among (a) HCR Manorcare, Inc. (the "Debtor"), (b) MC Operations Investments, LLC (the "QCP Holder") and (c) Carlyle MC Partners, L.P., a Delaware limited partnership, Carlyle Partners V-A MC, L.P., a Delaware limited partnership, Carlyle Partners V MC, L.P., a Delaware limited partnership, CP V Coinvestment A, L.P., a Delaware limited partnership, and CP V Coinvestment B, L.P., a Delaware limited partnership (collectively, the "Majority Holders") (as set forth in Annex I hereto, the "Restructuring Support Agreement"), is executed and delivered by [_____] (the "Joining Supporting Party") as of [_____], 2018.  Each capitalized term used herein but not otherwise defined shall have the meanings set forth in the Restructuring Support Agreement.

1.   Agreement to be Bound.  The Joining Supporting Party hereby agrees to be bound by all of the terms of the Restructuring Support Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time). The Joining Supporting Party shall hereafter be deemed to be a "Supporting Party" and a Party for all purposes under the Restructuring Support Agreement.

2.   Representations and Warranties.  With respect to the aggregate principal amount of shares held by the Joining Supporting Party upon consummation of the Transfer of such shares, the Joining Supporting Party hereby makes the representations and warranties of the Supporting Parties set forth in Section 1 of the Restructuring Support Agreement to each of the other Parties.

3.   Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

* * * * *

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Joining Supporting Party has caused this Joinder Agreement to be executed as of the date first written above.

**SUPPORTING PARTY**

By: _____
　　　Name:
　　　Title:

**Notice Address and E-mail:**

_____

_____

_____

_____@_____

Annex 1 to Joinder Agreement

Restructuring Support Agreement

**EXHIBIT C**


**FINANCIAL PROJECTIONS**

**Financial Information and Projections**

I.      Financial Projections

For purposes of demonstrating feasibility of the Plan, the Debtor, with the assistance of its advisors, has prepared forecasted, post-Effective Date income statements (the "**Financial Projections**" or the "**Projections**") for annual periods ending December 31, 2018 (fiscal year 2018) through December 31, 2021 (fiscal year 2021) (the "**Projection Period**"). The Financial Projections represent the consolidated forecasted projections of the 4H Business and the Outpatient Rehab and Other Businesses.   These Projections have been prepared based on a number of assumptions made by the Debtor's management, in consultation with the Debtor's financial advisors, as to the future performance of the Reorganized Debtor, and reflect management's judgement and expectations regarding its future operations and financial position.

The Financial Projections are subject to inherent risks and uncertainties, several of which are difficult to predict and many of which are beyond management's control. Factors that may cause actual results to differ from expected results include, but are not limited to:

(i)      changes in the reimbursement rates or methods or timing of payment from third party payors, including the Medicare and Medicaid programs, or the implementation of other measures to reduce reimbursement for the 4H Business and the Outpatient Rehab and Other Businesses' services and products;

(ii)      changes in the acuity of patients, as well as payor mix and payment methodologies;

(iii)      changes in existing or future laws and regulations or the enforcement of these laws and regulations, including but not limited to future adjustments in healthcare regulation;

(iv)      further consolidation of Managed Care organizations and other third party payors; and

(v)      the uncertainty inherent in estimating changes in population demographics and healthcare service requirements.

Should one or more of the risks or uncertainties referenced above occur, or should underlying assumptions prove incorrect, actual results could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections.

In addition, QCP, who will control the reorganized Debtor, has not prepared the Financial Projections or expressed a view on their accuracy or the basis on which they were prepared.  The Financial Projections reflect neither the future business plans of QCP nor changes to the business that may be implemented by QCP after the Effective Date, including asset dispositions, new investments and changes in operating performance.

II.    Accounting Policies and Disclaimer

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE FINANCIAL PROJECTIONS DO NOT REFLECT THE FORMAL IMPLEMENTATION OF REORGANIZATION ACCOUNTING PURSUANT TO FINANCIAL ACCOUNTING STANDARDS BOARD ACCOUNTING STANDARDS CODIFICATION TOPIC 852, REORGANIZATIONS ("**ASC 852**"). OVERALL, THE IMPLEMENTATION OF ASC 852 IS NOT ANTICIPATED TO HAVE A MATERIAL IMPACT ON THE UNDERLYING ECONOMICS OF THE PLAN. THE FINANCIAL PROJECTIONS HAVE BEEN PREPARED USING GENERALLY ACCEPTED ACCOUNTING POLICIES ("**GAAP**") THAT ARE MATERIALLY CONSISTENT WITH THOSE APPLIED IN THE DEBTOR'S HISTORICAL FINANCIAL STATEMENTS. THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY A REGISTERED INDEPENDENT ACCOUNTING FIRM.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, THE DEBTOR AND THE REORGANIZED DEBTOR CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. THE FINANCIAL PROJECTIONS HEREIN ARE NOT, AND MUST NOT BE VIEWED AS, A REPRESENTATION OF FACT, PREDICTION, OR GUARANTY OF THE COMPANY'S FUTURE PERFORMANCE. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTOR'S FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, ANY REVIEW OF THE PROJECTIONS SHOULD TAKE INTO ACCOUNT THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS, INCLUDING WITHOUT LIMITATION THOSE SET FORTH HEREIN. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS NO EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTOR UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTOR, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTOR'S CONTROL. THE DEBTOR CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE

PROJECTIONS OR TO THE REORGANIZED DEBTOR'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTOR PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTOR AND REORGANIZED DEBTOR, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

III.    General Assumptions

a.  Overview

The Debtor is a holding company that conducts business operations through more than 300 wholly owned or controlled subsidiaries, which, together with the Debtor, comprise the Company.  The Company operates three business segments – the Long-Term Care Business, the 4H Business and the Outpatient Rehab and Other Businesses.  The Long-Term Care Business is primarily conducted through non-debtor subsidiaries of non-debtor HCR III, an intermediate holding company and indirect subsidiary of the Debtor. HCR III, which is subject to the MLSA, after the Effective Date will be subject to terms of the New Master Lease.  During the Projection Period, HCR III will be able to timely satisfy all of its financial obligations as they come due in the ordinary course.  The accompanying projections provide a perspective of the earnings potential of the combined results of the 4H Business and the Outpatient Rehab and Other Businesses.  The 4H Business provides Home Health and Hospice Services.  The Outpatient Rehab and Other Businesses provide comprehensive rehabilitation and various therapeutic services.

b.  Methodology

In preparing the Projections, management considered the key revenue drivers including the Average Daily Rates ("**ADRs**") charged for the healthcare services provided by, and recent trends in the Average Daily Census ("**ADC**") of, the 4H Business and the Outpatient Rehab and Other Businesses. The key revenue drivers were combined with historical trends in operating costs, initiatives to reduce operating and non-operating costs, and non-operating aspects of the 4H Business and the Outpatient Rehab and Other Businesses assessed at a granular level.

**Assumptions With Respect to the Projected Income Statement**

    a.   Revenues

Revenues are derived by multiplying the ADRs and the projected patient days.

The ADRs are driven by reimbursement rates, these vary depending on the patients' conditions, the necessary healthcare services provided and the patients' funding sources (including, but not limited to, Private Pay, Managed Care, Medicare and Medicaid).

Government agencies historically adjust rates on an annual basis. The rates charged to Private Pay and other funding sources may vary dependent on market influences. Due to the variance in reimbursement rates, the ADR is assessed based on the patients' expected funding source.

Projected patient days for the 4H Business and the Outpatient Rehab and Other Businesses are derived from the ADC and are forecast based on historical trends, adjusted to reflect input from management on changes to population demographics and future patient choices regarding healthcare services.

Participation rates in various public and private healthcare plans can influence the nature and duration of treatment and are forecast based on historical trends adjusted for management's input regarding changes in future patient choices.

The Outpatient Rehab and Other Businesses provide outpatient rehabilitation and ancillary healthcare services which are primarily charged at an hourly rate. The rate varies depending on healthcare service provided and is forecast based on historical trends.

    b.   Operating Expenses

The operating expenses for the 4H Business and the Outpatient Rehab and Other Businesses are primarily comprised of labor costs and other expenses associated with such businesses. These costs are based on historical trends adjusted for input from management regarding labor market influences during the Projection Period.

Nursing Expenses primarily represent the labor costs associated with the Nursing professionals who provide services for the 4H Business and the Outpatient Rehab and Other Businesses.

Ancillary Expenses represent supporting healthcare professionals, pharmaceutical and medical supplies.

Administrative Expenses primarily represent the labor costs associated with the administrative and management professionals supporting the 4H Business and the Outpatient Rehab and Other Businesses.

Other Expenses are comprised of costs associated with support staff and miscellaneous supplies necessary for the 4H Business and the Outpatient Rehab and Other Businesses

c.   General and Administrative

General and Administrative Costs ("**G&A**") are primarily forecasted through an allocation of labor costs and other expenses associated with the Company's corporate overhead. The allocation rate is based on historical G&A costs, adjusted for cost reduction efforts and the impact of operating the Reorganized Debtor post emergence.

d.   Equity Earnings

The Equity Earnings represent the  Debtor's share of the equity earnings in a joint venture with Omnicare, Inc. (a subsidiary of CVS Health Corporation), which provides pharmaceutical services to certain of the Debtor subsidiaries.

### Financial Projections for the Combined 4H Business and Outpatient Rehab and Other Business

| USD Millions | Fiscal Periods | | | |
| --- | --- | --- | --- | --- |
| | 2018E (1) | 2019E | 2020E | 2021E |
| **Income Statement** | | | | |
| **Revenue** | | | | |
| Medicare A | $ 598.0 | $ 630.2 | $ 662.1 | $ 691.7 |
| Managed Care | 37.7 | 39.1 | 40.9 | 43.3 |
| Private | 6.3 | 6.5 | 6.8 | 7.0 |
| Assisted Living | 0.0 | 0.0 | 0.0 | 0.0 |
| Hospice & VA | 2.3 | 2.3 | 2.4 | 2.5 |
| Medicaid | 44.2 | 46.3 | 48.2 | 50.4 |
| Medicare B | 0.8 | 0.8 | 0.8 | 0.8 |
| Other Revenue | 78.8 | 80.2 | 81.4 | 82.6 |
| **Total Revenues** | **$ 768.1** | **$ 805.4** | **$ 842.6** | **$ 878.3** |
| **Operating Expenses** | | | | |
| Nursing | $ 169.7 | $ 175.2 | $ 182.6 | $ 190.2 |
| Ancilliary | 65.4 | 66.2 | 68.9 | 71.6 |
| Dietary | 5.4 | 5.5 | 5.6 | 5.8 |
| Utilities | 2.0 | 2.0 | 2.0 | 2.1 |
| Maintenance | 1.0 | 1.1 | 1.1 | 1.1 |
| Laundry | 0.6 | 0.6 | 0.6 | 0.6 |
| Housekeeping | 1.7 | 1.7 | 1.7 | 1.8 |
| Activities | 43.7 | 50.0 | 52.2 | 54.5 |
| Administrative | 172.3 | 174.9 | 182.5 | 190.4 |
| Other Expenses | 144.5 | 153.5 | 158.1 | 162.9 |
| **Total Operating Expenses** | **$ 606.3** | **$ 630.6** | **$ 655.4** | **$ 681.1** |
| **Total Contribution Margin** | **$ 161.8** | **$ 174.8** | **$ 187.2** | **$ 197.2** |
| **Other Operating Expenses** | | | | |
| Insurance | $ 3.9 | $ 3.9 | $ 4.0 | $ 4.1 |
| Non-Income Taxes | 2.7 | 2.9 | 2.9 | 3.0 |
| Lease Expenses | 12.4 | 12.7 | 12.9 | 13.2 |
| **Total Other Operating Expenses** | **$ 18.9** | **$ 19.4** | **$ 19.8** | **$ 20.3** |
| **Total Operating Income** | **$ 143.0** | **$ 155.4** | **$ 167.4** | **$ 177.0** |
| *OI%* | *18.6%* | *19.3%* | *19.9%* | *20.1%* |
| Allocated General & Administrative Costs | $ 32.5 | $ 31.8 | $ 32.6 | $ 34.2 |
| **Consolidated Earnings Before Interest, Tax, Depreciation and Amortization** | **$110.5** | **$123.6** | **$134.7** | **$142.8** |
| **Other Income and (Expenses)** | | | | |
| *Equity Earnings from JV* | $ 8.6 | $ 8.4 | $ 8.4 | $ 8.4 |
| *Capital Expenditure* | (6.9) | (7.9) | (9.1) | (10.5) |
| **Cash Generation Prior To Working Capital Adjustments and Interest** | **$ 112.1** | **$ 124.1** | **$ 134.0** | **$ 140.7** |

(1) Fiscal Period 2018 includes provisional unaudited financial information for January 2018 together with Financial Projections for February 2018 to December 2018