## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HCR MANORCARE, INC.,[1] | Case No. 18-_____ (___) |
| Debtor. | |

## DEBTOR'S MOTION FOR ENTRY OF AN ORDER WAIVING
## APPOINTMENT OF PATIENT CARE OMBUDSMAN PURSUANT TO 11 U.S.C. § 333

HCR ManorCare, Inc., the above-captioned debtor and debtor in possession (the "Debtor" and, together with its non-debtor affiliates, the "Company") submits this motion (this "Motion"), pursuant to section 333 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and rule 2007.2 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) finding that the appointment of a patient care ombudsman is unnecessary in this chapter 11 case and (ii) granting related relief. In support of this Motion, the Debtor submits the *Declaration of John R. Castellano, Chief Restructuring Officer of HCR ManorCare, Inc., in Support of the Debtor's Chapter 11 Petition and First Day Motions* (the "Castellano Declaration"), filed contemporaneously herewith and incorporated herein by reference. In further support of this Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1.      The Debtor believes that the requirements of section 333 of the Bankruptcy Code regarding appointment of a patient care ombudsman do not apply to the Debtor in this case.

---

[1] The last four digits of the Debtor's federal tax identification number are 9231. The Debtor's mailing address is 333 N. Summit St., Toledo, OH 43604.

[2] Certain capitalized terms used in this Preliminary Statement, including the definitions of the Long-Term Care Business, the 4H Business, and the Outpatient Rehab and Other Businesses, are defined below.

The Debtor is a holding company that does not conduct any direct business operations. The Debtor is not licensed to provide health care services nor is it certified to participate in the Medicare or Medicaid programs. As such, the Debtor is not a "health care business" as defined by section 101(27A) of the Bankruptcy Code and, therefore, the provisions of section 333 are not applicable to the Debtor. See 11 U.S.C. §§ 101(27A), 333.

2.      Even if section 333 were applicable, the Debtor respectfully submits that the facts and circumstances of this case justify the Court's exercise of its discretion to decline to appoint an ombudsman because "such ombudsman is not necessary for the protection of patients under the specific facts of the case." See 11 U.S.C. § 333(a)(1). As discussed in detail below, the health care businesses of the Company are conducted entirely by separately licensed and certified non-debtor operating entities that provide health care services to patients (the "Non-Debtor Providers"), and are not part of this bankruptcy proceeding. Consequently, the Non-Debtor Providers will continue to operate the Company's businesses and provide compliant patient-centered quality care as usual during the pendency of the Debtor's case, and appointment of a patient care ombudsman is not necessary for the protection of the Non-Debtor Providers' patients.

3.      Moreover, the Debtor is filing this Motion contemporaneously with a prepackaged plan of reorganization (the "Plan"), which reflects a consensual long-term resolution of the financial issues between the Company and Quality Care Properties, Inc. ("QCP"), which, together with certain of its affiliates, is the lessor of approximately 98% of the Company's skilled nursing and assisted living facilities. The Plan provides for a consensual, orderly transition of ownership of the Company to QCP in full satisfaction of QCP's claims against the Debtor. The Plan does not impair the Debtor's other creditors. QCP, the sole

impaired creditor entitled to vote on the Plan, has voted to accept the Plan through the prepetition solicitation process.  Additionally, the Debtor seeks to confirm this chapter 11 case on an expedited basis.  The consensual and expedited nature of this case further supports the Court's exercise of its discretion not to appoint a patient care ombudsman.

4.      The state and federal regulatory and licensing authorities that are charged with monitoring patient care, as well as an independent health care accreditation association, will continue to adequately protect the patients and residents of the Non-Debtor Providers. Specifically, several governmental authorities and programs, including the Centers for Medicare and Medicaid Services ("CMS"), the respective state survey agencies that carry out the CMS certification process and enforce standards (collectively, the "State Survey Agencies") for each state in which the Non-Debtor Providers operate, state licensing agencies, state long-term care ombudsmen, and Medicaid fraud control units, as well as the Accreditation Commission for Health Care (the "ACHC") with respect to the 4H Business—already provide significant and stringent oversight of the health and well-being of such patients.  The regulation of the Non-Debtor Providers by these authorities will not be impacted by this chapter 11 case and will continue in the ordinary course.  Moreover, HCR ManorCare Services, LLC ("HCR Services"), a non-debtor, non-provider subsidiary of the Debtor, already provides extensive internal administrative support services to the Non-Debtor Providers through an administrative support services agreement with each of the Non-Debtor Providers, as further described below.  The administrative support services provided by HCR Services include extensive internal resources provided to maintain and enhance the quality of patient care and will continue unaffected by this chapter 11 case.

5.      Additionally, the Debtor does not anticipate material changes in the daily operations of the Non-Debtor Providers during this chapter 11 case.[3]  At the core of the Company's operations is a stable, loyal workforce of approximately 50,000 employees, more than 10,000 of whom have been employed with the Company for ten or more years.  For these reasons and the reasons set forth below, in the event the Court determines that section 333 of the Bankruptcy Code applies, the Debtor respectfully requests that this Court exercise its discretion, pursuant to section 333(a)(1) of the Bankruptcy Code, to find that appointment of a patient care ombudsman is not necessary for the protection of patients under the specific facts of this chapter 11 case.

## STATUS OF THE CASE AND JURISDICTION

6.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues, through its direct and indirect non-debtor subsidiaries, to operate the Company's businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in this case, and no statutory committee has been appointed.

7.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtor confirms its consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or

---

[3] The Debtor's Board of Directors (the "Board") appointed John R. Castellano of AlixPartners as the Chief Restructuring Officer of the Debtor, effective as of August 31, 2017, to work with the Board and management to provide restructuring advice and lead a restructuring process.  Shortly thereafter, on September 14, 2017, the Board unanimously resolved to appoint two independent directors to the Board and established a special committee for such directors in connection with exploring potential restructuring options.

judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory and other bases for the relief requested in this Motion are section 333 of the Bankruptcy Code and Bankruptcy Rule 2007.2.

**THE PREPACKAGED PLAN OF REORGANIZATION**

10.     Concurrently with this Motion, the Debtor filed the Plan and a related disclosure statement.  The Debtor has also filed a motion seeking to schedule (i) a combined hearing for the Court to consider approval of the disclosure statement and the prepetition solicitation procedures, as well as confirmation of the Plan and (ii) related objection and other deadlines.  The only class of creditors entitled to vote on the Plan has voted unanimously in favor of confirming the Plan.

**BACKGROUND OF THE COMPANY**

11.     Additional information regarding the Debtor, the Company's business segments, and the events preceding the Petition Date may be found in the Castellano Declaration.

**DESCRIPTION OF THE COMPANY'S OPERATIONS AND REGULATIONS**

I.      **Overview of Company Services**

12.     The Debtor is a holding company with no material assets other than its direct and indirect ownership interests in operating and non-operating subsidiaries within the Company. The Company is a national healthcare leader that, through the Non-Debtor Providers, operates a network of more than 450 locations nationwide across the following business segments: (a) skilled nursing and inpatient rehabilitation facilities, memory care facilities, and assisted living facilities (collectively, the "Long-Term Care Business"); (b) hospice and home health care agencies (the "4H Business"); and (c) outpatient rehabilitation clinics and other ancillary

01:22949835.1

healthcare and related businesses (the "Outpatient Rehab and Other Businesses").  As detailed below, the Non-Debtor Providers are subject to strict and comprehensive federal and state regulations pertaining to patient care.  The Facilities, the 4H Agencies, and the Outpatient Rehab Clinics (each as defined below) and the associated services within these business segments have been recognized for their delivery of high quality care, both through objective metrics and independent review.

> ### A.     Long-Term Care Business

13.     As of the Petition Date, the Long-Term Care Business operates 295 skilled nursing and rehabilitation facilities (each, a "SNF") and memory care or assisted living facilities (each, an "ALF" and collectively with the SNFs, the "Facilities") in twenty-five (25) states, with the majority of such Facilities located in Florida, Illinois, Michigan, Ohio, and Pennsylvania.[4] The SNFs operate primarily under the Heartland Health Care Center® and ManorCare Health Services® brands, and the ALFs operate primarily under the Arden Courts® brand.  The SNFs treat a wide range of patients who are transitioning from hospital to home or to a lower level of care.  The SNFs also include rehabilitation units, which are separate and distinct units within Heartland and ManorCare SNFs designed for patients' rehabilitation after shorter hospital stays. The ALFs primarily provide specialized memory care in a residential environment designed exclusively for patients living with dementias such as Alzheimer's disease.  The Long-Term Care Business treated more than 143,000 patients in 2017.  The Company has made significant investments in the SNFs' post-acute clinical capabilities, clinical support systems, and specialty programs to treat patients requiring intensive rehabilitation, as well as focusing on the coordination and integration of care between acute care and post-acute care providers.

---

[4] As stated in the Castellano Declaration, non-debtor HCR III Healthcare, LLC leases 289 of the 295 Facilities pursuant to a long-term, "triple-net" master lease agreement.  For purposes of this Motion, the term "Facilities" refers to all SNFs and ALFs without regard to lessor.

Additionally, SNF staffing levels are scheduled at or above the required state minimum staffing standards.

14.    The ALFs are designed for individuals who require assistance with activities of daily living but do not require care in a SNF.  The ALFs include facilities that provide specialized memory care in a residential environment designed exclusively for patients living with dementias such as Alzheimer's disease, in addition to facilities that offer various long-term residential options featuring varying levels of care and independence for residents.  Staffing levels are scheduled at or above any applicable required state minimum staffing standards for ALFs.

### B.    4H Business

15.    As of the Petition Date, the 4H Business operates out of more than 100 offices and agencies located in twenty-three (23) states (each, a "4H Agency"), and provides certain hospice and home health services in home settings.  The 4H Business is comprised of two primary lines of business.  First, "Home Health Care" provides nursing and rehabilitation services to patients at home or in independent or assisted living facilities.  Home Health Care provides services to patients who have been certified by a physician as home-bound and require the services of a registered nurse, occupational therapist, or physical therapist.  Home Health Care also provides non-skilled nursing services such as companion care and/or assistance with daily living activities that are not covered by Medicare.  Second, "Hospice" serves patients in their last six months of life.  Caregivers including physicians, registered nurses, social workers, licensed practical nurses, and spiritual advisers provide services to help manage patients' pain and symptoms.

01:22949835.1

7

### C.    Outpatient Rehabilitation and Other Businesses

16.    The licensed therapists in the Company's fifty-two (52) outpatient rehabilitation clinics (the "Outpatient Rehab Clinics"), which are operated through non-debtor Heartland Rehabilitation Services, LLC, provide comprehensive programs in sports medicine and industrial, pediatric, physical, occupational, speech, and orthopedic therapy for patients recovering from major surgery, strokes, heart attacks, neurological, and orthopedic conditions, and other illnesses, injuries, and disabilities.  The Outpatient Rehab Clinics are operated under the Heartland Rehabilitation Services® brand and are primarily located in Florida, Kentucky, New Jersey, Ohio, and Virginia.  Professional physical therapists, occupational therapists, and speech therapists are each individually licensed in and regulated by the respective states in which they work.    In addition to the Outpatient Rehab Clinics, the Company also provides comprehensive outpatient rehabilitation services through certain SNFs and in homes, schools, hospitals, and third-party independent and assisted living facilities.

## II.    Government Regulations Affecting the Company

17.    Each of the Company's business segments, including the Long-Term Care Business, is highly regulated and subject to oversight by a number of federal and/or state regulatory and licensing authorities.  Specifically, several governmental authorities and programs provide significant and stringent oversight of the Non-Debtor Providers and the services they provide to patients, including CMS, the State Survey Agencies for each state in which the Company operates, state licensing agencies, state long-term care ombudsmen, and Medicaid fraud control units.[5]

---

[5] For purposes of the following discussion, it should be noted that the ALFs are not subject to CMS federal regulations, and only certain of the ALFs are subject to Medicaid regulations.

A.     **Federal Regulations—CMS**

18.     Each of the Non-Debtor Providers—specifically, the individual SNFs, the 4H Agencies, and the Outpatient Rehab Clinics—are independently and individually certified as Medicare and Medicaid providers.  The SNFs and the 4H Agencies are also subject to various CMS regulations, including the Medicare Conditions of Participation (the "Conditions of Participation"), which are evaluated through regular surveys, Conditions for Coverage, and billing rules.  The Conditions of Participation are certain health and safety standards related to ethics, provision of care treatment, medication management, environment of care, and human resources, among other categories.   SNFs and 4H Agencies that do not comply with the Conditions of Participation risk sanctions or losing certification for Medicare and Medicaid reimbursement, which are vital sources of revenue across the Company's business segments.  It is essential that the Non-Debtor Providers focus on providing compliant, patient-centered quality care in compliance with the Conditions of Participation and the health and safety standards established therein.

19.     The SNFs' compliance with applicable federal quality standards are assessed through surveys by the State Survey Agencies in each state in which the SNFs operate.  For example, the applicable State Survey Agency regularly evaluates each SNF through surveys conducted by qualified health professionals, which involve regular unannounced visits to the SNFs to determine whether and how each SNF satisfies the CMS standard.  Surveys are aided in certain states by CMS's Quality Indicator Survey, a computer-assisted long-term care survey process used by selected State Survey Agencies and CMS.  Among many others, SNFs are surveyed on categories including, but not limited to, infection control, kitchen, dining, nutrition, medication administration and storage, staffing, activities of daily living, management of behavioral and emotional needs, pain management, management of resident trust funds, and

protection from abuse and neglect.  State Survey Agencies communicate the certification results to the applicable CMS regional office, which determines whether a facility is eligible to participate in the Medicare and Medicaid programs.

20.     CMS has also implemented Five-Star Quality Rating Systems for nursing homes and home health care and hospice providers to help consumers, their families, and caregivers compare providers and provide increased transparency and data to the public.  For example, CMS calculates SNF star ratings based on three domains: health inspection results, staffing, and quality measures.  CMS uses a formula to provide an overall star rating as well.  The health inspection rating contains information from the previous three years of onsite inspections by trained inspectors, who go onsite to evaluate whether a SNF has met Medicare and Medicaid's minimum quality requirements.  As of the end of 2017, the SNFs had an average star rating of 4.52, with 87.1% of SNFs maintaining a four- or five-star rating as such relates to quality measures of the rating system.  Similarly, the 4H Agencies are subject to a quality rating system, with ratings and data publicly available for Home Health Care on Medicare's home health care comparison website.  The star rating system is based on a variety of sources, including outcome and assessment information sets reported to CMS, Medicare claims data, and patient experience surveys.  Hospice is also subject to hospice quality reporting requirements, with penalties for hospice centers that fail to report, and a quality star rating system publicly available online through Medicare's website.

21.     In addition to these regulations, both the Hospice and Home Health Care lines of the 4H Business are fully accredited by ACHC, which offers a CMS-approved accreditation program.  Accreditation through a national accreditation organization such as ACHC is voluntary and is not required for Medicare certification, although the Secretary of the United States

Department of Health and Human Services may deem all certification requirements met if an accreditation body demonstrates that a provider has met or exceeded all applicable conditions.

### B.    State Regulations

22.    State authorities also heavily regulate the Non-Debtor Providers in the ordinary course of business.  With operations in thirty (30) states, the Non-Debtor Providers within the Long-Term Care Business, the 4H Business, and the Outpatient Rehab and Other Businesses are subject to a wide array of state monitoring and inspection programs from various regulatory agencies and organizations in each state, such as State Survey Agencies, state departments of health services, state licensing agencies, state long-term care ombudsman programs, and Medicaid fraud control units.  In particular, the state long-term care ombudsman program is available in each state the Non-Debtor Providers operate in and protects the rights of older persons who live in long-term care facilities.  Pursuant to the federal Older Americans Act, 42 U.S.C. §§ 3001–3058ff, and various state laws, each state is mandated to have an ombudsman program in place that addresses patient complaints and protects and promotes the rights and quality of life for people who reside in long-term care facilities.  This mandate is implemented through regional ombudsmen, who maintain a working relationship with the residents and staff of the facilities within their program areas.

23.    Internal resources are dedicated to maintaining substantial compliance with the requirements of applicable federal and state regulatory agencies, and ensuring that any identified deficiency is promptly corrected.

### III.    The Company's Internal Standards for Patient Care and Safety

24.    In addition to federal and state oversight, HCR Services provides extensive internal support resources to the Non-Debtor Providers for monitoring and safeguarding the quality of patient care.  These support services will continue during this chapter 11 case.

01:22949835.1

Examples of available resources within the overall corporate compliance program (the "Compliance Program") are as follows:

(a) **HCR ManorCare Independent Advisory Committee on Quality**: The HCR ManorCare Independent Advisory Committee on Quality is appointed by and reports regularly to the Board's quality committee. Its sole function is to provide advice and recommendations to enhance the quality of care and services provided by the Non-Debtor Providers. It is comprised of professionals in health policy and academia.

(b) **Compliance Committee**: The Compliance Committee consists of the Company's Chief Compliance Officer and other top management and reports to the Board's audit committee. It is responsible for developing health care and privacy-related compliance policies, conducting internal investigations, and recommending corrective actions.

(c) **HCR ManorCare Standards of Business Conduct**: The HCR ManorCare Standards of Business Conduct sets forth the Company's legal and ethical standards by which employees conduct the business affairs of the Company.

(d) **Auditing and Monitoring**: The Company's Internal Audit Department conducts periodic audits of the operations of each Company business unit on behalf of the Board's audit committee and reports the results to management on a regular basis.

(e) **Education and Training**: HCR Services provides extensive education and training on the Compliance Program for employees at the Non-Debtor Providers, including ongoing training and guidance on specific health care regulatory requirements and federal and state clinical education requirements through "HCR ManorCare University."

(f) **Communication**: The Company maintains a variety of communication mechanisms, including the maintenance of the HCR ManorCare Care Line, a telephone number and email address by which employees, patients, and relatives may report (anonymously if they wish) patient care and safety issues for investigation and corrective action, as appropriate.

(g) **Internal Investigations**: Internal compliance investigations are conducted with the assistance of the Legal Department, as appropriate.

## RELIEF REQUESTED

25.     By this Motion, which the Debtor has filed out of an abundance of caution, the Debtor requests entry of the Proposed Order, substantially in the form attached hereto as

**Exhibit A**, (i) finding that the appointment of a patient care ombudsman is not necessary for the protection of patients in this chapter 11 case, and (ii) granting related relief.

## BASIS FOR RELIEF

26.     Section 333(a)(1) of the Bankruptcy Code provides as follows:

> "If the debtor . . . is a health care business, the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business *unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case*."

11 U.S.C. § 333(a)(1) (emphasis added).  Under section 333(a)(1) of the Bankruptcy Code, the appointment of a patient care ombudsman is required only if (a) the debtor is a health care business <u>and</u> (b) under the specific facts of the case, appointment of an ombudsman is necessary for the protection of patients.  11 U.S.C. § 333(a)(1).  The Debtor believes it is not a health care business and the requirements of section 333 are not applicable for the reasons described herein.  However, in the event the Court disagrees, the Debtor respectfully submits that appointment of an ombudsman is not necessary for the protection of patients based on the facts and circumstances of this chapter 11 case and the Court, therefore, should exercise its discretion to waive the appointment of an ombudsman for the reasons that follow.

**I.     The Debtor Is Not a "Health Care Business" as Defined by Section 101(27A) of the Bankruptcy Code**

27.     Section 101(27A) of the Bankruptcy Code defines a "health care business," in relevant part, as "any public or private entity . . . that is primarily engaged in offering to the general public *facilities and services* for (i) the diagnosis or treatment of injury, deformity, or disease and (ii) surgical, drug treatment, psychiatric, or obstetric care."  11 U.S.C. § 101(27A) (emphasis added).  The Debtor in this chapter 11 case is the indirect parent and holding company of the Non-Debtor Providers that engage in operating the Company's health care businesses and

providing care to patients.  The Debtor has no material assets (other than the stock of its direct

subsidiary), no operations, and no revenues, and thus does not provide "facilities and services" to

the general public within the definition of section 101(27A) of the Bankruptcy Code.[6]  Indeed,

the Debtor is not licensed to provide health care services nor is it certified to participate in the

Medicare and Medicaid programs.  Consequently, the Debtor is not a "health care business"

within the meaning of section 101(27A) and section 333 of the Bankruptcy Code does not apply.

## II.  Appointment of a Patient Care Ombudsman Is Not Necessary to Protect Patients

28.  Even if section 333 of the Bankruptcy Code does apply (which it does not),

appointment of a patient care ombudsman is not necessary for the protection of patients of the

Non-Debtor Providers for the following reasons: (a) the Debtor commenced this chapter 11 case

to implement the wholly consensual Plan—not for reasons related to the quality of patient care—

and the Debtor anticipates achieving confirmation of the Plan in an expedited timeframe;

(b) various federal and state regulatory agencies have—and during the pendency of this case,

will continue to have—jurisdiction over the rights of and care provided to the patients of the

Non-Debtor Providers given that the Company is operated by such Non-Debtor Providers that

are separately licensed and certified, and given the Debtor's status as a non-operating holding

company; (c) the Non-Debtor Providers maintain a strong patient care record above and beyond

industry standards and possess the financial ability to continue providing high quality care; and

(d) patients retain the ability to protect their rights and lodge complaints with relevant

governmental agencies, and HCR Services provides robust support services for the Non-Debtor

Providers as detailed above, which will remain in place during this chapter 11 proceeding.

Furthermore, the fees and expenses that would be incurred by an ombudsman and his or her

---

[6] See, e.g., In re MF Global Holdings Ltd., 465 B.R. 736, 739–43 (Bankr. S.D.N.Y. 2012) (finding that even though a non-debtor affiliate was a "commodity broker" under the Bankruptcy Code, certain of the debtor affiliates, including the parent and holding company, were not).

professionals, if any, would be unnecessary and duplicative in light of the Non-Debtor Providers'
internal patient care expertise, existing patient care staff and resources, and their substantial
internal compliance procedures.

29.    Following the factors set forth by the court in Alternate Family Care, courts apply
a balancing test that incorporates nine non-exclusive factors to weigh the necessity of a patient
care ombudsman:

> (a) the cause of the bankruptcy; (b) the presence and role of
> licensing or supervising entities; (c) the debtor's past history of
> patient care; (d) the ability of the patients to protect their rights; (e)
> the level of dependency of the patients on the facility; (f) the
> likelihood of tension between the interests of the patients and the
> debtor; (g) the potential injury to patients if the debtor drastically
> reduced its level of patient care; (h) the presence and sufficiency of
> internal safeguards to ensure an appropriate level of care; and (i)
> the impact of the cost of an ombudsman on the likelihood of a
> successful reorganization.

In re Alternate Family Care, 377 B.R. 754, 758 (Bankr. S.D. Fla. 2007).

30.    The weight accorded to each of the Alternate Family Care factors is committed to
the sound discretion of the bankruptcy court.  See, e.g., In re Denali Family Servs., No. A13-
00114-GS, 2013 WL 1755481, at *2–4 (Bankr. D. Alaska 2013) (determining ombudsman
unnecessary for provider of juvenile behavioral health services where patient care issues did not
precipitate the bankruptcy, there was no evidence that patient care would be jeopardized during
the chapter 11 cases, and internal patient care monitoring procedures and external regulatory
oversight existed); In re N. Shore Hematology-Oncology Assocs., P.C., 400 B.R. 7, 11 (Bankr.
E.D.N.Y. 2008) (declining to appoint an ombudsman given debtor's formal federal compliance
program, internal procedures to address complaints, ability to pay for patient treatment, and
overall lack of patient complaints); In re Valley Health Sys., 381 B.R. 756, 761–64 (Bankr. C.D.
Cal. 2008) (determining that ombudsman for skilled nursing facility operator unnecessary given

lack of evidence of any patient care or privacy concerns, debtor's history of patient care, presence of strong internal controls, and extensive external oversight); In re Saber, 369 B.R. 631, 637–38 (Bankr. D. Colo. 2007) (declining to appoint patient care ombudsman where debtor's bankruptcy filing was unrelated to patient care); In re Total Woman Healthcare Ctr., P.C., No. 06-52000, 2006 WL 3708164, at *4–6 (Bankr. M.D. Ga. Dec. 14, 2006) (declining to appoint ombudsman because patients had not been adversely affected by bankruptcy filing).[7]

31.     First, as noted above, the Debtor's filing is unrelated to any deficiencies in patient care by the Non-Debtor Providers.    Instead, as discussed above and in the Castellano Declaration, the Debtor has commenced this case to confirm and implement the consensual Plan, on an expedited timeframe, in order to preserve the value of the Company for the benefit of all its stakeholders and continue to provide industry-leading care to the Non-Debtor Providers' patients in the ordinary course.    These facts weigh against the appointment of a patient care ombudsman.    See, e.g., In re Denali Family Servs., 2013 WL 1755481, at *3 (holding ombudsman unnecessary where "[debtor's] bankruptcy was precipitated by discovery of substantial unpaid federal employment taxes rather than patient care issues"); In re Saber, 369 B.R. at 637 (finding that bankruptcy was not precipitated by patient care quality or privacy concerns); In re Total Woman, 2006 WL 3708164, at *2 (finding that debtor's primary obligations for taxes did not arise from deficient patient care).

32.     Second, the Non-Debtor Providers' operations are subject to oversight by numerous governmental and regulatory authorities at both the federal and state level, including but not limited to CMS and the respective State Survey Agencies for each of the thirty (30) states

---

[7] In addition to the Alternate Family Care factors, a court may consider "(1) the high quality of the debtor's existing patient care; (2) the debtor's financial ability to maintain high quality patient care; (3) the existence of an internal ombudsman program to protect the rights of patients, and/or (4) the level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant." In re N. Shore, 400 B.R. at 11; In re Valley Health, 381 B.R. at 762.

in which the SNFs, the ALFs, and the 4H Agencies operate, state departments of health, state licensing agencies, state long-term care ombudsmen, Medicaid fraud control units, and ACHC. Moreover, given that the Long-Term Care Business, the 4H Business, and the Outpatient Rehab and Other Businesses will continue to be operated by the Non-Debtor Providers, the licensing and certification process will continue unabated in the ordinary course despite this chapter 11 case regardless of whether an ombudsman is appointed. The continued oversight of these federal and state regulatory authorities also weighs against the appointment of a patient care ombudsman. See, e.g., In re Denali Family Servs., 2013 WL 1755481, at *3 (finding that "appointment of an ombudsman would be redundant" where the debtor was already subject to governmental supervision of its patient care); In re Valley Health, 381 B.R. at 761–62 (monitoring by multiple federal and state agencies weighed against appointment of ombudsman).

33.    Third, the Company maintains a strong patient care record through the Non-Debtor Providers, and possesses the financial and organizational ability to continue to provide this level of patient care during this chapter 11 case through the Non-Debtor Providers. As discussed above, the patient care ratings of the Non-Debtor Providers exceed industry averages in a variety of categories. Given the revenue stream into the Company as a whole, the Debtor possesses the financial ability to maintain high-quality patient care through the Non-Debtor Providers currently operating the SNFs, ALFs, 4H Agencies, and Outpatient Rehab Clinics. The Non-Debtor Providers' history of strong patient care along with their financial ability to maintain a high level of patient care weighs against appointing a patient care ombudsman. See In re N. Shore, 400 B.R. at 13 (finding appointment of ombudsman unnecessary where debtor had financial ability to continue to pay for patient treatments and history of strong patient care practices); In re Saber, 369 B.R. at 638 (finding against appointment of ombudsman where

debtor presented positive cash flow in its financial projections during the bankruptcy case, which demonstrated a lack of patient care concerns).

34.     <u>Fourth</u>, in addition to the high quality of care that the Non-Debtor Providers deliver, patients possess the ability to protect their rights through multiple channels, and are protected by the oversight of regulatory agencies in thirty (30) states.  These robust internal controls are reflected in the Non-Debtor Providers' longstanding track record of strong patient care and weigh against the need for a patient care ombudsman, which would be duplicative of existing programs.  <u>See, e.g.</u>, <u>In re Denali Family Servs.</u>, 2013 WL 1755481, at *4 (debtor's internal monitoring program weighed against appointing ombudsman); <u>In re N. Shore</u>, 400 B.R. at 13 (ability of patient to file complaint with the state medical board and the debtor's procedures to address complaints were relevant to the court's decision not to appoint a patient care ombudsman); <u>In re Valley Health</u>, 381 B.R. at 763 (debtor's existing hospital compliance procedures and patient safeguards were "comprehensive and redundant," weighing heavily against ombudsman appointment).

35.     <u>Finally</u>, appointing an ombudsman would entail the expenditure of substantial unnecessary expense when such efforts would be duplicative of the existing external regulatory regime and internal safeguards at the Company.  The fees incurred by an ombudsman and its professionals would only further constrain the Debtor's available cash and reduce the value of the Debtor's estate without materially enhancing patient health and safety.  This too weighs against the appointment of a patient care ombudsman.  <u>See, e.g.</u>, <u>In re Valley Health</u>, 381 B.R. at 764–65 (finding that ombudsman would duplicate debtor's internal monitor and external state regulatory monitoring).

36.     Moreover, in addition to the fully consensual nature of this prepackaged chapter 11 case, the expedited anticipated timing upon which the Debtor must achieve confirmation of the Plan minimizes any potential role for a patient care ombudsman.  The Debtor's Plan provides for payment in full of any general unsecured creditors and was accepted by the sole impaired voting class.  Contemporaneously with the filing of this Motion, the Debtor has filed a motion to schedule a combined hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan.  If such hearing is scheduled, the Debtor may achieve confirmation of the Plan within forty (40) days of the Petition Date.  In the time likely required for a patient care ombudsman to become familiar with the Non-Debtor Providers' operations and prepare reporting regarding such operations, the Debtor anticipates it will already have achieved confirmation of the Plan.  During the period between confirmation of the Plan and the receipt of regulatory approval necessary for the Plan to become effective (which the Debtor estimates may take three to six months), the Non-Debtor Providers will continue to be governed by the existing extensive regulatory regimes and internal resources discussed in detail above, obviating any need for the appointment of a patient care ombudsman.  Indeed, the regulatory approval process will scrutinize the very same factors that would otherwise be reported by a patient care ombudsman.

37.     In sum, the quality of patient care provided by the Non-Debtor Providers was not the impetus for this case, and the Debtor does not believe that the patient care provided by the Non-Debtor Providers will be negatively impacted during this chapter 11 case.  Ample safeguards for the protection of patients already exist, and the appointment of a patient care ombudsman would only saddle the Debtor's estate with additional administrative expense that would bring no added benefit to the Debtor, its creditors, the estate, or the patients of the Non-

Debtor Providers.  Under similar circumstances, courts both in and outside of this District have

found that appointment of an ombudsman was unnecessary for the protection of patients.[8]

### III.    Subsequent Appointment of a Patient Care Ombudsman Is Within the Court's Discretion

38.    Additionally, Bankruptcy Rule 2007.2(b) states that "[i]f the court has ordered

that appointment of an ombudsman is not necessary . . . the court, on motion of the United States

trustee or a party in interest, may order the appointment at any time during the case if the court

finds that the appointment of an ombudsman is necessary to protect patients."  Fed. R. Bankr. P.

2007.2(b); see, e.g., In re Valley Health, 381 B.R. at 765–66 ("[T]he court . . . may order the

appointment of a patient care ombudsman at any time during the pendency of this case if the

court finds a change in circumstances or newly discovered evidence that demonstrates the

necessity of an ombudsman to monitor the quality of patient care and protect the interests of

patients.").  Therefore, if at any time the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee") or any other party in interest believes that patient care is at risk,

they are not without recourse and may request that this Court reevaluate its decision not to

appoint a patient care ombudsman.

### NOTICE

39.    Notice of this Motion will be provided to (i) the U.S. Trustee; (ii) the holders of

the thirty (30) largest unsecured claims against the Debtor; (iii) counsel to QCP; (iv) counsel to

the administrative agent under the Company's prepetition credit facility; (v) counsel to The

Carlyle Group; (vi) CMS; (vii) the U.S. Attorney's Office for the District of Delaware; (viii) the

---

[8] See, e.g., In re Timothy Place, NFP, Case No. 16-01336 (JPC) (Bankr. N.D. Ill. Feb. 16, 2016); In re Amsterdam House Continuing Care Ret. Cmty., Inc., Case No. 14-73348 (AST) (Bankr. E.D.N.Y. Aug. 12, 2014); In re Devonshire PGA Holdings, LLC, Case No. 13-12460 (CSS) (Bankr. D. Del. Oct. 17, 2013); In re The Clare at Water Tower, Case No. 11-46151 (SPS) (Bankr. N.D. Ill. Dec. 7, 2011); In re N. Shore Hematology-Oncology Assocs., P.C., Case No. 08-76389 (AST) (Bankr. E.D.N.Y. Dec. 11, 2008); In re Alternate Family Care, Case No. 07-18203 (RBR) (Bankr. S.D. Fla. Oct. 30, 2007); In re Valley Healthcare Sys., Case No. 07-18293 (PC) (Bankr. C.D. Cal. Jan. 11, 2008).

Internal Revenue Service; (ix) the U.S. Department of Justice; and (x) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtor respectfully requests entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated: March 4, 2018               SIDLEY AUSTIN LLP
Wilmington, Delaware           Larry J. Nyhan
                             Dennis M. Twomey
                             William A. Evanoff
                             Allison Ross Stromberg
                             Matthew E. Linder
                             One South Dearborn Street
                             Chicago, Illinois 60603
                             Telephone:  (312) 853-7000
                             Facsimile:  (312) 853-7036

                                   -and-

                             YOUNG CONAWAY STARGATT & TAYLOR, LLP

                             */s/ Edmon L. Morton*
                             Robert S. Brady (No. 2847)
                             Edmon L. Morton (No. 3856)
                             Justin H. Rucki (No. 5304)
                             Tara C. Pakrouh (No. 6192)
                             Rodney Square
                             1000 North King Street
                             Wilmington, Delaware 19801
                             Telephone:  (302) 571-6600
                             Facsimile:  (302) 571-1253

                             PROPOSED ATTORNEYS FOR THE DEBTOR AND
                             DEBTOR IN POSSESSION

**<u>Exhibit A</u>**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| HCR MANORCARE, INC.,[1] | Case No. 18-_____ (___) |
| Debtor. | **Ref. Docket No. ___** |

## ORDER WAIVING APPOINTMENT OF PATIENT
## CARE OMBUDSMAN PURSUANT TO 11 U.S.C. § 333

Upon the motion (the "Motion")[2] of the above-captioned debtor and debtor in possession

(the "Debtor") for the entry of an order (the "Order") finding that the appointment of a patient

care ombudsman is not necessary for the protection of patients in this chapter 11 case; and upon

consideration of the Castellano Declaration; and the Court having jurisdiction over this matter

pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United

States District Court for the District of Delaware, dated February 29, 2012; and this matter being

a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and the Court being able to issue

a final order consistent with Article III of the United States Constitution; and venue of this

proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409;

and appropriate notice of and the opportunity for a hearing on the Motion having been given; and

the relief requested in the Motion being in the best interests of the Debtor's estates, its creditors

and other parties in interest; and the Court having determined that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

---

[1] The last four digits of the Debtor's federal tax identification number are 9231. The Debtor's mailing address is 333 N. Summit St., Toledo, OH 43604.

[2] Capitalized terms used but not defined in herein shall have the meanings ascribed to such terms in the Motion.

1.      The relief requested in the Motion is GRANTED as set forth herein.

2.      The appointment of a patient care ombudsman pursuant to section 333 of the Bankruptcy Code is not necessary for the protection of patients under the current facts and circumstances of this chapter 11 case.

3.      The requirement to appoint a patient care ombudsman pursuant to section 333 of the Bankruptcy Code, to the extent applicable, is hereby waived.

4.      This Order is without prejudice to the right of any party to file a motion seeking to have a patient care ombudsman appointed in this case pursuant to section 333 of the Bankruptcy Code and Bankruptcy Rule 2007.2(b).

5.      Notice of this Motion shall be deemed good and sufficient notice of such Motion under the circumstances and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

6.      The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

7.      The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Dated: _____, 2018
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

01:22949835.1

2